## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CHEMOURS COMPANY FC, LLC, | |
| Plaintiff, | |
| v. | C. A. No. _____ |
| DAIKIN INDUSTRIES, LTD, DAIKIN AMERICA, INC., CRI-TECH, INC., and MDA MANUFACTURING, INC., | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

## COMPLAINT FOR PATENT INFRINGEMENT

For its Complaint against Defendants Daikin Industries, Ltd., Daikin America, Inc., Cri-Tech, Inc., and MDA Manufacturing, Inc. ("Defendants"), Plaintiff Chemours Company FC, LLC ("Chemours"), by its attorneys, alleges as follows:

### NATURE OF THE ACTION

1.      This is an action for infringement of United States Patent No. 7,122,609 (the "'609 patent") and United States Patent No. 8,076,431 (the "'431 patent") under 35 U.S.C. § 271.

### THE PARTIES

2.      Plaintiff Chemours Company FC, LLC is a Delaware limited liability corporation with a principal place of business at 1007 Market Street, Wilmington, Delaware 19899.

3.      Defendant Daikin Industries, Ltd. is a company organized and existing under the laws of Japan with a principal place of business at Umeda Center Bldg., 2-4-12, Nakazaki-Nishi, Kita-ku, Osaka 530-8323, Japan.

4.      Defendant Daikin America, Inc., a wholly owned subsidiary of Daikin Industries, Ltd., is a corporation organized and existing under the laws of the State of Delaware, with a

principal place of business at 20 Olympic Drive Orangeburg, New York 10962. Service upon Daikin America, Inc. may be made by serving its registered agent for service of process, The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

5.      Defendants Daikin Industries, Ltd. and Daikin America, Inc. derive manufacturing services from wholly owned subsidiaries Cri-Tech, Inc., a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 85 Winter Street, Hanover, MA 02339 and MDA Manufacturing, Inc., a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 905 State Docks Rd., Decatur, AL 35601. Service upon Cri-Tech, Inc. and MDA Manufacturing, Inc. may be made by serving their registered agent for service of process, The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

## JURISDICTION AND VENUE

6.      This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 100 *et seq.*  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

7.      This Court has personal jurisdiction over Daikin America, Inc., Cri-Tech, Inc., and MDA Manufacturing, Inc. because all three are Delaware corporations.

8.      On information and belief, this Court has personal jurisdiction over Daikin Industries, Ltd., under Delaware's long-arm statute, Del. Code Ann. tit. 10 § 3104, because Daikin Industries, Ltd. regularly does or solicits business in this jurisdiction, engages in other persistent courses of conduct in this jurisdiction, and/or derives substantial revenue from goods and services provided to persons or entities in Delaware.  On information and belief, Daikin Industries, Ltd., in concert with its United States subsidiaries, oversees a nationwide distribution network through

which it purposefully provides, directly or indirectly, sales and service of its products in the state of Delaware. On information and belief, Daikin Industries, Ltd. has established minimum contacts with the forum such that the exercise of jurisdiction over Daikin Industries, Ltd. would not offend traditional notions of fair play and substantial justice.

9.      Venue is proper in this District under 28 U.S.C. § 1400(b).

## FACTUAL BACKGROUND

10.     The patents-in-suit relate generally to a copolymer of tetrafluoroethylene and hexafluoropropylene in an amount corresponding to a hexafluoropropylene index (HFPI) of from about 2.8 to 5.3, polymerized and isolated in the absence of added alkali metal salts, with a melt flow rate of about 30 +/- 3 g/10 min, and having no more than about 50 unstable endgroups/$10^6$ carbon atoms.

11.     The claimed copolymer is a novel type of fluorinated ethylene-propylene polymer ("FEP"). Before the present invention, a number of FEPs existed but they were incapable of being extruded at high speeds while still producing a high quality wire coating. High-speed extrusion is beneficial because it allows for more efficient use of the wire coating equipment and greater productivity.

12.     FEPs extruded at high speeds are susceptible to two primary flaws that can render the resulting FEP coated wire commercially unusable: spark failures and lumps. A variety of factors contribute to the presence of these flaws. For example, the presence of alkali metal salt in the FEP contributes to the formation of lumps. *See* **Exhibit A** ('609 patent) at 3:6-16.

