IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CHEMOURS COMPANY FC, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 17-1612-MN-CJB |
| v. | ) | |
| | ) | **PUBLIC REDACTED VERSION** |
| DAIKIN INDUSTRIES, LTD. & | ) | |
| DAIKIN AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>LETTER TO THE HONORABLE CHRISTOPHER J. BURKE FROM JOHN G. DAY</u>

*Of Counsel:*

Anthony M. Insogna
JONES DAY
4655 Executive Drive, Suite 1500
San Diego, CA 92121-3134

David M. Maiorana
John C. Evans
JONES DAY
901 Lakeside Avenue
Cleveland, OH 44114

John M. Michalik
Lisa L. Furby
Michelle B. Smit
JONES DAY
77 West Wacker Drive
Chicago, IL 60601-1692

Suzie Vardanyan
JONES DAY
555 Flower Street
Los Angeles, CA 90071

Dated:  December 2, 2021

ASHBY & GEDDES
John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
jday@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Defendants*

Dear Judge Burke:

The Court should deny Chemours's motion to compel production of *three metric tons* of the accused resins and a unilateral extension of the schedule. Chemours does not—and cannot—say why it needs metric tons of resin to test against the asserted claims, or how its demands are proportional to the needs of this case. Even if Chemours had good reasons for its belated demands (and it does not), Daikin cannot ███████████████████████████ without irreparably damaging business relationships. As a compromise, Daikin offered about 60 kilograms—enough to coat about 270,000 feet of cable—more than enough for the testing Chemours says it wants to conduct. But Chemours rejected that offer, and inexplicably insists that it must have no less than 3000 kilograms. Chemours also seeks to extend expert discovery by nearly two months to excuse its lack of diligence. Chemours long did *nothing* to advance its samples request, which has been pending since April 2018, and instead surprised Daikin on October 8, 2021, with an eleventh-hour demand for three metric tons. Chemours's motion should be denied.

***Metric Tons Are Neither Relevant Nor Proportional.*** As "the potential for discovery abuse is ever-present," "courts are authorized to limit discovery to that which is proper and warranted in the circumstances of the case." *Katz v. Batavia Marine & Sporting Supplies, Inc.,* 984 F.2d 422, 424 (Fed. Cir. 1993). Chemours does not—and cannot—show that its request for 3000 kilograms is necessary to compare the claimed copolymer to the accused resins. Nor can Chemours show that such enormous volumes are proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1). And Chemours has not adequately explained why a lesser amount would not allow Chemours to do what it says it wants to do.

Testing for the claimed properties does not require metric tons. The asserted claims recite a polymer with specific physical features, including a melt flow rate ("MFR") within the range of "about 30±3 g/10 min," as well as certain limitations about alkali metals and unstable endgroups. D.I. 225, Ex. A (10:15-34); Ex. K (10:19-22). As to the first property, MFR, it is undisputed that the ASTM D1238 standard defines MFR. D.I. 153 at 44. ASTM D1238 testing requires just 4 to 8 *grams* of resin. D.I. 155, Ex. 28, at DKN0001135 (Table 2). As for the other two properties, alkali metal and unstable end groups, Chemours identifies no testing it intends—or needs—to conduct to assess those limitations, much less one requiring 3000 kilograms of sample to complete.

Chemours apparently wants to run tests that have nothing to do with the three claimed copolymer properties. Chemours says that it needs three metric tons to evaluate *unclaimed* "spark failures and industry quality criteria" pursuant to the UL 444 standard. D.I. 225 at 2. The patents-in-suit merely mention UL 444, and based on that, Chemours seemingly wants to assess 45,000 feet of coated wire for the number of "sparks." *Id.*

Chemours's motion fails several times over. First, and contrary to Chemours's assertions, the claims say nothing about processing features, like the number of sparks or lumps during extrusion. Nor do the claims recite a process for making or using the copolymer. And the claims certainly do not require miles and miles of coated cables.

Second, the UL 444 standard is not relevant to the *claimed properties*, and Chemours has never seriously contended that it is. Tellingly, Chemours never mentioned "sparks" or "lumps," or UL 444, or any other spark or lump test in its August 2018 initial infringement contentions or its November 17, 2021, final contentions. Ex. 1 [Final Infringement Contentions]. In fact, Chemours never raised UL 444 until the very last day of discovery. D.I. 225, Ex. J, at 3. Worse,

Chemours did not provide the Court with UL 444.  And after insisting the Court should read the ASTM D1238 standard *out* of the claimed "melt flow rate" during the *Markman* proceedings, Chemours should not be heard now trying to read UL 444 standard *into* the claims.

Third, even if UL 444 testing were relevant (and it is not), Chemours fails to show why it needs *three metric tons* to do UL 444 testing.  Again, Chemours did not provide a copy of UL 444 with its motion, or identify any test in UL 444 that requires anything close to metric tons.  No such test exists, as confirmed by the attached declaration from Dr. Lensey Smith, Ph.D.  Ex. 2 [Smith Decl.] ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ That is twice the 45,000 foot figure cited by Chemours, and ostensibly enough to meet its needs.

For its part, Chemours offers a combination of attorney argument and tortured reads of Daikin documents about customers' evaluations of Daikin's products.  D.I. 225 at 2.  Chemours does not show that Daikin customers needed metric tons of resin to test any of the relevant claimed properties, *i.e.*, the MFR, alkali metal, or unstable endgroups.  *See, e.g.*, D.I. 225, Ex. B ████████████████

***Daikin Cannot Divert Metric Tons Already Promised To Customers.***  As Daikin previously explained to Chemours, *see, e.g.*, Ex. 3 [Nov. 9, 2021, Evans Letter] at 2, even if its request for 3000 kilograms were relevant and proportional, ██████████████████████ as confirmed by the attached declaration of Mr. Jonathan Rogers.  Ex. 4 [Rogers Decl.], ¶ 3.  As Mr. Rogers attests, in the normal course of business, ██████████████████████████████████ *. Id.*, ¶ 4. ██████████████ *Id.* Ex. 2 [Smith Decl.] , ¶ 3.

██████████████████████████████████████████████████████████████████ Ex. 4 [Rogers Decl.], ¶ 5. ██████████████████ *. Id.*  Among other things, ████ ██████████████████████ *Id.*, ¶¶ 5-6; Ex. 2 [Smith Decl.], ¶ 8.  Accordingly, ████████████████████ Ex. 4 [Rogers Decl.] ¶ 8. ██████ *Id.*, ¶ 9 ██████████████ Ex. 5 [*Bayer HealthCare, LLC v. Apotex Inc.*, 16-1221 (LPS), D.I. 124 (D. Del. Apr. 28, 2019) (denying request for product samples because "[t]he Court cannot order [defendant] to produce something that does not exist")].

██████████████████████████████████████, Daikin still made reasonable efforts to accommodate Chemours's request.  Daikin offered either:  (1) ~5-10 kilograms ██████████████████████████████████████████ or (2)

~20 kilogram samples ████████████████████████████████████
D.I. 225, Ex. J, at 2; Ex. 2 [Smith Decl.], ¶¶ 5-6.  Despite the fact that Daikin offered Chemours enough resin to coat up to 270,000 feet of wire with the three resins, Chemours rejected both offers without ever explaining why it needs over a quarter million feet of coated wire.

