IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CHEMOURS COMPANY FC, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 17-1612 (MN) (CJB) |
| | ) | |
| DAIKIN INDUSTRIES, LTD. and DAIKIN AMERICA, INC., | ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM ORDER

At Wilmington this 23rd day of March 2022:

On December 15, 2021, Magistrate Judge Burke issued an Oral Report and Recommendation (D.I. 247) ("the Motion to Amend Report") recommending that the Court grant-in-part and deny-in-part Defendants Daikin Industries, Ltd. and Daikin America, Inc. (collectively, "Defendants" or "Daikin") Motion for Leave to Amend Answer and Counterclaims (D.I. 218). On December 29, 2021, Defendants filed objections to the Motion to Amend Report. (D.I. 250).[1] On January 12, 2022, Plaintiff Chemours Company FC, LLC ("Plaintiff" or "Chemours") responded to the objections. (D.I. 255). The Court has reviewed the Motion to Amend Report, the objections and the responses thereto, and has considered *de novo* the original Motion for Leave to Amend Answer and Counterclaims briefing and supporting documents. *See, e.g.*, 28 U.S.C. § 636(b)(l); FED. R. CIV. P. 72(b)(3).[2] For the reasons set forth below, Defendants' objections are

---

[1] No party objected to the Motion to Amend Report's finding that the motion to amend be granted as to counterclaims 5 and 6 and affirmative defenses 13 and 15. Therefore, the Court adopts those findings and the motion is granted with respect to these counterclaims and affirmative defenses.

[2] A motion for leave to amend is a non-dispositive motion. *See Cont'l Cas. Co. v. Dominick D'Andrea, Inc.*, 150 F.3d 245, 251 (3d Cir. 1998). Objections to a Magistrate Judge's

OVERRULED and the Motion to Amend Report is ADOPTED. Defendants' Motion for Leave to Amend Answer and Counterclaims is GRANTED-IN-PART and DENIED-IN-PART as specified in the Motion to Amend Report.

Additionally, on January 13, 2022, Magistrate Judge Burke issued a Report and Recommendation ("the Claim Construction Report") (D.I. 256) recommending that the Court adopt constructions for disputed claim terms in U.S. Patent Nos. 7,122,609 ("the '609 patent") and 8,076,431 ("the '431 patent" and, collectively with the '609 patent, "the asserted patents" or "the patents-in-suit"). On January 27, 2022, Defendants objected to the Claim Construction Report only as to the Claim Construction Report's construction of the "about" terms: "about," "about 30±3 g/10 min," and "about 30±2 g/10 min". (D.I. 259). On February 10, 2022, Plaintiff responded to Defendants' objections. (D.I. 277). The Court has reviewed the Claim Construction Report, the objections and the responses thereto, and has considered *de novo* the original claim construction briefing and supporting documents, as well as the transcript of the claim construction hearing regarding the objected to terms. *See, e.g.*, *St. Clair Intellectual Prop. Consultants, Inc. v. Matsushita Elec. Indus. Co.,* 691 F. Supp. 2d 538, 541-42 (D. Del. 2010); 28 U.S.C. § 636(b)(l); FED. R. CIV. P. 72(b)(3). For the reasons set forth below, the Defendants' objections to the Claim Construction Report are OVERRULED and the recommended constructions are ADOPTED.

---

ruling on a non-dispositive motion are subject to a "clearly erroneous or contrary to law" standard of review, pursuant to 28 U.S.C. § 636(b)(1)(A) and Rule 72(a) of the Federal Rules of Civil Procedure. Thus, the Court would typically review objections to a Magistrate Judge's order regarding a motion for leave to amend under the clearly erroneous or contrary to law standard. In this case, however, the Magistrate Judge did not issue an Order but, instead, issued a Report and Recommendation (the Motion to Amend Report). Thus, the Court has reviewed Defendants' objections to the Motion to Amend Report *de novo*.