13.     The inventors developed a novel FEP comprised of tetrafluoroehylene and hexafluoropropylene in an amount corresponding to a hexafluoropropylene index (HFPI) of from about 2.8 to 5.3, polymerized and isolated in the absence of added alkali metal salts, with a melt

3

flow rate of about 30 +/- 3 g/10 min, and having no more than about 50 unstable endgroups/$10^6$ carbon atoms. One of the benefits of the copolymer is that it is capable of high-speed extrusion resulting in coated wire with a low incidence of spark failures and lumps. Wires coated with the copolymer also have a reduced dissipation factor for high-speed data transmission.

14.     Another benefit of the novel copolymer is that it is thermally stable, in part, because it is polymerized and isolated in the absence of added alkali metal salts.

15.     The innovative advantages of the invention are numerous and make it the gold standard in insulated coatings for high bandwidth and data transmission speed local area network cabling.

## THE '609 PATENT

16.     On October 17, 2006, the United States Patent & Trademark Office ("USPTO") duly and legally issued the '609 patent, entitled "High Melt Flow Fluoropolymer" to Thomas Robert Earnest, Jr., Daniel A. Favereau, Niall D. McKee, and Patricia A. Tooley. A true and correct copy of the '609 patent is attached as **Exhibit A** to this complaint.

17.     Chemours Company FC, LLC is the assignee of the entire right, title, and interest in and to the '609 patent.

18.     Independent claim 1 of the '609 patent is directed to a partially-crystalline copolymer comprising tetrafluoroethylene and hexafluoropropylene in an amount corresponding to a hexafluoropropylene index (HFPI) of from about 2.8 to 5.3, where the copolymer is polymerized and isolated in the absence of added alkali metal salt, has a melt flow rate of within the range of about 30+/-3 g/10 min, and has no more than about 50 unstable endgroups/$10^6$ carbon atoms.

4

19.     Claims 2, 3, 6 and 7 depend from claim 1 and further specify melt flow rate, percentage of perfluoro (alkyl vinyl ether) monomer, number of endgroups/$10^6$ carbon atoms, and a particular alkali metal salt.

20.     Claim 4 depends from claim 3 and further specifies that the perfluoro(alkyl vinyl ether) is perfluoro(propyl vinyl ether).

## THE '431 PATENT

21.     On December 13, 2011, the United States Patent & Trademark Office ("USPTO") duly and legally issued the '431 patent, entitled "High Melt Flow Fluoropolymer" to Thomas Robert Earnest, Jr., Daniel A. Favereau, Niall D. McKee, and Patricia A. Tooley. A true and correct copy of the '431 patent is attached as **Exhibit B** to this complaint.

22.     Chemours Company FC, LLC is the assignee of the entire right, title, and interest in and to the '431 patent.

23.     Independent claim 1 of the '431 patent is directed to partially-crystalline copolymer comprising tetrafluoroethylene and hexafluoropropylene in an amount corresponding to a hexafluoropropylene index (HFPI) of from about 2.8 to 5.3, having less than less than about 50 ppm alkali metal ion, having a melt flow rate of within the range of about 30+/-3 g/10 min as determined by ASTM D1238 at 372ºC, and having no more than about 50 unstable endgroups/$10^6$ carbon atoms.

24.     Claims 2–7 depend from claim 1 and further specify quantities of alkali metals, the type of alkali metal ion, melt flow rate, and a maximum number of unstable endgroups/$10^6$ carbon atoms.

## ACTS GIVING RISE TO THIS ACTION

25.     On information and belief, Defendants have made, used, offered to sell, sold, or imported the copolymers Neoflon® FEP NP-1108, Neoflon® FEP NP-1109, and Neoflon® FEP NP-3180 ("Accused Products"), and/or wires coated with the above copolymers, in the United States, including in this District, individually and in concert.

26.     On information and belief, Defendants have induced others, and/or contributed to the actions of others, to make, use, sell, offer to sell, and/or import Neoflon® FEP NP-1108, Neoflon® FEP NP-1109, and Neoflon® FEP NP-3180 copolymers and/or wires coated with these copolymers in the United States, including in this District, individually and in concert.

27.     Attached as **Exhibit C** are true and accurate copies of the data sheets for Neoflon® FEP NP-1108, Neoflon® FEP NP-1109, and Neoflon® FEP NP-3180 copolymers. These copolymers are developed for high-speed extrusion of thin coatings of wires (such as plenum cable insulation). On information and belief, Defendants intend for these copolymers to be used to coat wires and Defendants and/or others are coating wires with these copolymers.