***Chemours's Delayed Request Is Not Justified.***  Chemours suggests that Daikin slow-rolled Chemours's requests for three metric tons of samples.  D.I. 225 at 2-3.  That is not true.  It is Chemours who unjustifiably waited until October 8, 2021—the last day to serve discovery requests—to ask for 3000 kilograms of the accused products.  Such an unusual request could—and should—have been made long before then.  In fact, in *April 2018*, Chemours requested samples, not in metric tons but "in an amount sufficient to test the properties thereof."  *Id.*, Ex. E at 12.  In *May 2018*, Daikin responded that it would make samples "available for inspection at a mutually agreeable time and location."  *Id.*, Ex. F at 24.  For nearly *seven months* of fact discovery before the case was stayed, Chemours never contacted Daikin about product samples.  And when the case was stayed in December 2018, fewer than four months of fact discovery remained; Chemours had already served its infringement contentions and had noticed depositions.  D.I. 39, 51-60.  Thus, nearly *three years ago*, Chemours knew (or should have known) that it wanted metric tons of samples.  Yet Chemours never requested such volumes or otherwise followed up on its pending sample request.

Chemours also said nothing about samples when the stay was lifted in this case.  (D.I. 81.)  For the first two months of 2021 fact discovery, Chemours made no mention of samples, either in discovery correspondence, in new document requests, or in the multiple issues raised with the Court during fact discovery.  *See, e.g.*, Ex. 6 [Sept. 15, 2021, Whitley Letter]; Ex. 7 [Chemours's Second Set of RFPs].  It was not until October 8, 2021, the very last possible day to serve written discovery requests, that Chemours asked for three 1000 kilogram samples.  D.I. 225, Ex. G at 7.  Any complaint that Daikin did not respond until November 8, 2021, is baseless because that was when Daikin's written response was due under the Federal Rules.  Nonetheless, Daikin even extended the courtesy of sharing its concerns about Chemours's requests *before* Daikin's response was due.  Ex. 8 [Nov. 1, 2021, Furby Email] at 1.  Chemours's *own* delay, alone, justifies denying its motion.  *See, e.g.*, Ex. 9 [*Jaguar Land Rover Ltd. v. Bentley Motors Ltd.*, No. 2:18-cv-320, D.I. 328 at 2-3 (E.D. Va. Mar. 24, 2020) (denying motion to compel product inspection as untimely where plaintiff waited a month to move "after it had full knowledge" defendant offered such inspection and did not agree to produce samples).

***There Is No Cause To Modify The Schedule.***  Chemours's belated request for metric tons of samples is not good cause to modify the schedule.  To show good cause, a party must show that the deadline "cannot reasonably be met *despite the diligence of the party seeking the extension.*"  *See* Fed. R. Civ. P. 16 (1983 Adv. Comm. Notes) (emphasis added); *Venetec Int'l, Inc. v. Nexus Med., LLC*, 541 F. Supp. 2d 612, 618 (D. Del. 2008).  As shown above, Chemours was not diligent in requesting production of three metric tons of samples and can offer no legitimate excuse for its lack of diligence.  Chemours should have prepared and developed its case within the aggressive schedule that it requested (and previously has refused to extend).  Chemours has no excuse for failing to do so.  And there is no reason to extend Chemours's deadline for expert reports or supplementation, which would, in all likelihood, require adjusting the deadlines for summary judgment motions, and, ultimately, the trial date.

Daikin respectfully requests that the Court deny Chemours's motion in its entirety.

Respectfully,

*/s/ John G. Day*

John G. Day (#2403)

JGD/nlm

cc:     All Counsel of Record (via electronic mail)

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 2nd day of December, 2021, the attached **LETTER TO THE**

**HONORABLE CHRISTOPHER J. BURKE FROM JOHN G. DAY** was served upon the

below-named counsel of record at the addresses and in the manner indicated:


Martina Tyreus Hufnal, Esquire                          VIA ELECTRONIC MAIL
FISH & RICHARDSON P.C.
222 Delaware Avenue, 17th Floor
Wilmington, DE  19801

Dexter Whitley, Esquire                                     VIA ELECTRONIC MAIL
FISH & RICHARDSON P.C.
1180 Peachtree Street NE, 21st Floor
Atlanta, GA  30309

Meghana Thadani, Esquire                                 VIA ELECTRONIC MAIL
FISH & RICHARDSON P.C.
7 Times Square, 20th Floor
New York, NY 10036

Megan Chacon, Esquire                                     VIA ELECTRONIC MAIL
FISH & RICHARDSON P.C.
12860 El Camino Real, Suite 400
San Diego, CA 92130

John M. Farrell, Esquire                                     VIA ELECTRONIC MAIL
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 400
Redwood City, CA 94063

*/s/ John G. Day*

_____

John G. Day

# EXHIBIT 1

## REDACTED IN ITS ENTIRETY

# EXHIBIT 2

## REDACTED IN ITS ENTIRETY

# EXHIBIT 3

## JONES DAY

901 LAKESIDE AVENUE  •  CLEVELAND, OHIO  44114.1190

TELEPHONE: +1.216.586.3939  •  FACSIMILE: +1.216.579.0212

DIRECT NUMBER:  (216) 586-7126
JCEVANS@JONESDAY.COM

November 9, 2021

VIA E-MAIL

Katherine D. Prescott, Esq.
Fish & Richardson P.C.
500 Arguello Street
Suite 400
Redwood City, CA 94063

Re:     *Chemours Company FC, LLC v. Daikin Industries, Ltd.* and *Daikin America, Inc.*,
C.A. No. 17-1612-MN-CJB (D. Del.)

Dear Katherine:

We are in receipt of your November 9, 2021 correspondence alleging deficiencies in Daikin's response to Request for Production No. 54.  As you requested, we are available to meet and confer regarding this issue tomorrow at 9:00 AM PT.  I further write to correct and clarify the record regarding Chemours's requests for samples of the accused products.

In April 2018, Chemours requested "[s]amples of the Accused Products or products incorporating the Accused Products, in an amount sufficient to *test the properties* thereof." Chemours's Request for Production No. 255.  Notably, Chemours did not request samples sufficient to do "wire line testing."  In our May 29, 2018 response, we stated that we would make samples available for inspection.  Until last month, Chemours never raised this response with us. Chemours had this response for *six months* before the stay, and never reached out to Daikin to state that the response was deficient, never attempted to inspect samples or otherwise discuss this matter with Daikin.  Indeed, once the stay was lifted, Chemours raised issues with Daikin's other 2018 discovery responses, *see* 9-15-21 Whitley Ltr to Furby, but never raised issues with this RFP response.

On October 8, 2021, Chemours filed a *separate* request seeking a metric ton (1000 kg) of each of the accused products.  Under the Federal Rules, Daikin was not required to serve its objections and response until yesterday, November 8, 2021.  Despite the fact that our responses were not yet due, we informed Chemours last week that we are conferring with our client to determine whether we have any quantity of the accused products available to provide to Chemours. We specifically asked you to explain why you needed such a large sample, and your legal authority to support such a request.  Instead, you prematurely demanded a meet and confer.  On the parties'

ALKHOBAR • AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DETROIT • DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • LONDON • LOS ANGELES • MADRID • MELBOURNE
MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MOSCOW • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH • RIYADH
SAN DIEGO • SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

JONES DAY

Katherine Prescott, Esq.
November 9, 2021
Page 2

November 5, 2021 meet and confer, we explained to you that we were still conferring with our client and we again asked you to explain why three metric tons of accused products is necessary or proportional.  To date, we still do not have an answer to that request.

After conferring with our clients, we were able to determine that we could provide an approximately 5 kg sample of each of the accused products. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  This should be sufficient for any testing Chemours needs to conduct.  For example, melt flow rate testing pursuant to ASTM D1238 calls for a sample ranging from 4 to 8 *grams*.  With the samples that Daikin will be providing to Chemours, Chemours can easily test the MFR of the samples several times over.  To be clear, we do not waive any challenge to the sufficiency of any testing Chemours conducts in this case.