I.  **MOTION TO AMEND**

   A.  **LEGAL STANDARD**

"A schedule may be modified only for good cause and with the judge's consent." FED. R. CIV. P. 16(b)(4); *see also WebXchange Inc. v. Dell Inc.*, 2010 WL 256547, at *2 (D. Del. Jan. 20, 2010) ("After a pleading deadline has passed, the Third Circuit requires a showing of good cause in order to amend." (citing *E. Minerals & Chemicals Co. v. Mahan*, 225 F.3d 330, 340 (3d Cir. 2000))). "The good cause element requires the movant to demonstrate that, despite diligence, the proposed claims could not have been reasonably sought in a timely manner." *Roquette Freres v. SPI Pharma, Inc.*, No. C.A. 06-540GMS, 2009 WL 1444835, at *4 (D. Del. May 21, 2009).

"[A] claim for inequitable conduct must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which requires that in alleging fraud a party must 'state with particularity the circumstances constituting fraud or mistake.'" *Lipocine Inc. v. Clarus Therapeutics, Inc.*, No. CV 19-622 (WCB), 2020 WL 4794576, at *3 (D. Del. Aug. 18, 2020) (citing *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1326-27 (Fed. Cir. 2009)); *see also* FED. R. CIV. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

   B.  **DISCUSSION**

Defendant objects to the Motion to Amend Report for three reasons. The Court addresses each in turn.

First, Defendant broadly argues that the Motion to Amend Report contradicts "the law of this District" regarding the heightened pleading requirements for inequitable conduct because it "holds that a procedural amendment deadline trumps responsible pre-claim investigation[.]"

(D.I. 250 at 3-6, 5-6). The Court disagrees. The Court recognizes that, "[b]ecause it is often the case that the critical evidence necessary to prove inequitable conduct can be obtained only from the patentee, it is common for claims of inequitable conduct to arise only after discovery has been conducted [and] after the deadline for amending pleadings." *Lipocine*, 2020 WL 4794576, at *3. The Motion to Amend Report, however, does not contradict or otherwise overlook the heightened pleading requirements for inequitable conduct. Instead, the Motion to Amend Report directly addresses the heightened pleading standard and succinctly explains that the Defendants lacked diligence once the facts underlying their inequitable conduct counterclaims and affirmative defenses were discovered. (D.I. 247 ("To be sure, claims like these invoking the Rule 9(b) standard are serious ones; in some cases, that can mean that deposition testimony is required before such claims can be responsibly filed. But on the facts here, were the Court to agree with Defendants, it would be tantamount to suggesting that a party can never file a plausible Rule 9(b)-related claim in a patent case before depositions occur. That is certainly not the rule[.] Thus, there is not good cause to permit the late filing of these claims in this case.")).

Second, Defendants argue that the Motion to Amend Report errs in its factual analysis because, although one document on which Defendants rely (PM-W-478) for their inequitable conduct counterclaims and affirmative defenses was discovered prior to the pleading deadline, "[o]nly post-deadline discovery revealed the full significance of PM-W-478[.]" (D.I. 250 at 6-8). Again, the Court disagrees. The Court has carefully reviewed the record regarding Defendants' discovery of the facts underlying its inequitable conduct counterclaims and affirmative defenses *de novo* as well as the Motion to Amend Report, which states:

> Here, the Court agrees with Plaintiff that the key document that these claims rely on is PM-W-478 (Exhibit 16), which was produced in September 2018. (D.I. 228 at 2; *see also* D.I. 218, ex. B at 43-49; D.I. 228, ex. 1) While Defendants note that the claims also rely on

4

> some recently-obtained testimony from Mr. Chapman and Dr. Venkataraman, (D.I. 234 at 2; *see also* D.I. 218, ex. B at 44-45), in the Court's view, that testimony is simply used to corroborate or bolster a theory of liability that was already purportedly evident in light of the content of PM-W-478, (D.I. 228 at 4). The question here is only whether Defendants would have had purportedly plausible claims prior to the October 6 amendment deadline; in light of the above, they would have, and they should have been ready to file these claims long before that deadline.