28.     The Accused Products are partially crystalline copolymers comprised of tetrafluoroethylene and hexafluoropropylene. *See* **Exhibit D** (Neoflon® FEP Product Information Sheet) and **Exhibit E** (BOLA Technical Information Packet, at 213).

29.     On information and belief, the Accused Products are comprised of tetrafluoroethylene and hexafluoropropylene in an amount corresponding to a hexafluoropropylene index (HFPI) of from about 2.8 to 5.3.

30.     The Accused Products are thermally stable. *See* **Exhibit D**. On information and belief, wires coated with the Accused Products have a low incidence of lumps. On information and belief, the Accused Products are thermally stable and exhibit a low incidence of lumps at least in

part because they are isolated and polymerized in the absence of added alkali metal salts and/or contain less than 50 ppm alkali metal ion.

31.     Publicly available information identifies a melt flow rate (MFR) for the Accused Products of around 35 g/10 min. *See* **Exhibit C**. Additionally, Defendants Daikin Industries, Ltd and Daikin America, Inc. are assignees to U.S. Patent No. 9,012,580 (the "'580 patent"), which identifies a preferred MFR range for their FEPs from 20–35 g/10 min. *See* **Exhibit F** at 4:56-62.

32.     The Accused Products contain no more than about 50 unstable endgroups/$10^6$ carbon atoms. *See, e.g.*, **Exhibit F** at 5:45-56 and claims 4, 5, 7, and 8.

33.     On information and belief, Defendants are making, using, offering for sale, selling and/or importing the Accused Products in this District and elsewhere in the United States, without the consent or authorization of Chemours.

## COUNT 1:

### (Direct Infringement under 35 U.S.C. § 271(a) of the '609 Patent)

34.     Paragraphs 1 through 33 are incorporated herein as set forth above.

35.     The '609 patent is valid, enforceable, and was duly issued on October 17, 2006 in full compliance with Title 35 of the United States Code.

36.     On information and belief, Defendants are making, using, offering for sale, selling and/or importing in this District and elsewhere in the United States, without the consent or authorization of Chemours, copolymers covered by one or more claims of the '609 patent and/or wire products coated with copolymers claimed by the '609 patent. These infringing copolymers include Neoflon® FEP NP-1108, Neoflon® FEP NP-1109, and Neoflon® FEP NP-3180. Defendants' infringement is ongoing.

7

37.     On information and belief, the Accused Products literally infringe at least claims 1, 2, 3, 4, 6, and 7 of the '609 patent. Claim 1, by way of example, requires:

> A partially-crystalline copolymer comprising tetrafluoroethylene, hexafluoropropylene in an amount corresponding to a hexafluoropropylene index (HFPI) of from about 2.8 to 5.3, said copolymer being polymerized and isolated in the absence of added alkali metal salt, having a melt flow rate of within the range of about 30 +/- 3 g/10 min, and having no more than about 50 unstable endgroups/$10^6$ carbon atoms.

38.     The Accused Products are partially crystalline copolymers comprised of tetrafluoroethylene and hexafluoropropylene, *see* **Exhibit D** (Neoflon® FEP Product Information Sheet) and **Exhibit E** (BOLA Technical Information Packet, at 213) and, upon information and belief, have tetrafluoroethylene and hexafluoropropylene in an amount corresponding to a hexafluoropropylene index (HFPI) of from about 2.8 to 5.3.

39.     The Accused Products are isolated and polymerized in the absence of added alkali metal salt. Defendants tout the Accused Products as thermally stable. *See* **Exhibit D**. On information and belief, wires coated with the Accused Products have a low incidence of lumps. On information and belief, the Accused Products are thermally stable and exhibit a low incidence of lumps at least in part because they are isolated and polymerized in the absence of added alkali metal salts.

40.     The Accused Products have a melt flow rate (MFR) of about 30 +/- 3 g/10 min, as shown in publicly available information, including the '580 patent. *See* **Exhibit C**; **Exhibit F** at 4:57-62.

41.     The Accused Products have no more than about 50 unstable endgroups/$10^6$ carbon atoms. *See* **Exhibit F** at 5:45-56 and claims 4, 5, 7, and 8.