Moreover, Chemours could have served this request for production at any point during this litigation, but waited until the last possible day to do so.  Any "delay of testing" for opening expert reports is a problem of Chemours's own making.  Given Chemours's steadfast refusal to extend any deadline in this matter thus far, we will oppose any attempts by Chemours to extend the deadline for opening expert reports or any attempt to add untimely supplements thereafter.

Regards,

*/s/ John C. Evans*

John C. Evans

cc:     Counsel of Record

2

# EXHIBIT 4

## REDACTED IN ITS ENTIRETY

# EXHIBIT 5

CLOSED,LEAD,MEDIATION–CJB,PATENT

## U.S. District Court
## District of Delaware (Wilmington)
## CIVIL DOCKET FOR CASE #: 1:16–cv–01221–LPS

Bayer Healthcare LLC et al v. Apotex Inc. et al.
Assigned to: Judge Leonard P. Stark
Related Cases:  1:15–cv–00114–LPS
                1:16–cv–01222–LPS
                1:16–cv–01220–LPS
                1:17–cv–00334–LPS
                1:18–cv–01465–LPS
Cause: 35:271 Patent Infringement

Date Filed: 12/16/2016
Date Terminated: 08/17/2020
Jury Demand: None
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**Bayer Healthcare LLC**                represented by   **Jack B. Blumenfeld**
                                                          Morris, Nichols, Arsht & Tunnell LLP
                                                          1201 North Market Street
                                                          P.O. Box 1347
                                                          Wilmington, DE 19899
                                                          (302) 658–9200
                                                          Email: Jbbefiling@mnat.com
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Adam L. Perlman**
                                                          Email: adam.perlman@lw.com
                                                          *TERMINATED: 01/21/2020*
                                                          *PRO HAC VICE*

                                                          **Anthony David Raucci**
                                                          Morris, Nichols, Arsht & Tunnell LLP
                                                          1201 North Market Street
                                                          P.O. Box 1347
                                                          Wilmington, DE 19899
                                                          302–351–9392
                                                          Email: araucci@morrisnichols.com
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Ben V. Picozzi**
                                                          Email: bpicozzi@wc.com
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Bruce R. Genderson**
                                                          Email: bgenderson@wc.com
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Derek James Fahnestock**
                                                          Morris, Nichols, Arsht & Tunnell LLP
                                                          1201 North Market Street
                                                          P.O. Box 1347
                                                          Wilmington, DE 19899
                                                          302–658–9200
                                                          Email: dfahnestock@mnat.com
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Dov P. Grossman**
                                                          Email: dgrossman@wc.com
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

| | | |
|---|---|---|
| 04/15/2019 | 120 | NOTICE OF SERVICE of Bayer's Objections and Responses to Apotex's Third Set of Interrogatories (Nos. 8–15) filed by Bayer HealthCare Pharmaceuticals Inc., Bayer Healthcare LLC.(Fahnestock, Derek) (Entered: 04/15/2019) |
| 04/18/2019 | 121 | ORAL ORDER: After having been advised by Plaintiff(s) and Defendant(s) of their inability to resolve a discovery matter, IT IS HEREBY ORDERED that a teleconference is scheduled for April 29, 2019 at 2:45 p.m. Counsel for the party seeking relief shall initiate the teleconference call to 302–573–4571. IT IS FURTHER ORDERED that not later than April 23, 2019, any party seeking relief shall file with the Court a letter, not to exceed three (3) pages, outlining the issues in dispute and its position on those issues. Not later than April 25, 2019, any party opposing the application for relief may file a letter, not to exceed three (3) pages, outlining that party's reasons for its opposition. Each party shall submit to the Court two (2) courtesy copies of its discovery letter and any attachments. Should the Court find further briefing necessary upon conclusion of the telephone conference, the Court will order it. Alternatively, the Court may choose to resolve the dispute prior to the telephone conference and will, in that event, cancel the conference. ORDERED by Judge Leonard P. Stark on 4/18/19. (ntl) (Entered: 04/18/2019) |
| 04/23/2019 | 122 | [SEALED] Letter to The Honorable Leonard P. Stark from Anthony Raucci regarding discovery dispute. (Attachments: # 1 Exs. A–C)(Raucci, Anthony) (Entered: 04/23/2019) |
| 04/25/2019 | 123 | [SEALED] Letter to The Honorable Leonard P. Stark from Kenneth L. Dorsney regarding Discovery Dispute – re 121 Order Setting Teleconference. (Dorsney, Kenneth) (Main Document 123 replaced on 4/26/2019 (ntl). Modified on 4/26/2019 (ntl). (Entered: 04/25/2019) |
| 04/26/2019 | | CORRECTING ENTRY: D.I. 123 placed under seal per request of counsel. (ntl) (Entered: 04/26/2019) |
| 04/28/2019 | 124 | ORAL ORDER: Having reviewed the parties' submissions (D.I. 122, 123), IT IS HEREBY ORDERED that Bayer's request for an order that Apotex produced unexpired samples of its ANDA Product, or alternatively to stay proceedings with respect to the '232 patent until after Apotex manufactures and produces such samples, is DENIED. The Court cannot order Apotex to produce something that does not exist, nor is the Court persuaded it should order Apotex to create unexpired samples for Bayer. See Wyeth LLC v. Alembic Pharms., Ltd., C.A. No. 16–1305 D.I. 145 (denying request for order that generic company make unexpired product samples). The record does not establish that Apotex agreed to produce unexpired samples of its ANDA Product or tried to mislead Bayer into reaching its "understanding that Apotex would produce unexpired samples." IT IS FURTHER ORDERED that the teleconference scheduled for tomorrow is CANCELLED. ORDERED by Judge Leonard P. Stark on 4/28/19. (ntl) (Entered: 04/28/2019) |
| 05/01/2019 | 125 | NOTICE OF SERVICE of Initial Invalidity Contentions regarding U.S. Patent 9,957,232 filed by Apotex Corp., Apotex Inc..(Dorsney, Kenneth) (Entered: 05/01/2019) |
| 05/02/2019 | 126 | REDACTED VERSION of 123 Letter *to The Honorable Leonard P. Stark from Kenneth L. Dorsney regarding Apotex's responsive discovery dispute letter* by Apotex Corp., Apotex Inc.. (Dorsney, Kenneth) (Entered: 05/02/2019) |
| 05/02/2019 | 127 | REDACTED VERSION of 122 Letter by Bayer HealthCare Pharmaceuticals Inc., Bayer Healthcare LLC. (Attachments: # 1 Exhibit A–C)(Raucci, Anthony) (Entered: 05/02/2019) |
| 05/09/2019 | 128 | Joint STIPULATION TO EXTEND TIME to extend discovery deadlines to various dates – filed by Bayer Healthcare LLC. (Raucci, Anthony) (Entered: 05/09/2019) |
| 05/09/2019 | 129 | STIPULATION of Dismissal *(Apotex Inc. & Apotex Corp.)* by Bayer HealthCare Pharmaceuticals Inc., Bayer Healthcare LLC. (Raucci, Anthony) (Entered: 05/09/2019) |
| 05/14/2019 | | SO ORDERED, re 128 Joint STIPULATION TO EXTEND TIME to extend discovery deadlines to various dates filed by Bayer Healthcare LLC. Signed by Judge Leonard P. Stark on 5/14/19. (ntl) (Entered: 05/14/2019) |
| 05/14/2019 | | SO ORDERED, re 129 Stipulation of Dismissal re Apotex filed by Bayer HealthCare Pharmaceuticals Inc., Bayer Healthcare LLC. Signed by Judge Leonard P. Stark on 5/14/19. (ntl) (Entered: 05/14/2019) |
| 05/31/2019 | 130 | NOTICE OF SERVICE of (1) Apotex's Opening Expert Report of Marvin M. Hansen and (2) Apotex's Opening Expert Report of Clayton H. Heathcock filed by Apotex Corp., Apotex Inc..(Dorsney, Kenneth) (Entered: 05/31/2019) |

# EXHIBIT 6



Fish & Richardson P.C.
222 Delaware Avenue
17th Floor
P.O. Box 1114
Wilmington, DE 19899-1114

302 652 5070 main
302 652 0607 fax

**BY E-MAIL**

September 15, 2021

**Dexter Whitley, Ph.D.**
Associate
whitley@fr.com
404 724 2808  direct

Lisa Furby, Esq.
Jones Day
77 West Wacker
Chicago, IL 60601

Re:   ***Chemours Company FC, LLC v. Daikin Industries, Ltd.*** **and** ***Daikin America, Inc.,***
      **C.A. No. 17-1612-GMS (D. Del.)**

Dear Lisa:

I write regarding deficiencies in Defendants' responses to Chemours' interrogatories.  As
detailed below, Chemours requests prompt supplementation.  Should Defendants desire to
meet and confer, Chemours is available at a mutually agreeable time this week to discuss the
issues raised below.