(D.I. 247). The Court agrees with the Motion to Amend Report's reasoning and analysis of the record. Recognizing the heightened pleading standard for these inequitable conduct counterclaims and affirmative defenses, the Court does not find that Defendants' post-deadline discovery was necessary to substantiate what already could have been evident from PM-W-478 alone.

Third, regarding Defendants' state law and patent misuse counterclaims and affirmative defenses, Defendants argue that the Motion to Amend Report erred in finding that "documents produced in 2018 were enough, in and of themselves, to support these claims." (D.I. 250 at 9-10). Yet again, the Court disagrees. The Court has carefully reviewed the record regarding Defendants' discovery of the facts underlying its state law and patent misuse counterclaims and affirmative defenses *de novo* as well as the Motion to Amend Report, which states:

> With regard to [state law] counterclaims 11 and 12, . . . [k]ey to these claims are certain documents (Exhibit 1 and Exhibit 5) that were produced to Defendants back in 2018, before the case was stayed. (D.I. 218, ex. B at 73-74; D.I. 228, ex. 1) To the extent the claims also rely on certain other recently-produced documents (like Exhibits 3, 34 and 36) that address Plaintiff's alleged strategy for discussing the ongoing litigation with Defendants' customers, (D.I. 218, ex. B at 74-75; D.I. 228, ex. 1; D.I. 234 at 2), Defendants' counsel acknowledged during argument that Defendants will also rely on other of Plaintiff's documents for this same purpose-- documents that were produced in 2018, (*see* D.I. 228 at 3 (citing Exhibits 1, 4 and 5); *id.*, ex. 1). And to the extent that Defendants argue that these claims also cite to recently-obtained deposition testimony of Plaintiff's witness Ms. Dignam, (D.I. 234 at 2; *see also* D.I. 218, ex. B at 73-74), again, the question here is only whether Defendants would have had a plausible claim prior to the

5

> amendment deadline. Ms. Dignam's testimony (which is said only to confirm what is in long-ago-produced documents) does not appear to have been needed to make out such a claim. (D.I. 218, ex. B at 73-74)  There is thus no good cause to allow these claims as well. . . . [W]ith regard to [patent misuse] counterclaim 13 (and affirmative defense 17), . . . [t]he key document in the claims (Exhibit 1) and all but one of the other documents cited (Exhibits 2, 4 and 5) were produced back in 2018.  (D.I. 228 at 3; *see also* D.I. 218, ex. B at 24-25, 77-78)  These claims also could have been plausibly alleged months before the deadline for amendment.

(D.I. 247).  The Court agrees with the Motion to Amend Report's reasoning and analysis of the record.  The Court does not find that Defendants' confirmatory post-deadline discovery provides good cause for Defendants to amend their pleadings.

For these reasons, Defendants' objections to the Motion to Amend Report are overruled and Defendants' motion to amend is granted-in-part and denied-in-part.

## II. CLAIM CONSTRUCTION

### A. LEGAL STANDARD

"[T]he ultimate question of the proper construction of the patent [is] a question of law," although subsidiary fact-finding is sometimes necessary.  *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837-38 (2015).  "[T]he words of a claim are generally given their ordinary and customary meaning [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (internal citations and quotation marks omitted).  Although "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered.  *Id.* at 1314.  "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent."  *Id.* at 1321 (internal quotation marks omitted).

6

The patent specification "is always highly relevant to the claim construction analysis . . . [as] it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996). It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips,* 415 F.3d at 1316. "Even when the specification describes only a single embodiment, [however,] the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Hill-Rom Servs., Inc. v. Stryker Corp.,* 755 F.3d 1367, 1372 (Fed. Cir. 2014) (internal quotation marks omitted) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898, 906 (Fed. Cir. 2004)).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), *aff'd,* 517 U.S. 370 (1996). The prosecution history, which is "intrinsic evidence, . . . consists of the complete record of the proceedings before the PTO [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips,* 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id*.