42.     On information and belief, the Accused Products directly infringe the '609 patent under the doctrine of equivalents. The Accused Products are partially crystalline and comprised of

tetrafluoroethylene and hexafluoropropylene in an amount corresponding to a hexafluoropropylene index (HFPI) of from about 2.8 to 5.3, are isolated and polymerized in the absence of added alkali metal salt, have a melt flow rate (MFR) that is insubstantially different from a MFR of about 30 +/- 3 g/10 min and/or that performs substantially the same function in substantially the same way to achieve substantially the same result as a MFR of about 30 +/- 3 g/10 min, and have no more than about 50 unstable endgroups/$10^6$ carbon atoms. The Accused Products are insubstantially different from the copolymers claimed by the '609 patent. Further, the Accused Products offer the same function as the copolymers of the '609 patent, operate in the same way, and ultimately produce the same innovative results as the copolymers of the '609 patent.

43.     On information and belief, Defendants had actual or constructive knowledge of the '609 patent since at least May 2013.

44.     On May 29, 2013, Defendant Daikin America, Inc. approached Chemours to license "fluorinated FEP of any MFR through fluorination within the extruder during pelletization." The '609 patent published October 16, 2006. Defendant Daikin America, Inc.'s request as stated indicates an awareness of the '609 patent.

45.     Alternatively, Defendants had actual knowledge of the '609 patent as of at least May 2014, when the '609 patent was cited as prior art to the '580 patent. *See* **Exhibit F**.

46.     On information and belief, Defendants knew or should have known that manufacture, use, sale, and importation of the Accused Products would directly infringe the '609 patent literally or under the doctrine of equivalents. On information and belief, despite such knowledge, Defendants have been and actively continue to directly infringe the '609 patent.

47.     On information and belief, the direct infringement by Defendants has been willful, intentional, and deliberate with full knowledge of the '609 patent and in total disregard of Chemours' rights under the '609 patent.

48.     On information and belief, Defendants will continue to directly infringe the '609 patent unless and until they are enjoined by the Court.

49.     As a result of Defendants' direct infringement of the '609 patent, Plaintiff has suffered damages.

## COUNT 2:

### (Direct Infringement under 35 U.S.C. § 271(a) of the '431 Patent)

50.     Paragraphs 1 through 49 are incorporated herein as set forth above.

51.     The '431 patent is valid, enforceable, and was duly issued on December 13, 2011 in full compliance with Title 35 of the United States Code.

52.     On information and belief, Defendants are making, using, offering for sale, selling and/or importing in this District and elsewhere in the United States, without the consent or authorization of Chemours, copolymers covered by one or more claims of the '431 patent and/or wire products coated with copolymers claimed by the '431 patent. These infringing copolymers include Neoflon® FEP NP-1108, Neoflon® FEP NP-1109, and Neoflon® FEP NP-3180. Defendants' infringement is ongoing.

53.     On information and belief, the Accused Products literally infringe at least claims 1–7 of the '431 patent. Claim 1, by way of example, requires:

> A partially-crystalline copolymer comprising tetrafluoroethylene, hexafluoropropylene in an amount corresponding to a hexafluoropropylene index (HFPI) of from about 2.8 to 5.3, said copolymer having less than about 50 ppm alkali metal ion, having a melt flow rate of within the range of about 30 +/- 3 g/10 min as determined by ASTM D1238 at 372□., and having no more than about 50 unstable endgroups/$10^6$ carbon atoms.

10

54.     The Accused Products are partially crystalline copolymers comprised of tetrafluoroethylene and hexafluoropropylene, s*ee* **Exhibit D** (Neoflon® FEP Product Information Sheet) and **Exhibit E** (BOLA Technical Information Packet, at 213) and, upon information and belief, have tetrafluoroethylene and hexafluoropropylene in an amount corresponding to a hexafluoropropylene index (HFPI) of from about 2.8 to 5.3.

55.     The Accused Products have less than about 50 ppm alkali metal ion. Defendants tout the Accused Products as thermally stable. *See* **Exhibit D**. On information and belief, wires coated with the Accused Products have a low incidence of lumps.  On information and belief, the Accused Products are thermally stable and exhibit a low incidence of lumps at least in part because they have less than 50 ppm alkali metal ion.

56.     The Accused Products have a melt flow rate (MFR) within the range of about 30 +/- 3 g/10 min, as shown in publicly available information, including the '580 patent. *See* **Exhibit C**; **Exhibit F** at 4:57-62. The MFR is determined by ASTM D1238 at 372ºC, which is the test procedure specified in ASTM 2116. *See* **Exhibit C**; **Exhibit F** at 4:62-65.