**Chemours Interrogatory No. 1**

This interrogatory seeks a description of the composition, characteristics, and function of
each Accused Product and any Predecessor Products, including identifying the chemical
composition melt flow rate or melt flow index, quantity and chemical formula of unstable
endgroups, quantity and identify of alkali salts added, the amount and identity of alkali metal
ion in the polymer, and the person(s) most knowledgeable about the compositions,
characteristics, and function of each such product.

Daikin submitted less than ten (10) pages of materials in response. These documents include
the Process Control Plans for NP-1108 and NP-1109, but not the Process Control Plans for
NP-3180. The documents also include the Control Plans for NP-3180, but not for NP-1108
and NP-1109. Given the sparse citations and the missing documents, this response is clearly
deficient.  Please confirm that Daikin has included all of the documents Daikin intends to
rely on to describe the Accused Products. If Daikin cannot provide such confirmation, Daikin
must supplement its response to include the full scope of the interrogatory. This deficient
response, in addition to the deficient response to Interrogatory No. 2, is impeding Plaintiff's
ability to fully supplement its infringement contentions and the deficiencies must be
corrected before any supplementation can occur.



Lisa Furby, Esq.
September 15, 2021

**Chemours Interrogatory No. 2**

This interrogatory seeks a description of the conception, design, development, and testing of each Accused Product, including the development from any Predecessor Products to the Accused Products with a timeline describing the development of Daikin's wire coating products from 1990 to present, and identify the people most knowledgeable regarding the design and operation of each Accused Product.

Daikin's response to this interrogatory is insufficient because, among other reasons, Daikin fails to provide concrete dates for any of these development activities. Furthermore, Daikin failed to include citations for any documents. To the extent Daikin intends to rely on any documents to establish the conception, design, development, and testing of each Accused Product, including as part of its invalidity defense, Daikin must supplement its response to identify these documents.

**Chemours Interrogatory No. 3**

This interrogatory seeks all the facts and reasons upon which Daikin bases its contentions, made in their Affirmative Defenses and Counterclaims of its Amended Answer, that Daikin has not infringed, either directly or indirectly, either literally or under the doctrine of equivalents, any valid and enforceable claim of the Patents-in-Suit, including an identification of each element of the claim that Daikin alleges the Accused Products do not meet and an identification of all documents that refer or relate to Dakin's allegations.

Daikin has only submitted fifteen (15) pages of materials with no explanation as to how these documents establish Daikin's alleged non-infringement. In addition, Daikin failed to cite documents responsive to the full scope of this Interrogatory. For example, the cited documents include sales specifications for products NP-1108 and NP-1109 but fail to include the sales specifications for NP-3180. As another example of this deficient response, Daikin identified the quality specification for NP-3180 but not for NP-1108 and NP-1109. Daikin must supplement its response immediately to provide a substantive explanation of its non-infringement position and citations to all of the documents it intends to rely on to establish its non-infringement.

2



Lisa Furby, Esq.
September 15, 2021

**Chemours Interrogatory No. 4**

This interrogatory seeks the invalidity contentions made in Daikin's Affirmative Defenses and Counterclaims of the Amended Answer, including the identity of the specific statutory provision(s) relied upon for invalidity, the identity of the claim(s) that Daikin contends are rendered invalid, a description of all the evidence that Daikin contends renders any claim invalid, a claim chart comparing each element of the asserted claims to the asserted prior art, any portions of the specification or prosecution history of the Patents-in-Suit relied upon for any invalidity claim, and the identification of all documents that refer or relate to Daikin's allegations.

We have repeatedly asked Daikin to provide its invalidity contentions, given Daikin's inability to rely on printed publications. To date, Daikin has refused this request. Daikin's refusal to articulate its invalidity arguments is improper, and Daikin must supplement its response to this interrogatory immediately.

**Chemours Interrogatory No. 8**

This interrogatory seeks a volume of sales in the United States and abroad for each Accused Product. The response should include the quantity and amount on a month-by-month basis from January 1, 2006 to present, projections for 2019, and the person(s) most knowledgeable about the marketing and sales for each Accused Product.

Thus far, Daikin has only identified DKN0001059, which accounts for sales only so far as September 2018. Please supplement your response to address the volume of sales in the United States and abroad for each Accused Product through the present.

**Chemours Interrogatory No. 9**

This interrogatory seeks the identity of every Third Party, including customers, retailers, distributors, manufacturers, and exporters, to whom Daikin has sold or offered to sell any Accused Products in the United States, provided importation of the Accused Products into the United States for, and/or provided exportation of the Accused Products from the United States for, from January 1, 2006 to present. The response should also include the quantity and sale price of each Accused Product sold or offered for sale.

Daikin identified eleven (11) customers, but failed to include the quantity and sales prices listed. Thus, Daikin failed to respond to the full scope of the Interrogatory.  Daikin must supplement its response to this Interrogatory to address the quantity and sale price of each Accused Product sold or offered to sale. In addition, Daikin must update this response to



Lisa Furby, Esq.
September 15, 2021

provide the requested information from the date of Daikin's initial response through the present.

**Chemours Interrogatory No. 12**

This interrogatory seeks considerations, plans, or attempts by Daikin to design or alter any Accused Product, any method of use of such Products, any process of manufacture of such Products, or labeling or any instructions for use of such Products, to avoid infringement or potential infringement of the Patents-in-Suit, and identify the person(s) knowledgeable of and/or involved in such consideration, plan, or attempt, and identify all documents which refer to or relate to such consideration, plan or attempt.

Daikin failed to provide any substantive response. Instead, Daikin objected on the basis of legal conclusion, privilege, overbreath, and undue burden. Please confirm immediately that there is no non-privileged information that has not been disclosed.

**Chemours Interrogatory No. 13**

This interrogatory seeks a description of the process by which the Accused Products were manufactured, including identification and quantities of all material components, reagents, and additives as well as any processes by which the Accused Products are created, and identify all parties involved in the manufacturing process, including third parties, as well the part of the manufacturing process in which each such party is involved.

In response, Daikin produced eight (8) pages of documents. We believe this sparse citation of documents does not respond to the full scope of the Interrogatory, and the cited documents reflect these deficiencies.  For example, Daikin's response identified Process Control Plans for NP-1108 and NP-1109 but not NP-3180. Similarly, Daikin identified process flow charts for NP-3810 but failed to cite the same charts for NP-1108 and NP-1109. Daikin must supplement its response to respond to the full scope of the interrogatory, including identifying the Process Control Plans for NP-3180 and the Process Flow Charts for NP-1108 and NP-1109.