In some cases, a court "will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva,* 135 S. Ct. at 841. Extrinsic evidence "consists of all evidence external to the patent and prosecution history,

7

including expert and inventor testimony, dictionaries, and learned treatises." *Markman,* 52 F.3d at 980.  Expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips,* 415 F.3d at 1318.  Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id*.  Overall, although extrinsic evidence "may be useful to the court," it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id* at 1318-19.  Where the intrinsic record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper.  *See Pitney Bowes, Inc. v. Hewlett-Packard Co.,* 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics,* 90 F.3d at 1583).

### B. **DISCUSSION**

The Claim Construction Report recommended construing the "about" terms according to Plaintiff's proposed constructions, where "about" means "approximately," "about 30±3 g/10 min" means "approximately 30±3 g/10 min," and "about 30±2 g/10 min" means "approximately 30±2 g/10 min."  (D.I. 256 at 9-18, 23).  The Claim Construction Report rejected Defendants' proposed constructions which, unlike Plaintiff's proposed constructions, placed strict numerical limits on the "about 30±3 g/10 min" and "about 30±2 g/10 min" terms.  (D.I. 256 at 9-18).  Specifically, Defendants proposed construing "about 30±3 g/10 min" to mean "26 to 33 g/10min" and "about 30±2 g/10 min" to mean "27 to 32 g/10 min."  (D.I. 256 at 10).

The Defendants object to the recommended constructions of the "about" terms for two reasons.  The Court will address these objections in turn.

8

First, Defendants object to the recommended constructions of "about 30±3 g/10 min" and "about 30±2 g/10 min" as "at odds with specification" because, allegedly, "[t]he specification delineates clear boundaries for permissible MFR [melt flow rate] properties of the polymer of 'The Invention' [where the] MFR *cannot* exceed 33 g/10 min[.]" (D.I. 259 at 3, 5 (citing '609 Patent at 5:56-60)). Correspondingly, Defendants allege that "[t]he [Claim Construction Report's] conclusion that 'it is possible' that the polymer of 'the Invention' 'could' have a MFR of 33 g/10 min or higher contradicts the specification's description of the polymer of 'The Invention,' finds no support in the specification, and erroneously relies on unclaimed process limitations such as melt temperature." (D.I. 259 at 8).

The Court has carefully reviewed the record regarding the construction of the about terms *de novo* as well as the Claim Construction Report's analysis of whether the specification sets clear limits for permissible MFR properties, which states:

> For the reasons discussed below, the Court concludes that the patentee did not act as his own lexicographer in redefining the term "about." Instead, in claiming a range of "about 30±3" (and "about 30±2"), the patentee contemplated melt flow rate values that could be less than 27 and greater than 33 g/10 min (and less than 28 and greater than 32 g/10 min). In arguing to the contrary, Daikin first contends that the specification states that a precise numerical range is required for the "about" terms because it describes a melt flow rate range of 27-33 g/10 min as being "critical to the invention." (D.I. 153 at 56; *see also id.* at 54, 73-74; Tr. at 123-24, 127-28) Daikin points in particular to the following portion of the specification, which describes Example H:
>
> Example H (The Invention)
> . . . The same result is obtained when the MFR of the copolymer is varied within the range of 28-32 g/10 min. . . . As the MFR or melt temperature moves out of these ranges, the occurrence of sparks and lumps increases drastically. The MFR range of 30±3 g/10 min and melt temperature range of 393° C.±6° C. include the transition from acceptable quality to borderline quality, the narrower MFR and melt

9

> temperature ranges giving the most consistent highest quality results.

('609 patent, col. 5:38-62 (cited in D.I. 153 at 54, 56, 74; Tr. at 123-24, 127-28)) According to Daikin, this passage, in describing "[t]he [i]nvention[,]" conveys that the range of 27 to 33 g/10 min is the "sweet spot" required for obtaining a copolymer that is of acceptable quality. (D.I. 153 at 54, 56; *see also* Tr. at 123-24, 127-28) Thus, Daikin asserts that the "about" terms cannot be construed in a way that would extend the range "above 33 or below 26" because neither is "'acceptable[;]'" expanding beyond this range will drastically increase the occurrence of sparks and lumps. (D.I. 153 at 56-57, 73-74)[.]