57.     The Accused Products have no more than about 50 unstable endgroups/$10^6$ carbon atoms. *See* **Exhibit F** at 5:45-56 and claims 4, 5, 7, and 8.

58.     On information and belief, the Accused Products directly infringe the '431 patent under the doctrine of equivalents. The Accused Products are partially crystalline and comprised of tetrafluoroethylene and hexafluoropropylene in an amount corresponding to a hexafluoropropylene index (HFPI) of from about 2.8 to 5.3, have less than about 50 ppm alkali metal ion, have a melt flow rate (MFR) that is insubstantially different from a MFR of about 30 +/- 3 g/10 min as determined by ASTM D1238 at 372 ºC and/or that performs substantially the same function in substantially the same way to achieve substantially the same result as a MFR of

about 30 +/- 3 g/10 min as determined by ASTM D1238 at 372 ºC, and have no more than about 50 unstable endgroups/$10^6$ carbon atoms. The Accused Products are insubstantially different from the copolymers claimed by the '431 patent. Further, the Accused Products offer the same function as the copolymers of the '431 patent, operate in the same way, and ultimately produce the same innovative results as the copolymers of the '431 patent.

59.     On information and belief, Defendants had actual or constructive knowledge of the '431 patent since at least May 2013.

60.     On May 29, 2013, Defendant Daikin America, Inc. approached Chemours to license "fluorinated FEP of any MFR through fluorination within the extruder during pelletization." The '431 patent published December 13, 2011. Defendant Daikin America, Inc.'s request as stated indicates an awareness of the '431 patent.

61.     On information and belief, Defendants knew or should have known that manufacture, use, sale, and/or importation of the Accused Products would directly infringe the '431 patent literally or under the doctrine of equivalents. On information and belief, despite such knowledge, Defendants have been and actively continue to directly infringe the '431 patent.

62.     On information and belief, the direct infringement by Defendants has been willful, intentional, and deliberate with full knowledge of the '431 patent and in total disregard of Chemours' rights under the '431 patent.

63.     On information and belief, Defendants will continue to directly infringe the '431 patent unless and until they are enjoined by the Court.

64.     As a result of Defendants' direct infringement of the '431 patent, Plaintiff has suffered damages.

## COUNT 3:

**(Indirect Infringement under 35 U.S.C. § 271(b) & (c) of the '609 Patent)**

65.     Paragraphs 1 through 64 are incorporated herein as set forth above.

66.     On information and belief, Defendants' had knowledge of the '609 patent at least as of May 2013.

67.     On information and belief, Defendants have been and are actively inducing and/or contributing to infringement the '609 patent in this District and elsewhere in the United States by making, using, offering to sell, selling, importing, or otherwise promoting and distributing the Accused Products and/or wires coated with the Accused Products. For example, on information and belief, Defendants induce and/or contribute to the infringement of the '609 patent by selling the Accused Products to customers outside of the United States, who in turn, coat wires with the Accused Products and import those wires into the United States.

68.     On information and belief, Defendants' customers and others who make, use, sell, offer to sell, or import the Accused Products and/or wires coated with the Accused Products directly infringe the '609 patent.

69.     On information and belief, Defendants possess specific intent to encourage direct infringement of the '609 patent.  For example, Defendants sell and deliver the Accused Products to customers and advertise and promote the use of the Accused Products "for high-speed extrusion of thin coatings of small wire sizes." *See* **Exhibit C**. Additionally, Defendants promote and advertise a number of benefits of using the Accused Products to coat wires, such as resulting in wire coating with high transparency, low dissipation factor, and few defects.  *See* **Exhibit D**; **Exhibit F.**

70.     On information and belief, Defendants knew the Accused Products are not staple articles or commodities of commerce suitable for substantial non-infringing use.

71.     On information and belief, Defendants had knowledge of the '609 patent since at least May 2013, and knew that the use, sale, offer for sale, or importation of the Accused Products and/or wires coated with the Accused Products would be an act of direct infringement of the '609 patent, and that the activities referenced in this Complaint would actively contribute to or induce infringement of the '609 patent. On information and belief, despite such knowledge, Defendants have been and actively continue to induce and/or contribute to the infringement of the '609 patent.

72.     On information and belief, the contributory and/or induced infringement by Defendants has been willful, intentional, and deliberate with full knowledge of the '609 patent and in total disregard of Chemours' rights under the '609 patent.