**Chemours Interrogatory No. 14**

This interrogatory seeks a description, on a product-by-product basis, of the entire process by which each product Daikin asserts as prior art (NP-3000 and NP-101H) is manufactured. The description should include a claim chart comparing each prior art product to each asserted claim of the Patents-in-Suit as well as the chemical composition melt flow rate or melt flow index, quantity and chemical formula of unstable endgroups, quantity and identity of alkali salts added,

4



Lisa Furby, Esq.
September 15, 2021

amount and identity of alkali metal ion in the polymer, and the person(s) most knowledgeable about the composition, characteristics, and function of each such product.

Daikin contends that they will provide their invalidity contentions as their response. This is not sufficient. As Daikin is aware, Daikin is precluded from relying on printed publications as an invalidity defense. *See Wasica Fin. GmbH v. Schrader Int'l, Inc.*, 432 F. Supp. 3d 448, 454 (D. Del. 2020), *appeal dismissed*, No. 2020-2124, 2020 WL 8374870 (Fed. Cir. Sept. 24, 2020) (finding that defendant is estopped from raising invalidity arguments which could have been reasonably raised during the IPR.) Daikin, therefore, must provide notice to Plaintiff of its contentions that its products allegedly constitute prior art.

**Chemours Interrogatory No. 15**

This interrogatory seeks a description, on a product-by-product basis, the entire process by which each Daikin product asserted as prior art in Daikin's Amended Answer (D.I. 16) (NP-2000, NP-3000, and NP-101H) is manufactured, including identification of all third parties or subsidiaries involved, identification and quantities of all material components, reagents, and additives as well as any processes by which the key characteristics of said products are created, including but not limited to, melt flow rate and number of unstable end groups.

Thus far, Daikin has only provided approximately eighteen (18) pages of documents for NP-2000 and NP-101H. This response is deficient for both its sparse citations to any documents and its failure to cite any documentation relating to NP-3000. Please confirm immediately (1) whether Daikin is maintaining its prior use defense with respect to NP-3000 and, if so, identify the documents Daikin intends to rely on for this defense; and (2) that Daikin has identified all of the documents it intends to rely on to support its prior art defenses with respect to NP-2000 and NO-101H.

**Chemours Interrogatory No. 16**

This interrogatory seeks a description on the sales information for each Daikin product asserted as prior art in Daikin's Amended Answer (D.I. 16) (NP-2000, NP-3000, and NP-101H).

In response, Daikin identified DKN0001046, DKN0001047, and DKN0001058. All three of these documents must be updated to reflect sales information from 2018 through the present. Please produce these updated documents immediately and supplement Daikin's response to this Interrogatory accordingly.



Lisa Furby, Esq.
September 15, 2021


Very truly yours,

/s/ *D. J. S. Whitley*

Dexter Whitley, Ph.D.


cc:     Counsel of Record – by e-mail

# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CHEMOURS COMPANY FC, LLC, | |
| Plaintiff, | |
| v. | C.A. No. 17-1612-MN |
| DAIKIN INDUSTRIES, LTD and DAIKIN AMERICA, INC., | |
| Defendants. | |

**PLAINTIFF'S SECOND SET OF REQUESTS FOR
<u>PRODUCTION OF DOCUMENTS (36-53)</u>**

Pursuant to Federal Rules of Civil Procedure 26 and 34, Plaintiff Chemours Company

FC, LLC ("Chemours") hereby submits this First Set of Requests for Production of Documents

("Requests") to Defendants Daikin Industries, Ltd. and Daikin America, Inc. ("Daikin"). Plaintiff

requests that Defendants produce, in accordance with the Definitions and Instructions of this

document, the following requested documents and things at the office of Fish & Richardson P.C.,

222 Delaware Avenue, 17th Floor, P.O. Box 1114, Wilmington, DE 19801, or at another

mutually convenient location hereafter agreed upon, no later than thirty (30) days from the date

of service of these Requests. Documents shall be produced either as they are kept in the ordinary

course of business, or they shall be organized and labeled to correspond with categories set forth

in these Requests, as required by Federal Rule of Civil Procedure 34. Defendants are subject to a

duty to timely supplement all responses to these Requests in accordance with Federal Rule of

Civil Procedure Rule 26(e).

## **INSTRUCTIONS**

A.      Pursuant to Rule 34(b), a responding party is instructed to serve a written response upon propounding party's counsel within thirty (30) days after service of these Requests.

B.      These Requests for Production of Documents and Things shall be deemed to seek documents and things in existence as of the date of service thereof and to the full extent of the Federal Rules of Civil Procedure and local rules of this Court. These Requests are of a continuing nature, and Defendants are is required to file and serve supplemental responses promptly if Defendants obtain further or different information after the date of its initial response and before this litigation is completed.

C.      If Defendants decline to produce any document or part thereof based on a claim of privilege or any other claim, provide a privilege log, or "privilege document list," which identifies the type of document, the author of the document, the recipient of the document, the date of the document, the general subject matter of the document, and the privilege asserted.

D.      All documents requested are to be produced in the same file or other organizational environment in which they are maintained. For example, a document that is part of a file, docket, or other grouping, should be physically produced together with all other documents from said file, docket or grouping, in the same order or manner of arrangement as the original. Alternatively, as to each document and thing produced in response hereto, Plaintiff shall identify the request for production and where applicable, the request or interrogatory number, in response to which the document or thing is being produced.

E.      Different versions of the same documents, handwritten notes or notations in any form, draft documents and documents with handwritten notations or marks not found in the

2

original or on other copies are considered to be different documents for the purpose of production in compliance with these Requests, and each form should be produced separately.

F.      Each document and thing produced in response to these Requests shall be produced along with any and/or all attachments and/or enclosures as have ever been attached to and/or enclosed with the document or thing at any time.

G.      These Requests are specifically intended to include any and/or all documents and things in the possession, custody, or control of Defendants or in the possession, custody, or control of any parent, subsidiary or affiliated corporation, or by any of your officers, directors, employees, agents, representatives, or attorneys, wherever such documents are located, both within and outside the United States.

H.      If any responsive document or thing was previously possessed directly by Defendants, or by any parent, subsidiary or affiliated corporation, or by any of your officers, directors, employees, agents, representatives, or attorneys or was otherwise in your custody or control, but is no longer in your possession, then identify the document or thing, and state why it is no longer in your possession, custody or control and identify who currently has possession, custody or control of the responsive item.

I.      If any document responsive to these Requests has been destroyed, describe the content of said document, the location of any copies of said document, the date of such destruction, the basis for destruction, and the name of the person who ordered or authorized such destruction.

J.      If Defendants find the meaning of any term in these Requests to be unclear, Defendants must assume a reasonable meaning, state what the assumed meaning is, and produce documents on the basis of that assumed meaning.

K.      To the extent a document is responsive to multiple Requests, Defendants needs only produce the document once.

L.      If no documents or things are responsive to a particular request, you are to state that no responsive document or thing exists.

M.      Any redacted document should be clearly stamped with the word "REDACTED," and the portions redacted should be clearly indicated.

N.      The written answer to each individual request for production must repeat verbatim, immediately before each answer, the text of the individual request for production being answered.

## **DEFINITIONS**

The following definitions shall apply to the requests that follow:

A.      "Defendants" or "Daikin" means Daikin Industries, Ltd. and Daikin America, Inc., including, without limitation, all predecessors, subsidiaries, parents, successors and affiliates and all past or present directors, officers, shareholders, agents, representatives, employees, consultants, attorneys, and entities acting in joint venture or partnership with Daikin Industries, Ltd. and Daikin America, Inc.

B.      The terms "you," "your," or "yours" means Defendants or Daikin as defined above.

C.      The terms "entity" or "entities" include natural persons, proprietorships, partnerships, firms, private corporations, public corporations, municipal corporations, governments (including foreign national governments, the government of the United States or any state or local government), all departments and agencies thereof, and any governmental agencies of any country, political subdivisions, groups, associations, or organizations.