But even after taking into account the specification's description of Example H (and of the other examples described therein), the Court is not convinced that Daikin is correct. (*Id.* at 65-68; Tr. at 90-91, 94-99) To be sure, Example H is entitled "The Invention" and there is no doubt that what it discloses is meaningful. But this portion of the patent is teaching that a property of the polymer (the melt flow rate) and a processing condition (melt temperature) can both have an important effect on the production of a copolymer of acceptable quality or unacceptable quality. ('609 patent, col. 5:56-62; *see also id.*, col. 5:40-51; D.I. 153 at 66-67 (Chemours noting that "MFR values are [not] included or excluded in a vacuum"); Tr. at 95, 99) For instance, Example G describes a test in which the melt flow rate of the copolymer was 30 g/10 min (thus clearly within the claimed range); however, the test was processed at a melt temperature of 404° C and it ultimately produced an insulated conductor of inadequate quality. ('609 patent, cols. 4:30-31, 5:33-36; *see also id.*, col. 5:40-55 (noting that the results from Example G differed—and a result of acceptable quality was obtained—when the melt temperature was changed to 393° C, and also explaining how other changes to the melt temperature, melt flow rate and draw-down ratio can produce results of acceptable quality)) Example H also explains that when the melt temperature was decreased below 388° C or above 399° C, the quality of the conductor becomes unacceptable, even when the melt flow rate of the polymer was between 27 g/10 min to 33 g/10 min. (*Id.*, cols. 5:58-6:3)

With this in mind, it becomes significant that the patent claims do not impose a limitation requiring that a particular melt temperature be used during processing. (D.I. 153 at 66; Tr. at 89) Melt temperature is clearly an important variable in the process of producing high-quality insulated wire—and as set out above, using

10

>   a too high or too low melt temperature can (depending on other variables) cause a sample to be of poor quality. One of those variables is the melt flow rate of the polymer. And what the specification teaches is that if certain particular melt temperatures are used, then it is possible that a melt flow rate of outside of the 27 to 33 g/10 min band could provide acceptable results. (D.I. 153 at 65-66 ("[T]he Examples are not mere variations of MFR, but instead illustrate the flexibility of the invention by changing various operating conditions."); *Toro Co. v. Deere & Co.*, 355 F.3d 1313, 1319-20 (Fed. Cir. 2004) (explaining that claims should not be limited to specific numerical parameters from preferred embodiments unless the embodiment is the entire invention presented by the patentee). Indeed, that seems to be what is going on in Example E, where the melt flow rate was 26 g/10 min (i.e., a rate that Example H describes as generally undesirable), but the example still states that insulated conductor of "acceptable quality can be produced"—so long as a "narrow[]" variation in melt temperature is utilized (one that, admittedly, is outside of the "variation . . . typically present in the industry"). ('609 patent, col. 5:15-22)
>
>   In the end, even Daikin seems to acknowledge that the specification alone would not warrant narrowing the "about" terms to the precise numerical ranges reflected in its proposed constructions. (D.I. 153 at 74 ("[T]he intrinsic record *suggests* that the MFR range should exclude 33 g/10 min and above[.]") (emphasis added); Tr. at 152-53 (Daikin's counsel noting that the patentee put "about" into the claims because it "didn't want to be cabined to just 27-33" and because varying the melt temperature can impact the MFR)) Indeed, back in 2018, before the case was stayed pending IPR proceedings, Daikin had proposed that the term "about 30±3 g/10 min" be construed to mean "greater than 26 g/10 min and less than *34 g/10 min*" and that the term "about 30±2 g/10 min" be construed to mean "greater than 27 g/10 min and less than 33 g/10 min[,]" citing to, *inter alia*, the description in Example H of the specification in support. (D.I. 62, ex. A at 8 (emphasis added) (cited in D.I. 153 at 53-54)) Thus, at least at that point, Daikin was not arguing that the specification mandated that the claimed melt flow rate could never be above 33 g/10 min.