73.     On information and belief, Defendants will continue to indirectly infringe the '609 patent unless and until they are enjoined by this court.

74.     As a result of Defendants' indirect infringement of the '609 patent, Plaintiff has suffered damages.

## COUNT 4:

### (Indirect Infringement under 35 U.S.C. § 271(b) & (c) of the '431 Patent)

75.     Paragraphs 1 through 74 are incorporated herein as set forth above.

76.     On information and belief, Defendants' had knowledge of the '431 patent at least as of May 2013.

77.     On information and belief, Defendants have been and are actively inducing and/or contributing to infringement the '431 patent in this District and elsewhere in the United States by making, using, offering to sell, selling, importing, or otherwise promoting and distributing the

Accused Products and/or wires coated with the Accused Products. For example, on information and belief, Defendants induce and/or contribute to the infringement of the '431 patent by selling the Accused Products to customers outside of the United States, who in turn, coat wires with the Accused Products and import those wires into the United States.

78.     On information and belief, Defendants' customers and others who make, use, sell, offer to sell, or import the Accused Products and/or wires coated with the Accused Products directly infringe the '431 patent.

79.     On information and belief, Defendants possess specific intent to encourage direct infringement of the '431 patent.  For example, Defendants sell and deliver the Accused Products to customers and advertise and promote the use of the Accused Products "for high-speed extrusion of thin coatings of small wire sizes." *See* **Exhibit C**. Additionally, Defendants promote and advertise a number of benefits of using the Accused Products to coat wires, such as resulting in wire coating with high transparency, low dissipation factor, and few defects.  *See* **Exhibit D**; **Exhibit F.**

80.     On information and belief, Defendants knew the Accused Products are not staple articles or commodities of commerce suitable for substantial non-infringing use.

81.     On information and belief, Defendants had knowledge of the '431 patent since at least May 2013, and knew that the use, sale, offer for sale, or importation of the Accused Products and/or wires coated with the Accused Products would be an act of direct infringement of the '431 patent, and that the activities referenced in this Complaint would actively contribute to or induce infringement of the '431 patent. On information and belief, despite such knowledge, Defendants have been and actively continue to induce and/or contribute to the infringement of the '431 patent.

82.     On information and belief, the contributory and/or induced infringement by Defendants has been willful, intentional, and deliberate with full knowledge of the '431 patent and in total disregard of Chemours' rights under the '431 patent.

83.     On information and belief, Defendants will continue to indirectly infringe the '431 patent unless and until they are enjoined by this court.

84.     As a result of Defendants' indirect infringement of the '431 patent, Plaintiff has suffered damages.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

Plaintiff respectfully prays for the following relief:

a.     That judgment be entered that Defendants have infringed the '609 and '431 patents by making, using, selling, offering to sell, and/or importing Neoflon® FEP NP-1108, Neoflon® FEP NP-1109, and Neoflon® FEP NP-3180 in the United States;

b.     That an injunction be issued permanently enjoining Defendants and their affiliates, officers, agents, employees, attorneys, and all persons in active concert of participation with and of them, from infringing the '609 and '431 patents;

c.     That Plaintiff be awarded damages in an amount sufficient to compensate it for Defendants' infringement of the '609 and '431 patents, together with prejudgment and post-judgment interest and costs;

d.     That Plaintiff be awarded enhanced damages pursuant to 35 U.S.C. § 284 for Defendants' willful infringement;

e. That this case be declared exceptional under 35 U.S.C. § 285, and that Plaintiff be awarded reasonable attorneys' fees and costs;

f. That an accounting be performed of Defendants' infringing activities through trial and judgment; and

g. That this Court award such other and further relief as it may deem just and proper.

November 8, 2017                    FISH & RICHARDSON P.C.


                                    By: /s/ *Martina Tyreus Hufnal*
                                        Martina Tyreus Hufnal (#4771)
                                        Jeremy D. Anderson (#4515)
                                        Nitika Gupta Fiorella (#5898)
                                        222 Delaware Avenue, 17th Floor
                                        P. O. Box 1114
                                        Wilmington, DE 19899-1114
                                        Telephone:  (302) 652-5070
                                        janderson@fr.com; hufnal@fr.com;
                                        fiorella@fr.com

                                    **ATTORNEYS FOR PLAINTIFF**
                                    **CHEMOURS COMPANY FC, LLC**