4

D.     The term "employee" means all current and former persons employed by Defendants.

E.     The term "Third Party" means a person or entity other than a party to his lawsuit.

F.     The term "communication" means any transmission of information from one or more person or entity to another including without limitation by personal meeting, telephone, written correspondence (including without limitation letters, memoranda, and notes), facsimile, and electronic transmissions such as e-mail, instant messaging, and text messaging.

G.     The term "date" means the exact day, month, and year, if ascertainable, and if the exact day, month, and year is not ascertainable, then the best approximation thereof.

H.     The terms "document" or "documents" means all "writings and recordings" as that term is defined in the Federal Rules of Evidence 1001 and is used in its broadest sense within the context of the Federal Rules of Civil Procedure. Any document bearing marks including without limitation initials, stamped initials, comments, or notations that are not part of the original text is a separate document.

I.     The term "the '609 patent" means U.S. Patent No. 7,122,609.

J.     The term "the '431" means U.S. Patent No. 8,076,431.

K.     The terms "Asserted Patents" or "Patents-in-Suit" means the '609 and '431 patents.

L.     "Prior art" means all patents, publications, or events falling within or arguably falling within any of the categories set forth in 35 U.S.C. §§ 102 and 103.

M.     "Related Patent" or "Related Patents" means, with respect to any specific patent or application for a patent, any or all U.S. and non-U.S. patents and any or all U.S. or non-U.S.

5

patent applications, continuations, continuations in part, divisions, parent applications, parent patents, child applications, or child patents to which the Patents-in-Suit claims priority or for which the Patents-in-Suit form a basis for priority.

N.       "Claimed subject matter" means all chemical compositions, articles, resins, process, services, technology, implementations, uses, and any other subject matter that is or may be covered by one or more claims of the Patents-in-Suit, as defined above.

O.       "FEP products" means products comprising copolymer polymerized from tetrafluoroethylene, hexafluoropropylene, and optionally one or more other fluorinated monomers, sometimes referred to as fluorinated ethylene propylene, including but not limited to resins or polymers.

P.       "Accused Products" means Daikin copolymer products Neoflon® FEP NP-1108, Neoflon® FEP NP-1109, and Neoflon® FEP NP-3180.

Q.       "Predecessor Product" means any Daikin polymer product developed, marketed, or sold before development of any Accused Product, with a melt flow rate higher than 20, and used for high-speed extrusion of thin coatings of small wire sizes such as plenum cable insulation.

R.       The term "each" shall mean each and every.

S.       The terms "relate to," "related to," or "relating to" means to concern, embody, involve, describe, reflect, identify, state, discuss, constitute, comprise, or evidence.

T.       The terms "and," "or," and "and/or" shall be construed in the conjunctive or the disjunctive, whichever form renders the most inclusive request possible. The use of the singular shall be deemed to include the plural, and the use of one gender shall include the other as appropriate in the context.

U.    The term "any" shall include the term "all," and vice versa.

V.    The terms "thing" or "things" shall mean any tangible object other than a document as defined herein, and includes objects of every kind and nature.

## **REQUESTS FOR PRODUCTION**

I.    **REQUEST NO. 36:**

Documents from which the following may be determined regarding the Accused Products:

a.  the process for making a sale, including the process for forecasting sales and manufacturing demand;

b.  gross revenue and net revenue, by customer and product, listing the amount for all deductions required to reconcile gross and net revenues;

c.  total quantity of units sold and the total quantity sold, net of any returns, by customer, by product;

d.  total quantity of units produced;

e.  cost of goods sold on a per product basis, including, but not limited to:

    i.  direct labor and material costs;

    ii.  indirect labor and material costs;

    iii. manufacturing overhead costs; and

    iv. standard costs and any associated variances.

f.  actual total cost and variances from standard cost;

g.  gross profits, gross margin, or standard margin on a per product basis;

h.  all costs other than manufacturing costs on a per product basis, including whether those costs are fixed, variable, or partly fixed and partly variable in nature, and if partly fixed and partly variable, the percentage that is fixed and the percentage that is variable. These costs may include, but are not limited to:

    i.  commissions and other selling expenses;

    ii.  general and administrative expenses; and

    iii. engineering, research, and development expenses.

i.  net income or net profit before taxes on a per product basis;

j.  geographic sales information for each Accused Product, including but not limited to the location of each sale of an Accused Product and the "ship to address" of each Accused Product.

**II.  REQUEST NO. 37:**

Quarterly profit and loss statements, or similar data, for the smallest tracked business unit at Daikin that sells the Accused Products.

**III.  REQUEST NO. 38:**

Documents sufficient to show the units of the Accused Products produced by facility, by quarter.

**IV.  REQUEST NO. 39:**

Documents sufficient to show the units of the Accused Products transferred and/or sold (to end users, to sales departments, or to third party or related distributors), by facility, by quarter, including Documents sufficient to show where the units of Accused Products were shipped to, transferred and/or sold.

**V.  REQUEST NO. 40:**

All documents referring or relating to estimated or actual market shares for the Accused Products as well as those non-Daikin products the Accused Products compete with, by:

a.  aggregate market;

b.  region;

c.  end user.

**VI.  REQUEST NO. 41:**

All documents, brochures, advertising, promotional materials, consumer surveys, marketing studies, outside consultant reports, and sales and training materials describing the Accused Products, including discussing the performance/quality of the patented product,

Daikin's pricing, distribution, customer support and any other alleged competitive advantages or factors that drive purchasing decisions.

## VII.   **REQUEST NO. 42:**

All documents establishing or discussing Daikin's pricing policies for the Accused Products including price setting, target profit margins, pricing methodologies, price changes and price competition.

## VIII.   **REQUEST NO. 43:**

All documents reflecting pricing or price changes (including the basis for changes) for any of the Accused Products, including price lists, discount schedules, approval process for discounts, bid documents, cost estimates, any document reflecting variances from standard or published pricing and any document describing price concessions offered to customers for any reason.

## IX.   **REQUEST NO. 44:**

All salesperson's call reports, memoranda, correspondence, and customer relationship management reports related to the Accused Products or other documents relating to competitive bid situations, pricing in response to competitive bids, discounts in response to competitive bids and lost sales due to competitive bids related to the Accused Products, including such documents sufficient to identify customer(s), products(s), competitor(s) and bids.

## X.   **REQUEST NO. 45:**

All documents referring or relating to the effect of selling the Accused Products on sales of other Daikin products (convoyed products) or services.

## XI.   **REQUEST NO. 46:**

All documents regarding Daikin's competitors, including, but not limited to, documents sufficient to describe for each competitor of the Accused Products the regions they compete in

with respect to the market for the Accused Products and any products relating to the market for the subject matter of a claim of the Asserted Patents.

## XII.   **REQUEST NO. 47:**

All documents relating to the actual or projected present or future market, demand for, growth potential, and/or competitors in the market for the Accused Products and any products relating to the market for the subject matter of a claim of the Asserted Patents.

## XIII.   **REQUEST NO. 48:**

All market studies, reports or analyses relating to competition, individual competitors, market segments, and market share of the products relating to the subject matter of a claim of the Asserted Patents, Accused Products, and any convoyed products.

## XIV.   **REQUEST NO. 49:**

Contemporaneous market studies, competitive analyses product approvals, capital expenditure approvals or any other documents prepared by Daikin or anyone else relating to market expectations and/or discussions or descriptions of the competitive environment for the Accused Products and any products relating to the market for the subject matter of a claim of the Asserted Patents.

## XV.   **REQUEST NO. 50:**

Contemporaneous sales/market projections, budgets, business plans or other documents reflecting Daikin's expectations of the market potential for the Accused products.