(D.I. 256 at 10-14). The Claim Construction Report carefully analyzed the '609 Patent and the arguments put forth by the parties regarding whether the specification sets clear limits for permissible MFR properties. The Court agrees with the Claim Construction Report's analysis, as

11

well as its conclusion that the specification is not clearly limiting.  The Court finds the "patentee has [not] demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction" and, thus, the claimed ranges should not be construed to have the explicit limits that Defendants desire.  *Hill-Rom Servs.*, 755 F.3d at 1372.

Moreover, the Defendants particularly criticize the Claim Construction Report's analysis of how both the "melt temperature" and MFR effect resin quality, alleging that it was a "fundamental error of law" for the Claim Construction Report to consider "unclaimed melt temperatures" because "the claims cover compositions-of-matter regardless of whatever melt temperatures may be used, and ***irrespective of whether the claimed resins result in acceptable or unacceptable coatings***."  (D.I. 259 at 6 (emphasis added)).  As a preliminary matter, if it is immaterial whether the "claimed resins result in acceptable . . . coatings" (D.I. 259 at 6), then Defendants' core argument that the "MFR *cannot* exceed 33 g/10 min, because that is already beyond [the specification's description of] 'the transition from acceptable quality'" (D.I. 259 at 5 (quoting '609 Patent at 5:58-60)) is contradictory.  Nonetheless, the Court disagrees and finds that the Claim Construction Report's thorough analysis of the specification's description of the melt temperatures substantiated its conclusion that the specification does not clearly limit the MFR values to those that do not exceed 33 g/10 min.

Second, Defendants object to the recommended constructions of the about terms because they "contradict[] [Plaintiff's] own statements made during the IPR" that "'it was well-known at the time of the invention that increasing melt flow rate can have a detrimental effect on the final coating, particularly when the increase was achieved by decreasing molecular weight.'"  (D.I. 259 at 3, 9-10 (quoting D.I. 156, Ex. 31 at 30)).  The Court has carefully reviewed the record regarding the construction of the about terms *de novo* as well as the Claim Construction Report's analysis of

12

whether statements made by Plaintiff at the PTAB and Federal Circuit amount to prosecution disclaimer, which states:

> However, Daikin now asserts that during the IPR proceedings, Chemours "erased any doubt about whether the claims reach MFRs higher than 33 g/10 min[.]" (D.I. 153 at 74; *see also id.* at 57; Tr. at 133-35) According to Daikin, in the IPR, Chemours "*broadly* insisted . . . that increasing MFR would impair product quality and mechanical properties" and thus "cannot now say that 'about 30±3 g/10 min' permits doing precisely what Chemours insisted skilled artisans would *never* do, increasing MFR beyond the claimed MFR range." (D.I. 153 at 76-77 (emphasis in original); Tr. at 138)
>
> The Court thus turns to Chemours' statements from the IPR proceedings. In doing so, it asks: Do those statements amount to prosecution disclaimer with respect to the "about" terms? (See D.I. 153 at 57; Tr. at 141, 148) "The doctrine of prosecution disclaimer precludes . . . patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1286 (Fed. Cir. 2005) (brackets and citation omitted). Statements made by patentees during an IPR proceeding can be considered for prosecution disclaimer, though in order to invoke the doctrine, such statements must be "both clear and unmistakable." *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1361 (Fed. Cir. 2017) (internal quotation marks and citation omitted). Here, the Court concludes that during the IPR proceedings, Chemours did not make a clear and unmistakable argument that the "about" terms should be limited in the manner suggested by Daikin.
>
> In those proceedings, Daikin had argued that the patents were obvious over a prior art reference called "Kaulbach." (D.I. 158, ex. 7 at 55) Kaulbach taught that copolymers should have a melt flow rate of 15 g/10 min or higher, and disclosed a sample with a melt flow rate of 24 g/10 min. (Id.) Importantly, the invention of Kaulbach had a "very narrow molecular-weight distribution[.]" (D.I. 154, ex. 15 at col. 3:34-35; *see also id.*, ex. 12 at 12; D.I. 156, ex. 31 at 26); *see also Chemours Co.*, 4 F.4th at 1375. Daikin's position in the IPR proceedings was that it would have been obvious to modify the sample in Kaulbach to yield a copolymer with a melt flow rate of 30±3 g/10 min. (D.I. 158, ex. 7 at 52, 55-56)
>
> The IPR statements that Daikin points to as amounting to "a [h]ard and [f]ast [n]umeric [l]ine" for the upper limit of the "about"