## XVI.   **REQUEST NO. 51:**

All industry reports, research reports, or analyst reports addressing the competitive environment, market potential, individual competitors, and/or industry trends in the market for the Accused Products and any products relating to the market for the subject matter of a claim of the Asserted Patents.

## XVII.  **REQUEST NO. 52:**

All documents relating to the absence or presence of a non-infringing alternative to the

subject matter of a claim of an Asserted Patent, including without limitation analyses of

alternative design performance/quality differentials, cost increases to end users, manufacturing

costs differences, decreased benefits to end users or differences to the producer and marketer of

the alternative that has been considered, explored, developed, prototyped, tested, or analyzed.

## XVIII. **REQUEST NO. 53:**

Daikin's knowledge of the Asserted Patents and/or any related patents, including but not

limited to, the circumstances under which Daikin became aware of the Asserted Patents.


Dated:  September 24, 2021                     **FISH & RICHARDSON P.C.**

By: */s/ Jeremy D. Anderson*
  Martina Tyreus Hufnal (#4771)
  Jeremy D. Anderson (#4515)
  Nitika Gupta Fiorella (#5898)
  Kelly Allenspach Del Dotto (#5969)
  Grayson P. Sundermeir (#6517)
  222 Delaware Avenue, 17th Floor
  P.O. Box 1114
  Wilmington, DE  19899-1114
  (302) 652-5070
  hufnal@fr.com
  janderson@fr.com
  fiorella@fr.com
  kad@fr.com
  sundermeir@fr.com

  Dexter Whitley *(pro hac vice)*
  FISH & RICHARDSON P.C.
  1180 Peachtree Street
  NE, 21st Floor
  Atlanta, GA 30309
  whitley@fr.com

  *Attorneys for Plaintiff*
  **CHEMOURS COMPANY FC, LLC**

11

# EXHIBIT 8

| | |
|---|---|
| **From:** | Furby, Lisa L. |
| **Sent:** | Monday, November 1, 2021 8:39 PM |
| **To:** | Dexter Whitley; Martina Hufnal; Kelly Del Dotto |
| **Cc:** | jday@ashby-geddes.com; AMayo@ashby-geddes.com; DaikinJDDE |
| **Subject:** | RE: Chemours v. Daikin, 17-cv-1612:  Daikin's 30(b)(6) Witnesses and Sample Production |

Dexter:

In its RFPs served in 2018, Chemours requested samples of the Accused Products. *See* Chemours' RFP No. 25.  As you know, Daikin responded indicating that samples would be made available inspection at a mutually agreeable time and location. *See* Daikin's Response to Chemours' RFP No. 25.  Chemours has never reached out to Daikin to schedule a mutually agreeable time and location to inspect samples of the accused products.  On October 8th of this year, Chemours served a *separate* request seeking a metric ton of each of the accused products.  As you know, Daikin's objections and responses are not due until November 8, 2021. ███████████████████████ We are continuing to confer with our client to determine whether Daikin has any quantity of the accused products available to provide to Chemours.  At a minimum, we do not understand why Chemours would need three metric tons of the accused materials. Please provide an explanation for why Chemours would need such a large sample, and your legal authority to support such a burdensome request.

Regards,
Lisa

Lisa Furby
Associate
**JONES DAY® - One Firm Worldwide℠**
77 West Wacker Drive
Chicago, IL 60601
Office +1.312.269.1525
lfurby@jonesday.com

---

**From:** Dexter Whitley <whitley@fr.com>
**Sent:** Monday, November 1, 2021 5:54 PM
**To:** Furby, Lisa L. <lfurby@jonesday.com>; Martina Hufnal <TyreusHufnal@fr.com>; Kelly Del Dotto <allenspach.del.dotto@fr.com>
**Cc:** jday@ashby-geddes.com; AMayo@ashby-geddes.com; DaikinJDDE <DaikinJDDE@jonesday.com>
**Subject:** RE: Chemours v. Daikin, 17-cv-1612: Daikin's 30(b)(6) Witnesses and Sample Production

**\*\* External mail \*\***

Lisa,

We have not received a response to the below correspondence with regards to the 1,000 kg of resin samples for each Accused Product.  We request that you immediately produce the requested samples.  There is no legitimate reason that Daikin cannot readily produce samples of products in its possession.  Chemours is prejudiced by any further delay in the production of these samples.

Regards,
Dexter

**Dexter J. S. Whitley :: Associate :: Fish & Richardson P.C.**
1180 Peachtree Street NE, 21st Floor, Atlanta, GA 30309
404 724 2808 direct :: 601 832 9272 mobile :: whitley@fr.com
fr.com :: Bio :: LinkedIn :: Twitter

---

**From:** Dexter Whitley
**Sent:** Monday, October 25, 2021 9:35 PM
**To:** 'Furby, Lisa L.' <lfurby@jonesday.com>; Martina Hufnal <tyreushufnal@fr.com>; Kelly Del Dotto
<allenspach.del.dotto@fr.com>
**Cc:** jday@ashby-geddes.com; AMayo@ashby-geddes.com; DaikinJDDE <DaikinJDDE@jonesday.com>
**Subject:** Chemours v. Daikin, 17-cv-1612: Daikin's 30(b)(6) Witnesses and Sample Production

Lisa,

Please confirm by tomorrow (Oct. 26) whether Daikin will be producing a witness on Chemours' 30(b)(6) Topic Nos. 16, 17, 22, and 28 and producing witnesses to testify to the full scope of 30(b)(6) Topic Nos. 3, 4, 10, 11, 29 and 30. These issues were discussed during the parties Oct. 15 meet and confer. *See* Oct. 18 Letter to Furby from Whitley. If you do not confirm the above by tomorrow or refuse to make the requested witnesses available, we will consider the parties to be at an impasse and will be raising these issues with the Court during the Nov. 8 discovery conference.

Further, we requested that Daikin produce samples of the Accused Products in our first set of RFPs. *See* Chemours' RFP No. 25. You responded stating that you would make samples available for inspection. *See* Daikin's Response to Chemours' RFP No. 25. To the extent that our request was not clear, we are requesting that Daikin produce 1,000 kg of resin samples for each Accused Product. *See* Chemours' RFP No. 54. Please confirm that you will produce the requested resin samples by October 29, 2021 and that there is no issues between the parties on this matter.

Regards,
Dexter

**Dexter J. S. Whitley :: Associate :: Fish & Richardson P.C.**
1180 Peachtree Street NE, 21st Floor, Atlanta, GA 30309
404 724 2808 direct :: 601 832 9272 mobile :: whitley@fr.com
fr.com :: Bio :: LinkedIn :: Twitter

**************************************************************************************************
**************************
This email message is for the sole use of the intended recipient(s) and may contain confidential
and privileged information. Any unauthorized use or disclosure is prohibited. If you are not the
intended recipient, please contact the sender by reply email and destroy all copies of the original
message.
**************************************************************************************************
**************************

# EXHIBIT 9

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

| | |
|---|---|
| JAGUAR LAND ROVER LIMITED, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| BENTLEY MOTORS LIMITED, and | ) |
| BENTLEY MOTORS, INC., | ) |
| | ) |
| Defendants. | ) |

Case No.: 2:18-cv-320

**REDACTED**

## ORDER

This matter is before the Court on Plaintiff Jaguar Land Rover's ("JLR") Motion to Compel and memorandum in support, ECF Nos. 288-289, the opposition brief of Bentley Motors Limited and Bentley Motors Inc. (collectively, "Bentley"), ECF No. 310, and JLR's reply brief, ECF No. 321. JLR's Motion seeks to compel : (1) Bentley's production to JLR a representative Accused Product (the Bentley Bentayga) and diagnostic tools Bentley itself uses to evaluate the All-Terrain Specification ("ATS"); and (2) an additional deposition of Mr. Alistair Corner ("Mr. Corner") and Mr. Howard Chetwynd ("Mr. Chetwynd"), two persons Bentley designated as corporate witnesses under Rule 30(b)(6). ECF No. 289 at 8.