terms cannot be viewed in a vacuum. (D.I. 153 at 76 (citing D.I. 156, ex. 31 at 31, 32; *id.*, ex. 32 at 2, 10)); *see also, e.g., Galderma Labs., L.P. v. Amneal Pharms. LLC*, 806 F. App'x 1007, 1010 (Fed. Cir. 2020). Rather, viewed in proper context, Chemours' arguments to the PTAB were focused on the *disclosures in Kaulbach*. In other words, Chemours was explaining that, given those disclosures, a POSITA would not have been motivated to increase the melt flow rate of 24 g/10 min referenced in Kaulbach to the range claimed in the asserted patents—because doing so would involve *broadening the molecular weight distribution of the polymer*. (D.I. 153 at 69-71) To that end, Chemours argued to the PTAB that:

- "As of the invention of the '431 patent, a number of methods were known for adjusting an FEP's . . . melt flow rate. But to avoid the problems discussed above associated with overall molecular weight reduction, these methods often resulted in broadening the molecular weight distribution of the polymer…. [T]he conventional wisdom in the art was that a broad molecular weight distribution was necessary to create a polymer that could be processed at high speeds, with a high melt flow rate, without sacrificing coating quality[.]" (D.I. 156, ex. 31 at 24-25) Chemours then provided examples of disclosures that broadened molecular weight distributions to create copolymers with higher melt flow rates. (*Id.* at 25)[;]

- "Kaulbach [] recognized that broader molecular weight distributions were typically believed necessary to increase polymer melt flow rate without sacrificing coating quality." (*Id.*);

- "Consistent with his stated goal, Kaulbach teaches against common practices that were known to broaden the molecular weight distribution of a polymer and thereby increase melt flow rate." (*Id.* at 26);

- Daikin's expert fails to "explain why one of skill in the art would be motivated to increase Kaulbach's melt flow rate *while retaining its narrow molecular weight distribution*, in light of the significant drawbacks in coating quality, or how one of skill would have known how to

14

achieve this objective using ordinary skill and known methods." (*Id.* at 32-33 (emphasis added))

Similarly, in appealing the PTAB's findings of obviousness to the Federal Circuit, Chemours asserted that "[e]ven if one wanted to increase Kaulbach's melt flow rate, the known methods for doing so without sacrificing quality involved broadening the molecular weight distribution of the FEP." (D.I. 157, ex. 33 at 7-8 (emphasis added)) The Federal Circuit agreed with Chemours, concluding that the PTAB, in finding that a POSITA would have been motivated to increase the melt flow rate of the sample in Kaulbach to within the claimed range, "did not adequately grapple with why a skilled artisan would find it obvious to increase Kaulbach's melt flow rate to the claimed range while retaining its critical 'very narrow molecular-weight distribution.'" *Chemours Co.*, 4 F.4th at 1376 (citation omitted).

In light of this record, Chemours made no clear and unmistakable statement that the claimed invention is limited to the precise numeric range recited in Daikin's proposed constructions (or that increasing MFR above 33 g/10 min would always unduly impair product quality and mechanical properties). Instead, its IPR-related arguments were more nuanced— they were specific to the Kaulbach reference and to the interplay between increased melt flow rate *and its impact on narrow molecular weight distribution*. (D.I. 153 at 70); *see, e.g., Asetek Danmark A/S v. CoolIT Sys. Inc.*, Case No. 19-cv-00410-EMC, 2020 WL 4207520, at *26 (N.D. Cal. July 22, 2020) (finding that the defendant's statements relating to prior art did not amount to clear and unmistakable disclaimer).