### A. Motion to Compel Inspection of Bentayga

JLR served an interrogatory on Bentley requesting production of "[o]ne physical sample of each model, configuration, edition and/or trim of the Bentley Bentayga that includes the All-Terrain Specification." ECF No. 289, attach. 3 at 24-25. On December 27, 2019, along with its objections, Bentley initially agreed to "make a Bentley Bentayga available for a visual inspection" and directed JLR to "contact U.S. counsel to discuss arrangements." *Id.* According to JLR,

inspection of a Bentayga is necessary because Bentley cannot provide the source code related to the Accused Product, nor the technical documents detailing the operation of the Accused Products. ECF No. 289 at 7.

The parties held a meet and confer on January 8, 2020, and dispute the agreements made on that date. ECF No. 289, attach. 4 at 2. JLR sent Bentley an email after that meet and confer summarizing the agreements the parties made. *Id.* JLR's email stated that Bentley agreed to make a Bentayga with ATS available for inspection, Bentley would provide the diagnostic tools and equipment Bentley uses available to JLR, and that Bentley would be amenable to entering a stipulation that the vehicle is representative of other models with ATS. *Id.* There is no evidence that Bentley objected to JLR's interpretation of the meet and confer, but Bentley asserts that it only agreed to allow a visual inspection of a Bentayga, but never agreed to allow JLR access to Bentley's diagnostic equipment. ECF No. 310 at 7-8. The parties held another meet and confer on January 24, 2020, and Bentley asserts that only then did it realize that the Bentayga inspection was still an issue that needed to be resolved.[1]  *Id.*

First, the Court finds that Bentley's motion to compel inspection of a Bentayga untimely. Despite having knowledge as of at least January 24, 2020, that Bentley would not allow JLR to inspect a Bentayga with Bentley's diagnostic equipment (*see* ECF No. 310, attach. 5), JLR did not file the instant motion until February 26, 2020—over a month after it had full knowledge that Bentley would not produce a Bentayga and allow JLR to examine it with Bentley's diagnostic equipment. *See* Fed. R. Civ. P. 26(C). Moreover, JLR's request seeks only "[o]ne physical sample of each model, configuration, edition and/or trim of the Bentley Bentayga that includes the All-

---

[1] Bentley also asserts that it considered the Bentayga inspection issue moot because during depositions in mid-January, witnesses for JLR testified that JLR ████████████████████████████████ ████████████ ECF No. 312 at 8.

Terrain Specification." The Court agrees that JLR's current demands that Bentley provide its own diagnostic equipment to test a vehicle go well beyond the language of the discovery request it propounded to Bentley. Based on these circumstances, the Court **DENIES** JLR's Motion to Compel with respect to the inspection of a Bentayga.

### 2. Motion to Compel Bentley to produce Mr. Corner & Mr. Chetwynd again for Depositions

JLR also requests that the Court compel Bentley to re-produce two of Bentley's Rule 30(b)(6) witnesses—Mr. Alistair Corner ("Mr. Corner") and Mr. Howard Chetwynd ("Mr. Chetwynd")—for a deposition on the grounds that they were unprepared for their original depositions. The deposing party in a Rule 30(b)(6) deposition "must designate the areas of inquiry with reasonable particularity, and the corporation must designate and adequately prepare witnesses to address these matters." *United States v. Taylor*, 166 F.R.D. 356, 360 (M.D.N.C. 1996). The corporation "must put forth a thorough, good faith effort to prepare its designee to give binding answers on its behalf." *Dixon Lumber Co. v. Austinville Limestone Co.*, 256 F. Supp. 3d 658, 667 (W.D. Va. 2017). *See also Loboa v. Women's Health All., P.A.*, No. 5:18-CV-00329-FL, 2020 U.S. Dist. LEXIS 31395, at *4 (E.D.N.C. Feb. 24, 2020) ("The corporation must make 'a conscientious, good-faith effort to designate knowledgeable persons for Rule 30(b)(6) depositions and to prepare them to fully and unevasively answer questions about the designated subject matter.'") (citations and quotations omitted). "Producing an unprepared witness is tantamount to a failure to appear." *Taylor*, 166 F.R.D. at 362. However, [t]here is no obligation to produce witnesses who know every single fact" and "production of a designee who renders substantial testimony on the pertinent issues is not a basis for sanctions." *Wellman v. Bobcat Oil & Gas, Inc.*, No. 3:10-CV-00147, 2011 WL 13161415, at *2 (S.D.W. Va. Dec. 1, 2011)

JLR contends that Mr. Corner was not knowledgeable generally on two topics. First, JLR contends that Mr. Corner did not know details regarding ██████████████████████████████



██████████████████████████████ ECF No. 310 at 20. Bentley also contends that information relating to the ██████████████████████████████████████████ was provided to JLR through an interrogatory response. *See Id.*; ECF No. 313, attach 8 at 11-12 (Bentley's interrogatory responses). Second, JLR contends that Mr. Corner did not know details regarding the operation of the Bentayga, including how the ATS modes differed—including the details of ██████████████████████████████

██████████████████████████████[2] ECF No. 289 at 9. ████████

██████████████████████████████

██████████████████████████████ ECF No. 313 at 20.

With respect to Mr. Chetwynd, JLR contends that Mr. Chetwynd was not knowledgeable regarding Topic 56, which required him to testify regarding "facts and circumstances regarding "communications or documents exchanged by Bentley and Porsche AG, Audi AG, Volkswagen AG, and/or any entity of the Volkswagen Group concerning JLR, JLR's Terrain Response® technology, this lawsuit, the Asserted Patent, the '776 patent, and/or Bentley Bentayga vehicles with the All-Terrain Specification..." ECF No. 289 at 10. Bentley contends that Mr. Chetwynd's testimony regarding Topic 56 was limited by its objections and that Mr. Chetwynd properly

---

[2] These categories of information relate to Topics 3-8, 57, and 62 in JLR's Notice of 30(b)(6) deposition. *See* ECF No. 289 at 9; ECF No. 289, attach. 7.

provided testimony in the scope for which he was designated, and that in any event, Topic 56 is duplicative of Topics 3-8. ECF No. 310 at 21-22.

Upon review of the deposition testimony provided and the parties' contentions, the Court finds that Mr. Corner and Mr. Chetwynd provided "substantial testimony" on the topics for which they were designated and cannot fairly be considered unprepared to answer questions on these topics. *See Wellman*, 2011 WL 13161415, at *2; *cf. Spicer v. Universal Forest Prods.*, Civil Action No. 7:07cv462, 2008 U.S. Dist. LEXIS 77232, at *7 (W.D. Va. Oct. 1, 2008) (granting motion to compel only where 30(b)(6) witness did nothing to prepare for his deposition other than speaking with counsel, and refused, on the basis of privilege, to answer any questions propounded by counsel). The fact that Mr. Corner and Mr. Chetwynd could not answer every single question fathomable subsumed in a topic identified by JLR is not unsurprising considering the broad nature of JLR's designations. *See generally* ECF No. 289, attach 7. Though Mr. Corner and Mr. Chetwynd did not know the answer to every question propounded by JLR, they each addressed the substance of the topics on which they were designated to testify. Accordingly, JLR's Motion to Compel with respect to the deposition of Mr. Corner and Mr. Chetwynd is **DENIED**.

The Clerk is **DIRECTED** to forward a copy of this order to all counsel of record.

It is so **ORDERED**.

Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
March 24, 2020