In sum, the intrinsic record does not support an interpretation of the "about" terms that requires adoption of the precise melt flow rate ranges reflected in Daikin's proposals. And in the absence of Chemours redefining "about" to require a precise range, the Court agrees that "about" should be construed to mean "approximately," that "about 30±3 g/10 min" be construed to mean "approximately 30±3 g/10 min" and that "about 30±2 g/10 min" be construed to mean "approximately 30±2 g/10 min." *See, e.g., Sun Pharm. Indus. Ltd. v. Saptalis Pharms., LLC*, Civil Action No. 18-648-WCB, 2019 WL 2549267, at *4-5 (D. Del. June 19, 2019) (giving "about" its ordinary meaning of "approximately" and in doing so, rejecting the defendant's attempt to impose a strict 10% lower bound on the meaning of the term "about 15[%,]" where the specification did not clearly redefine "about"); *Genentech, Inc.*, 2019 WL 2493446, at *9 (giving "about" its ordinary meaning of "approximately" while

15

> rejecting the defendant's request that the court construe "about 1 mmol/l" to have a strict cutoff that excludes concentrations below 1 mmol/l, where there was no support in the intrinsic evidence for deviating from the ordinary meaning of "about").

(D.I. 256 at 14-18). The Claim Construction Report carefully analyzed the intrinsic evidence and the arguments put forth by the parties regarding whether the statements made by the Plaintiff at the PTAB and the Federal Circuit amount to prosecution disclaimer. The Court agrees with the Claim Construction Report's analysis, as well as its conclusion that Plaintiff "made no clear and unmistakable statement that the claimed invention is limited to the precise numeric range recited in [Defendants'] proposed constructions (or that increasing MFR above 33 g/10 min would always unduly impair product quality and mechanical properties)." D.I. 256 at 17; *see also Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016) ("When the prosecution history is used solely to support a conclusion of patentee disclaimer, the standard for justifying the conclusion is a high one. '[F]or prosecution disclaimer to attach, our precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable.'" (quoting *Omega Eng'g, Inc. v. Raytek Corp.,* 334 F.3d 1314, 1325–26 (Fed. Cir. 2003))).

Thus, the Court overrules Defendants' objections to the construction of the about terms and adopts the construction set forth in the Claim Construction Report as well as the unobjected to constructions set forth in the Claim Construction Report.

### III. **CONCLUSION**

For the foregoing reasons, IT IS HEREBY ORDERED that Defendants' objections to the Motion to Amend Report are OVERRULED and the Motion to Amend Report is ADOPTED. Defendants' motion to amend is GRANTED-IN-PART and DENIED-IN-PART as follows:

16

1.  The motion is GRANTED as to Counterclaims 5 and 6 and affirmative defenses 13 and 15.

2.  The motion is DENIED as to all other requested relief.

On or before March 30, 2022, Defendants shall docket their Second Amended Answer to Plaintiff's Amended Complaint, Affirmative Defenses and Counterclaims that conforms to the rulings set forth herein.

IT IS FURTHER ORDERED that, should the parties feel that additional discovery is needed with regard to the new counterclaims and affirmative defenses, on or before March 30, 2022, they shall file a joint letter setting forth what discovery they deem is necessary and how long that discovery will take to complete. The Court will NOT move the trial date.

IT IS FINALLY ORDERED that, for the foregoing reason, the Defendants' objections to the Claim Construction Report are OVERRULED and the recommended constructions are ADOPTED as follows:

1.  "melt flow rate" means "the amount of mass or volume of a viscous material moving past a reference point as a function of time";

2.  "about" means "approximately," "about 30±3 g/10 min" means "approximately 30±3 g/10 min" and "about 30±2 g/10 min" means "approximately 30±2 g/10 min"; and

3.  "unstable endgroups" means "chemical structures at the end of the polymer chains that react, usually by decomposition, under conditions at which fluoropolymers are melt-processed."

*Maryellen Noreika* (signature)
The Honorable Maryellen Noreika
United States District Judge