13:12:40

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


CHEMOURS COMPANY FC, LLC,     )
                             )
            Plaintiff,        )
                             ) C.A. No. 17-1612(MN)
v.                            )
                             )
DDDAIKIN INDUSTRIES, LTD.,    )
et al.,                       )
                             )
            Defendants.       )


                    Wednesday, July 7, 2022
                    2:30 p.m.
                    Pretrial Conference


                    844 King Street
                    Wilmington, Delaware


BEFORE:  THE HONORABLE MARYELLEN NOREIKA
         United States District Court Judge


APPEARANCES:


            FISH & RICHARDSON, P.C.
            BY:  MARTINA TYREUS HUFNAL, ESQ.
            BY:  DOUGLAS McCANN, ESQ.
            BY:  GREGORY R. BOOKER, ESQ.
            BY:  JOSEPH B. WARDEN, ESQ.


                    Counsel for the Plaintiff

1    APPEARANCES CONTINUED:

2

3              ASHBY & GEDDES
               BY:  ANDREW C. MAYO, ESQ.
               BY:  JOHN G. DAY, ESQ.

4              -and-

5              JONES DAY

6              BY:  JOHN LANIER, ESQ.
               BY:  CAROL HOGAN, ESQ.

7              BY:  DAVID M. MAIORANA, ESQ.
               BY:  LISA L. FURBY, ESQ.

8                        Counsel for the Defendants

9

10                       _ _ _ _ _ _ _ _ _

13:12:21  11

13:12:21  12             THE COURT:  Good afternoon.  Please be seated.

13:28:54  13   Let's start with some introductions.

13:28:56  14             MS. HUFNAL:  Good afternoon, Your Honor.

13:29:00  15   Martina Hufnal from Fish & Richardson.  And with me today

13:29:04  16   and presenting next week for the trial will be Douglas

13:29:07  17   McCann, Gregory Booker, and Joseph Warden, all from Fish &

13:29:13  18   Richardson.

13:29:13  19             THE COURT:  Good afternoon, Mr. Mayo.

13:29:20  20             MR. MAYO:  Good afternoon, Your Honor.  Andrew

13:29:24  21   Mayo fro Ashby & Geddes on behalf of the Daiken defendants.

13:29:26  22   I'm joined today in the back by my partner, John Day, as

13:29:30  23   well as my co-counsel from Jones Day at counsel table, David

13:29:35  24   Maiorana, Lisa Furby, Greg Lanier, and last but not least,

13:29:42  25   Carol Hogan.

13:29:44   1        THE COURT:  Good afternoon to all of you as

13:29:46   2   well.  We're here for the pretrial conference.  And there is

13:29:52   3   one motion I guess that's still pending and that is

13:29:58   4   defendants' request to file a supplemental motion *in limine*.

13:30:02   5   I'm going to grant that request, but defendants have to

13:30:05   6   withdraw one of their previously filed motions *in limine* if

13:30:09   7   they want me to address that.  I think it's appropriate

13:30:12   8   given my limits on motions *in limine* as well as the fact

13:30:17   9   that parties here presenting numerous other issues that

13:30:20  10   really appeared to be stealth motions *in limine* and we're

13:30:23  11   going to discuss how I'm going to address those issues in a

13:30:27  12   bit, but given that the parties have already taken some

13:30:30  13   liberties, I'm not inclined to allow you to avoid the limit,

13:30:34  14   so I'm assuming you want withdraw motion *in limine* number 3,

13:30:35  15   but let me know.

13:30:38  16        MR. MAIORANA:  That's right, Your Honor, it's

13:30:40  17   Exhibit 13C.

13:30:41  18        THE COURT:  It was a kind of a give me.

13:30:44  19        MR. MAIORANA:  Thanks, Your Honor.

13:30:48  20        THE COURT:  All right.  Plaintiff's motion *in*

13:30:48  21   *limine* number 1 -- I want to go through plaintiff's three

13:30:52  22   and then defendants' -- to preclude defendants from

13:30:57  23   referencing or relying on defendants' patents, patent

13:31:00  24   applications, et cetera.  Now, I understand that the

13:31:05  25   defendants are not going to use those patents to argue

13:31:12 1    anything with respect to invalidity; is that right?

13:31:15 2            MR. MAIORANA:  That's right, Your Honor.  And

13:31:17 3    we're also not going to assert that we don't infringe

13:31:20 4    because we have patents, but there are issues of willfulness

13:31:25 5    here as well as an allegation of copying and we think it's

13:31:29 6    fair and appropriate to hear that Daiken does have patents

13:31:33 7    on its products, but beyond that we're not planning to use

13:31:35 8    the existence of the patents to argue anything substantively

13:31:39 9    in terms of infringement or invalidity.

13:31:42 10           THE COURT:  Okay.  Let me hear from plaintiff.

13:31:45 11           MS. HUFNAL:  And Your Honor, we appreciate that,

13:31:49 12   but it kind of compounds the problem.  I don't know if

13:31:51 13   they're talking specifically about the old patents or the

13:31:54 14   patents that cover the prior art products or they're talking

13:31:57 15   about patents.

13:31:57 16           THE COURT:  We can confirm that.  Are you

13:31:59 17   talking about old patents, prior art patents or patents that

13:32:04 18   cover the current products or both?  What patents?  I mean,

13:32:09 19   it's weird that we're talking about a motion and we don't

13:32:11 20   even know what patents numbers are going to be subject to

13:32:14 21   it.

13:32:14 22           MR. MAIORANA:  Right.  So the only invalidity

13:32:17 23   argument here is on the prior art products.

13:32:17 24           THE COURT:  Right.  If you want to say -- if

13:32:21 25   you're going to start making arguments saying oh, these

13:32:25 1   products weren't in front of the Patent Office, then, you

13:32:27 2   know, you're putting those patents into issue and the whole

13:32:31 3   IPR proceeding, so are you going to do that?

13:32:34 4             MR. MAIORANA:  No.  The only thing we're going

13:32:36 5   to say to the jury, Your Honor, is that Daiken is an

13:32:38 6   innovative company, it gets patents including on the

13:32:42 7   products-in-suit here, but we're not going to use them to

13:32:45 8   argue that the patents-in-suit are invalid or that we don't

13:32:47 9   infringe because we have our own patents.

13:32:50 10            THE COURT:  And you're not going to say with

13:32:52 11  respect to the prior art products, these products were not

13:32:56 12  in front of the Patent Office?

13:32:58 13            MR. MAIORANA:  Well, that's for inequitable

13:33:01 14  conduct I assume, Your Honor, which we're going to talk

13:33:04 15  about today I assume, but no, we're not going to say that

13:33:07 16  those products -- well, what we're going to say is that

13:33:10 17  these products were not before the Patent Office and the

13:33:13 18  jury has to decide whether or not the products render the

13:33:16 19  patents invalid, but that's the limit of it.

13:33:19 20            THE COURT:  So you are going to say the products

13:33:22 21  were not in front of the Patent Office?

13:33:24 22            MR. MAIORANA:  The MIL is about patents I

13:33:26 23  thought.

13:33:27 24            THE COURT:  But it is kind of getting me back to

13:33:29 25  my PTAB, the IPR one because it is sort of related.

13:33:34 1          MR. MAIORANA:  So the prior art products are the

13:33:38 2 --

13:33:38 3          THE COURT:  Sorry, Ms. Hufnal, I made you stand

13:33:41 4 up and then I took it away.

13:33:42 5          MR. MAIORANA:  The prior art products are the

13:33:44 6 basis for the inequitable conduct claim here, but unless

13:33:48 7 Your Honor says otherwise, we're expecting to be doing that

13:33:52 8 --

13:33:52 9          THE COURT:  I'm sorry, I thought you were

13:33:53 10 asserting invalidity based on your products.

13:33:56 11          MR. MAIORANA:  We are.

13:33:56 12          THE COURT:  Okay.  So are you going to tell the

13:33:59 13 jury in your invalidity case --

13:34:01 14          MR. MAIORANA:  Right.

13:34:02 15          THE COURT:  -- that these products were not in

13:34:06 16 front of the Patent Office ever?

13:34:09 17          MR. MAIORANA:  I think it's fair for the jury to

13:34:11 18 hear just like you would in any patent case, Your Honor,

13:34:14 19 that the particular prior art wasn't presented.

13:34:17 20          THE COURT:  Okay.  So then if you do that, isn't

13:34:19 21 it fair game for them to stand up and say these products are

13:34:24 22 covered by these patents and these patents were in front of

13:34:28 23 the Patent Office?

13:34:30 24          MR. MAIORANA:  Well, I don't think there is any

13:34:31 25 evidence in the case that these products are covered by

13:34:34 1    these patents.  The products we're talking about are the

13:34:38 2    prior art products, there are patents associated with them

13:34:41 3    but they're not necessarily the patents that were before the

13:34:44 4    PTAB in the IPR.

13:34:46 5            THE COURT:  I'm sorry.  The products that you're

13:34:49 6    using to invalidate the patents are prior art?

13:34:53 7            MR. MAIORANA:  Yes.

13:34:53 8            THE COURT:  Are those products covered by the

13:34:56 9    patents that were in front of the Patent Office or the PTAB?

13:35:01 10           MR. MAIORANA:  No, Your Honor, not necessarily.

13:35:03 11    There are patents -- the patents that were before the PTAB

13:35:06 12    do cover products -- do cover compositions like the prior

13:35:11 13    art products, but we're not going to tell the jury that the

13:35:14 14    prior art products are the same as the patents that were

13:35:18 15    before the Patent Office.  We're not going to mention IPR's

13:35:22 16    at all, Your Honor, depending on what you say about the MIL

13:35:25 17    with respect to the IPR proceedings.  So I'm sorry if I'm

13:35:28 18    misunderstanding your question --

13:35:30 19           THE COURT:  The problem I'm having is, I think

13:35:33 20    you're opening the door for them to use your patents and

13:35:36 21    that's what I don't understand.  So I'm asking, are you

13:35:40 22    going to say these products, these old products of ours

13:35:43 23    invalidate their patents and these old patents of ours were

13:35:47 24    never in front of the Patent Office so the Patent Office

13:35:51 25    didn't consider them in which case I don't know if it's true

13:35:54 1    or not.  Are they going to then come in and say oh, but

13:36:01 2    their patents are, were in front of the Patent Office.  So

13:36:03 3    they're essentially opening -- you're opening the door for

13:36:06 4    them to come in and respond to something that you say by

13:36:09 5    bringing up the IPR.

13:36:11 6            MR. MAIORANA:  I understand what you're saying.

13:36:12 7    If Your Honor's position is by mentioning that the prior art

13:36:16 8    products were not before the Patent Office opens the door

13:36:19 9    for them to bring in the IPR's, then we will not tell the

13:36:25 10   jury that the prior art products were not before the Patent

13:36:28 11   Office.  It's not our intention to open the door to anything

13:36:31 12   about the IPR's.  I think that's sort of a zero sum game for

13:36:35 13   both parties considering what happened at the PTAB and the

13:36:39 14   Federal Circuit and that's the subject of the MIL's before

13:36:41 15   Your Honor.  So the answer to your question is no, we won't

13:36:45 16   say that to the jury if Your Honor's position is it will

13:36:48 17   open the door.  We do not intend to open the door to the

13:36:52 18   IPRs.

13:36:53 19           THE COURT:  I don't know if it's going to open

13:36:54 20   the door.  I'm just telling you there is a risk I'm going to

13:36:56 21   find you are opening the door.  I'm not ruling on that, but

13:37:02 22   you do it at your own peril if you do it.

13:37:03 23           Ms. Hufnal.

13:37:04 24           MS. HUFNAL:  I do appreciate that clarification.

13:37:05 25   There is -- I do think there is prejudice though if they're

13:37:13 1    talking about their prior art product, NP-2000, NP-3000,

13:37:18 2    they have a fact witness talking about the development and

13:37:20 3    that these were prior art and we got a patent on them.  Even

13:37:25 4    aside from the door opening issue, I agree --

13:37:27 5                THE COURT:  I didn't think they were going to

13:37:28 6    say that, I thought he said they weren't going to say that.

13:37:31 7    Are you going to say that?  Why don't you stay seated so I

13:37:34 8    don't have to make you sit down again.

13:37:36 9                MR. MAIORANA:  Sure, Your Honor.  So the

13:37:37 10   question I thought you were presenting to me --

13:37:39 11               THE COURT:  I did, I asked a different question.

13:37:41 12   I thought before I asked that question, you said oh, no, all

13:37:44 13   we want to say is we are an innovative company and we have

13:37:50 14   patents on our products, not that you want to say these

13:37:52 15   patents, prior art patents cover our prior art products, are

13:37:57 16   you going to say that?

13:37:58 17               MR. MAIORANA:  No, Your Honor, we're not.

13:38:00 18               MS. HUFNAL:  Okay.

13:38:00 19               THE COURT:  They are not going to say that.

13:38:02 20               MS. HUFNAL:  So then just for clarification, if

13:38:02 21   it is just a simple statement, we are an innovative company

13:38:10 22   and we have patents, full stop, that's one thing that I

13:38:12 23   think we will resolve with the MIL.  Our concern is if they

13:38:17 24   hear our accused products, so now we are talking about 1108

13:38:21 25   and 1109, the accused products in the case.  And if they

13:38:24 1    have one of their R & D folks here saying we do a lot of

13:38:28 2    work and we made these products and we got patents on them,

13:38:31 3    now it gets to the issue of using them for infringement.

13:38:35 4         THE COURT:  Aren't you going to say that they

13:38:38 5    are copying?

13:38:39 6         MS. HUFNAL:  We do.

13:38:39 7         THE COURT:  Can't they show all the work that

13:38:41 8    they did and they came up with some different stuff in terms

13:38:44 9    of copying and use a patent to show that.

13:38:46 10        MS. HUFNAL:  Absolutely.  The patent is the

13:38:47 11   concern there for a few reasons.  One is a disclosure issue.

13:38:51 12   Again, like Your Honor, we don't even know what patent

13:38:53 13   they're talking about.  So in fact discovery they didn't

13:38:56 14   tell us they were going to rely on this kind of innovative

13:39:00 15   theory or that patented theory, no expert has opined on it?

13:39:04 16   So I guess they're going to have a fact witness say yeah we

13:39:08 17   developed these products and yes, we have got a patent and

13:39:11 18   the patent is at least one we think maybe they're talking

13:39:15 19   about, there are other limitations and other issues.  The

13:39:18 20   patents we would like to have our expert challenge whether

13:39:22 21   or not these patents actually do cover number one, and that

13:39:26 22   number 2 get to the issue, as Your Honor knows, doctrine of

13:39:26 23   equivalents in the case on the melt flow rate 36 versus

13:39:30 24   about 33, clearly the a issue, if they would have had a

13:39:34 25   patent that, you know, they just got the patent 36, right,

13:39:38  1    and if that was like the only issue and they got a patent

13:39:40  2    over that, I think that's what the case law that says you

13:39:43  3    know, a patent --

13:39:44  4              THE COURT:  Aren't patents also relevant in case

13:39:47  5    law to the doctrine of equivalents?

13:39:51  6              MS. HUFNAL:  I think exactly to that point, if

13:39:53  7    they had a patent and somebody could testify about it that

13:39:56  8    show they got a patent over the difference, the equivalent

13:39:59  9    thing that we're arguing about, that might be probative, but

13:40:03 10    they don't have that, I don't frankly think they have a

13:40:06 11    patent that gets to that issue and they don't have any

13:40:08 12    testimony, let alone expert testimony to explain it to the

13:40:11 13    jury.

13:40:12 14              THE COURT:  So now my question is, are you going

13:40:15 15    to be just saying generally we're innovative and we have

13:40:19 16    patents or are you going to have someone, and if so, whom,

13:40:22 17    put on, and we have this patent that apparently nobody knows

13:40:25 18    the number of that covers X products.

13:40:28 19              MR. MAIORANA:  So there are allegations of

13:40:30 20    willful infringement, Your Honor, and --

13:40:32 21              THE COURT:  I just need you to tell me are you

13:40:34 22    going to say here is a patent with a number, or are you just

13:40:37 23    going to say look, we're innovative, we patent our stuff,

13:40:41 24    they patent their stuff, we all --

13:40:42 25              MR. MAIORANA:  Yes, that is what we're going to

13:40:46 1    do, Your Honor.

13:40:47 2              THE COURT:  Without having somebody testify this

13:40:49 3    patent covers this product?

13:40:50 4              MR. MAIORANA:  Correct.

13:40:51 5              MS. HUFNAL:  Okay, Your Honor.

13:40:52 6              THE COURT:  All right.  I think that one has

13:40:53 7    been resolved.  Thank you.

13:40:55 8              Plaintiff's motion *in limine* number 2.  To

13:40:57 9    preclude defendants from using certain Chemours' documents

13:41:02 10   at trial.  I liked this one.

13:41:05 11             MR. McCANN:  Oh, no.

13:41:07 12             THE COURT:  Because there were like fifty

13:41:10 13   documents, fifty.

13:41:10 14             MR. McCANN:  Doug McCann from Fish & Richardson.

13:41:13 15   May it please the Court.  And I realize --

13:41:15 16             THE COURT:  You're going to please me with this?

13:41:17 17             MR. McCANN:  The original submission did not

13:41:19 18   please the Court, I realize, and I did -- we did send in a

13:41:22 19   letter trying to narrow it as much as possible.

13:41:25 20             THE COURT:  Okay.  So here is my question before

13:41:27 21   you begin and before we decide if I am pleased or not.  So

13:41:37 22   we have the groups which I appreciate, though some documents

13:41:40 23   are in multiple groups, you know.  Now we have groups and it

13:41:42 24   says four documents exemplified by Exhibit B.  Is that

13:41:45 25   because it's one of those things where you have the same

13:41:54 1      e-mail is repeated, repeated, repeated so it's the same

13:41:57 2      document or is this actually just oh, it's stuff like this?

13:42:01 3              MR. McCANN:  It's a little bit of both, Your

13:42:04 4      Honor.  So a good example might be, you might see, and I

13:42:07 5      have copies if Your Honor wants to see them.

13:42:09 6              THE COURT:  I think we are going to have to go

13:42:11 7      through every single document because I can't just deal with

13:42:15 8      things as simplified.

13:42:16 9              MR. McCANN:  Understood, Your Honor.  The only

13:42:18 10     ones I have with me are the ones that are listed as an

13:42:21 11     example.  The direct answer to your question is there are

13:42:24 12     statements such as, you know, Daiken is a nominal 36

13:42:31 13     apparently in order to avoid our 30 plus or minus 3 patent.

13:42:37 14     The same person is in an e-mail, the same person might have

13:42:40 15     put it in a report.  It's similar statements in different

13:42:43 16     kinds of documents.

13:42:44 17              When we narrowed this what we tried to do was we

13:42:47 18     just narrowed it to the ones where some lay witness is

13:42:53 19     discussing the scope of the patent claim.  And we did that,

13:42:58 20     Your Honor, in reliance on the *SSL Services* case which does

13:43:02 21     say, and it's Federal Circuit, it's the only Federal Circuit

13:43:05 22     case I think in the briefing, talking about where Citrix as

13:43:10 23     chief engineer is going to come in and testify that we,

13:43:14 24     Citrix, did not believe that we infringed this patent and

13:43:17 25     therefore we're not willful and that sort of thing.

13:43:20 1           The District Court excluded it and the Federal

13:43:22 2   Circuit said look, as for that lay witness's personal

13:43:25 3   beliefs about infringement, the fact that they were beliefs

13:43:29 4   formed by a layperson without the benefit of the Court's

13:43:32 5   claim construction determinations --

13:43:34 6           THE COURT:  Right, nut you're arguing that they

13:43:37 7   willfully infringed before they got my claim construction,

13:43:40 8   right, so I mean, it's not like there is some bright line

13:43:46 9   where suddenly you get my claim construction and we all know

13:43:50 10  whether they infringe or not or else we wouldn't be here.

13:43:53 11          MR. McCANN:  Respectfully, Your Honor, there

13:43:56 12  might be a bright line and it's this, the Court has

13:43:58 13  construed the claim and the Court also relatively recently

13:44:01 14  the doctrine of equivalents in this case.  And what we have

13:44:05 15  is we have some engineers and some business people who don't

13:44:08 16  know -- in fact, if you look at the documents, Your Honor,

13:44:10 17  the ones that we did include you see that no one ever

13:44:13 18  actually uses that word "about".  No one indicates that they

13:44:16 19  understand what "about" means, that it could be construed as

13:44:19 20  approximately.  What impact that might have on the scope of

13:44:22 21  the claim.  And none of them know anything so far as the

13:44:26 22  record reveals about the doctrine of equivalents.

13:44:30 23          So when a jury hears here is engineer Chapman,

13:44:34 24  not an inventor on these patents, but he's a DuPont now

13:44:37 25  Chemours scientist saying --

13:44:41 1            THE COURT:  Let me just understand.  Are you

13:44:42 2    going to argue that defendants subjectively knew that they

13:44:45 3    infringed?

13:44:46 4            MR. McCANN:  Yes.

13:44:48 5            THE COURT:  And so doesn't it seem a little

13:44:50 6    unfair that they can't rebut that with attacks on the

13:44:53 7    credibility of that argument because even Chemours'

13:44:56 8    employees had doubts as to whether there was infringement.

13:44:59 9            MR. McCANN:  Well, I don't plan to argue that

13:45:02 10   they subjectively knew they infringed by some lay witness's

13:45:06 11   statement about what 30 plus or minus 3 means.  We do plan

13:45:10 12   to argue that you looked at our patent certainly, that you

13:45:14 13   had our patents before you did your work on your product so

13:45:18 14   you were aware at least to that extent.  Now I can't go so

13:45:21 15   far as to say, cross-examine the witness and say and here,

13:45:24 16   by the way, you must have known what the doctrine of

13:45:28 17   equivalents was.

13:45:29 18            It's sort of when you have the witness, you

13:45:33 19   know, saying in a document the words there is no

13:45:37 20   infringement here which is in essence what these witnesses

13:45:40 21   are saying, then I do think you end up with sort of a trial

13:45:44 22   in a trial, does the witness actually know what the word

13:45:47 23   "about" meant, did the witness know what the doctrine of

13:45:50 24   equivalents was, that sort of thing.

13:45:51 25            THE COURT:  It's not like we gave these terms

13:45:54 1  about and the plus or minus three some kind of like really

13:45:58 2  crazy meaning; right?

13:46:00 3          MR. McCANN:  No, no, Your Honor, we didn't.  I

13:46:03 4  mean, approximately.  I think that's one of the issues, all

13:46:05 5  of the quotes no one actually uses the word about, so the

13:46:09 6  record does not show that they were aware that that word was

13:46:11 7  even in the claim.  And actually as far as Mr. Chapman who

13:46:15 8  was the only witness who was deposed who is on these

13:46:19 9  documents, who was an author of one of these documents, he

13:46:22 10 said he didn't know.

13:46:23 11         THE COURT:  All right.  Let me hear from the

13:46:24 12 defendants.  You keep saying this is a party admission.  I

13:46:27 13 don't see that as a party admission when I look at

13:46:32 14 802(d)(2), why don't you walk me through that and tell me

13:46:35 15 how these are party admissions.

13:46:38 16         MS. HOGAN:  Sure, Your Honor.

13:46:39 17         First of all, they are not statements by lay

13:46:41 18 witnesses.  Greg Chapman is a senior scientist.  Your Honor,

13:46:45 19 I just want to give you a little background, we are going to

13:46:48 20 put on evidence that DuPont and Chemours had a long-standing

13:46:52 21 policy of doing competitive intelligence testing.  This is

13:46:55 22 not an e-mail where somebody ripped off an e-mail without

13:46:55 23 background information saying oh, I don't think they

13:47:01 24 infringe our patents.  These are e-mails that have reports,

13:47:04 25 Your Honor, sometimes hundred page reports where they have

13:47:07 1    looked at every single aspect of our products to make sure

13:47:10 2    we do not infringe their intellectual property.

13:47:14 3         In fact, the abstract at the beginning of these

13:47:17 4    reports, Your Honor, says that's exactly why they're testing

13:47:20 5    our documents.  And then we have e-mails, Your Honor, by

13:47:24 6    scientists, between tech people and scientists saying we

13:47:26 7    don't think they infringe our patents, see attached reports.

13:47:29 8         So the idea that these are simply impertinent

13:47:34 9    e-mails between lay people is simply an unfair description

13:47:38 10   of the documents.  I appreciate, Your Honor, it's very

13:47:40 11   difficult to know which documents we're talking about

13:47:42 12   because --

13:47:42 13        THE COURT:  You didn't answer my question.  You

13:47:44 14   keep telling me these are party admissions.  I said I don't

13:47:49 15   see it.  Walk me through the rule.  And you started telling

13:47:52 16   me why these are helpful documents to you.  I didn't need

13:47:56 17   that, kind of figured it out all by myself.  Why are they

13:48:01 18   party admissions?

13:48:02 19        MS. HOGAN:  Your Honor, because they are

13:48:05 20   admissions made by our opponent that are against their

13:48:08 21   interest that go directly to whether or not we infringe and

13:48:11 22   --

13:48:11 23        THE COURT:  Was made by a party whom the party

13:48:12 24   authorized to make a statement on the subject?

13:48:15 25        MS. HOGAN:  Yes.  These are scientists, Your

13:48:19 1    Honor, who have a long standing job responsibility of

13:48:23 2    gathering samples of competitive products and testing them.

13:48:27 3    This is not -- what I'm trying to say is this is a

13:48:31 4    well-organized program that existed at DuPont and at

13:48:34 5    Chemours after it to run these kinds of tests.

13:48:37 6            THE COURT:  And are you going to put evidence on

13:48:39 7    of this well-organized program?

13:48:42 8            MS. HOGAN:  Absolutely, Your Honor.  We have all

13:48:43 9    kinds of reports that tell us exactly that.  So these are

13:48:46 10   party admissions because these are people within a control

13:48:49 11   group, I'm not sure I need to show control group, but they

13:48:53 12   were people assigned to do this very thing who are talking

13:48:56 13   about their conclusions about whether my client's products

13:48:59 14   infringe their patents.  And if that's not a party

13:49:02 15   admission, I'm not sure I know what is one.

13:49:05 16           THE COURT:  Well, I mean Bob the janitor could

13:49:07 17   say we don't think Daiken infringes any of our patents,

13:49:10 18   right?  I don't know who these people are.

13:49:12 19           MS. HOGAN:  We'll show you who they are --

13:49:15 20           THE COURT:  You know, you already had an

13:49:15 21   opportunity here, we had a motion *in limine* here that I'm

13:49:21 22   supposed to be addressing these issues with, so I'm not sure

13:49:24 23   when are you planning to show me this.

13:49:26 24           MS. HOGAN:  Well, Greg Chapman, the one person

13:49:29 25   Mr. McCann mentioned is a senior scientist and head of the

13:49:34 1    fluoro products division.  He is a person who was intimately

13:49:38 2    involved in the competitive testing.  We deposed him.  We

13:49:41 3    showed him these documents.  He testified about the

13:49:43 4    programing, the testing, everything.  And he admitted that

13:49:46 5    these documents say what we say they say which is that we do

13:49:50 6    not infringe their patents.

13:49:51 7                THE COURT:  Did you ask him if he knew what the

13:49:53 8    approximately was?

13:49:54 9                MS. HOGAN:  He claimed he did not, Your Honor.

13:49:56 10   And that was an answer he gave repeatedly which we expected.

13:50:00 11   But again, they can explain that to the jury.

13:50:02 12                THE COURT:  That's an issue of fact.

13:50:03 13                MS. HOGAN:  For sure.

13:50:04 14                THE COURT:  All right.  So what I am going to

13:50:07 15   do, I am going to deny the motion, but I am going to do so

13:50:11 16   because one, I don't have a foundation that these actually

13:50:14 17   are party admission, so perhaps that will come out at some

13:50:18 18   point.  But two, I don't have the documents.  There are

13:50:21 19   fifty documents that Chemours wants me to keep out, and I

13:50:26 20   don't have them.  So Chemours, you're going to have to use

13:50:30 21   your time at trial in order to raise those issues if you

13:50:33 22   want on a document-by-document basis.

13:50:35 23                MR. McCANN:  Understood, Your Honor.  Thank you.

13:50:37 24                THE COURT:  Okay.  Plaintiff's motion *in limine*

13:50:40 25   number 3 to admit evidence, I like this one, to admit

13:50:45 1    evidence of arguments and outcomes in IPR proceedings.  So

13:50:50 2    we already talked a little bit about this.  If defendants

13:50:53 3    argue their prior art products were not before the Patent

13:50:56 4    Office, they aren't going to do that.  So why now do you get

13:51:00 5    to put these proceedings in?

13:51:03 6              MS. HUFNAL:  Sure.  Your Honor, I recognize this

13:51:06 7    Court, Delaware has held that you can have materials in the

13:51:11 8    IPR, but not the final IPR.  I would submit, though, that in

13:51:15 9    this case, the facts of this case warrant a different

13:51:17 10   outcome.  And the relevant facts are these.  We have a final

13:51:21 11   decision, like Federal Circuit has affirmed and everything.

13:51:24 12   The argument that is being made here at the trial court is

13:51:29 13   very similar.  I realize that, you know, Your Honor ruled on

13:51:33 14   there is no estoppel, but it's very similar to what was

13:51:36 15   argued in the IPR.  And a third point is they're relying on

13:51:42 16   references, like secondary references that are exactly the

13:51:45 17   same as what was relied on in the IPR.

13:51:48 18             THE COURT:  How would you use it?  Are you going

13:51:50 19   to talk about it's an IPR?  It's a separate proceeding?

13:51:52 20   It's an adverse proceeding?  You know, they already lost.

13:51:57 21   They took their shot.  Are you just going to treat it like

13:52:02 22   it's any other part of the prosecution history, so tell me

13:52:05 23   that.

13:52:05 24             MS. HUFNAL:  Your Honor, we would be absolutely

13:52:07 25   amenable to, you know, any instructions that you give us in

13:52:13 1    terms of how -- I mean, it would have to come across that --

13:52:18 2    I haven't thought this out, but that Daiken made those same

13:52:21 3    arguments, so I don't know if the jury is really going to

13:52:24 4    understand that Daiken made the same argument --

13:52:27 5            THE COURT:  It sounds like you're already going

13:52:29 6    way outside of my comfort zone and when you do that, you

13:52:32 7    risk the whole denied.

13:52:34 8            MS. HUFNAL:  Right.  I guess this argument was

13:52:35 9    before, we could do it in kind of a passive voice

13:52:41 10   presentation, that the PTO, we don't have to introduce the

13:52:45 11   concept of the PTAB or judges or anything like that, but it

13:52:49 12   really is just like if an examiner considered an argument in

13:52:54 13   the file history and rejected it, that is really what we

13:52:58 14   would like to be able to present.

13:53:00 15           THE COURT:  And you would be doing this in

13:53:03 16   response to something that Daiken says?

13:53:04 17           MS. HUFNAL:  Correct.

13:53:05 18           THE COURT:  So what I am going to do is I am

13:53:07 19   going to deny this motion.  But if you can -- if they say

13:53:11 20   something specific and you can make a proffer before you do

13:53:12 21   it in front of the jury, I'll reconsider.

13:53:16 22           MS. HUFNAL:  All right.  Thank you, Your Honor.

13:53:18 23           THE COURT:  Okay.  Now we get to defendants'

13:53:22 24   motion *in limine* number 1 to exclude evidence relating to

13:53:25 25   the parties' 2013 patent licensing discussion.

13:53:34 1          MS. HOGAN:  Back, Your Honor.

13:53:35 2          Your Honor, this is our motion.  It's very

13:53:38 3  brief.  I believe it's very straightforward.  Throughout the

13:53:41 4  case we have had almost every expert and every Chemours

13:53:44 5  witness talk about the fact that my client tried to license

13:53:47 6  the technology, it's very vague, relating to fluorination

13:53:51 7  and they used that as evidence of willfulness.

13:53:54 8          THE COURT:  My question was, why isn't this an

13:53:56 9  issue of fact for the jury to decide?  They say they tried

13:53:59 10 to license this technology, they tried to license this

13:54:02 11 technology, and you say we didn't try to license this

13:54:05 12 technology.

13:54:05 13         MS. HOGAN:  I actually expected that would be

13:54:09 14 your only question, Your Honor.  I think the answer to it is

13:54:11 15 because jurors are not equipped to understand the difference

13:54:15 16 between patents and it's not fair to ask a jury to make that

13:54:18 17 determination, it's very, very prejudicial to us because

13:54:24 18 it's confusing because there are three different patents

13:54:25 19 that all somehow relate to different issues of MFR and

13:54:28 20 fluorination.  And it's very clear and one of the documents,

13:54:31 21 you know, that they tried to keep out through MIL 2, which

13:54:33 22 has nothing to do with lay opinions of infringement, is a

13:54:36 23 document that I have it here --

13:54:38 24         THE COURT:  You just couldn't help yourself.  I

13:54:41 25 already dealt with that one.

13:54:43 1          MS. HOGAN:  I know, but it's a document, Your

13:54:45 2   Honor, that clearly shows that the patent my client

13:54:47 3   attempted to license is not one of the patents-in-suit in

13:54:50 4   this case.

13:54:51 5          THE COURT:  Okay.  So I am going to deny that

13:54:53 6   motion because one, I have more faith in the jury than you

13:54:57 7   seem to, and two, you just pointed out that it's very clear

13:55:01 8   in a document that it wasn't the same patent so it should be

13:55:04 9   easy enough for you to explain to a jury, so I don't think

13:55:07 10  403 keeps it out.

13:55:09 11         Defendants' motion *in limine* number 2, to

13:55:11 12  preclude plaintiff and its experts from attempting to show

13:55:15 13  infringement by comparing Daiken's commercial product to

13:55:20 14  Chemours' commercial products.  All right.

13:55:23 15         So this one, I get the general law, but there is

13:55:29 16  some issue here about showing substantiality of the

13:55:33 17  differences, so I guess I need to understand more.

13:55:39 18         MR. MAIORANA:  The issue we have, Your Honor,

13:55:41 19  this is analogous to the patent issue we already discussed.

13:55:44 20  So what we are concerned with is if they tell the jury that

13:55:47 21  our accused products are like their accused products and

13:55:51 22  that is used to imply that there is infringement.  And the

13:55:54 23  products are different --

13:55:56 24         THE COURT:  Right.  What if they're just saying

13:55:59 25  look, our products works like this?  I mean, I think the way

13:56:03 1   I have seen it used in the context of infringement is it

13:56:07 2   gives a concrete example of something that meets that

13:56:13 3   element so that the jury can make a determination as to

13:56:17 4   whether it's substantial or insubstantial.

13:56:20 5            MR. MAIORANA:  If they want to say their product

13:56:22 6   practices the patent, that's a dispute of fact for the jury

13:56:25 7   to decide that relates to damages and other issues, we're

13:56:27 8   not trying to keep that out.  If they want to say our

13:56:30 9   products meet the claim limitations, we're of course not

13:56:33 10  trying to keep that out.  What we're trying to keep out is

13:56:36 11  them saying our product is like their product.  There are

13:56:39 12  documents on both sides talking about our product versus

13:56:41 13  their product because they're competitors, and so our

13:56:45 14  concern is they're going to say -- they're going to have

13:56:48 15  witnesses come in and say 9494 was the greatest product in

13:56:51 16  history.  Their product is like ours, wink, wink, that means

13:56:55 17  they must infringe or they copied, that's what we're trying

13:56:58 18  to keep out is the comparison between the two.  The

13:57:00 19  comparison of the products for the patent is fair game, but

13:57:02 20  saying our product is like theirs or looks like theirs or

13:57:02 21  performs like theirs, that doesn't prove infringement.  It

13:57:02 22  doesn't go to a factual issue of whether or not our product

13:57:12 23  meets the claim.

13:57:12 24            THE COURT:  Okay.  Mr. Booker.

13:57:12 25            MR. BOOKER:  Your Honor, Greg Booker.

13:57:22 1              Our proof of infringement will be to check the

13:57:24 2    box that each limitation is met by Daiken's products.  Our

13:57:29 3    comparisons are to show that the MFR limitation is met and

13:57:34 4    we know that --

13:57:35 5              THE COURT:  If you're allowed to use those

13:57:38 6    videos, right, or is there something else?

13:57:40 7              MR. BOOKER:  There is something else.  We have

13:57:42 8    wire line coding testing that shows that the process

13:57:45 9    parameters that Daiken products are comparable to the

13:57:49 10   Chemours commercial embodiment 9494, and that is all tied to

13:57:55 11   the purpose of the MFR limitation.  And that's relevant

13:57:58 12   because again, that term is modified by the word "about,"

13:58:01 13   and we have our doctrine of equivalents argument.  And for

13:58:05 14   those reasons you need to look at the function and the

13:58:08 15   purpose of that limitation.  And that goes right to the

13:58:11 16   process windows, the operating conditions of how to coat

13:58:15 17   those polymers.  And that's why that type of comparison is

13:58:20 18   relevant to the overall infringement analysis which will be

13:58:23 19   done on a limitation-by-limitation basis.

13:58:26 20             THE COURT:  Okay.  All right.  So I think I am

13:58:31 21   going to deny this one.  It seems like comparing plaintiff's

13:58:35 22   product if it's covered by the claims to defendants' accused

13:58:41 23   product could be relevant to the function-way-result or

13:58:47 24   insubstantial differences for the doctrine of equivalents,

13:58:50 25   and if that's how plaintiff intends to use it, it seems fair

13:58:53  1   because it isn't using product-to-product comparisons on the

13:58:57  2   ultimate issue of infringement.  But if plaintiff slides

13:58:59  3   into just using product to product, look, ours is blue,

13:59:03  4   theirs is blue and showing the product side-by-side saying

13:59:07  5   look at these things, that is not going to be allowed and I

13:59:12  6   will be receptive to a request for a curative instruction if

13:59:17  7   the plaintiffs are going to do something like that.

13:59:20  8          All right.  So now we get to the supplemental

13:59:23  9   motion *in limine* regarding the videos.  I want to hear some

13:59:30 10   argument on this one.  And I guess part of my question in

13:59:34 11   reading the defendants' motion was you seem to emphasize a

13:59:42 12   lot the ASTM 2116 standard.  I was curious, is that because

13:59:47 13   I put in my construction the two -- I put "and" in between

13:59:54 14   them, are you reading my construction to mean you have to

13:59:57 15   meet it under both of those because just so you know, that's

14:00:01 16   not really what I meant, so if that's what you're saying,

14:00:04 17   we're going to have a real rolling claim construction here

14:00:07 18   where I roll it again.

14:00:09 19          MR. MAIORANA:  The only reason 2116 is relevant,

14:00:11 20   Your Honor, is because it just says when you apply 1238 to

14:00:11 21   these specific polymers, then you have to follow this

14:00:12 22   temperature, so you have to read them together because it's

14:00:23 23   specific to the FEPs in this case, so it has to be an "and"

14:00:27 24   because that's the way that they're written.  And that's the

14:00:30 25   way that we argued it to Judge Burke during claim

14:00:33 1    construction.  I don't think there is a dispute from the

14:00:35 2    other side that that's the way you have to read them.  It's

14:00:38 3    not that you have to read both, but you need to read them

14:00:41 4    together.

14:00:41 5             THE COURT:  So maybe we don't have to roll it

14:00:45 6    again, but I'll think about that.  Go ahead and tell me.

14:00:49 7             MR. MAIORANA:  The issue here now is where we

14:00:51 8    are at with Your Honor's claim construction is that the MFR

14:00:56 9    has to be measured in accordance with the ASTM standard and

14:01:00 10   their argument through this entire case is no, it doesn't.

14:01:03 11   And their evidence that they have compiled and that they

14:01:06 12   presented during fact discovery is that Daiken's product

14:01:10 13   infringe as long as you don't use the standard.  And so now

14:01:14 14   that in our view is in direct violation of Federal Circuit

14:01:18 15   precedent and in violation of Your Honor's claim

14:01:20 16   construction.  They shouldn't be allowed to tell the jury

14:01:23 17   that let's forget about the ASTM standard.  We're now going

14:01:28 18   to look at testing that doesn't comply with the standard and

14:01:32 19   we have explained why it doesn't comply in order to show

14:01:35 20   that it's equivalent.  Yes, you can see it's equivalent, but

14:01:39 21   our view is whether it applies with the standard or not,

14:01:42 22   that's a binary situation, either it does or it doesn't.

14:01:45 23   And by presenting evidence to the jury without using the

14:01:47 24   ASTM standard, that is vitiating that claim limitation from

14:01:51 25   the claim now that Your Honor has construed the claim to

14:01:53  1    require it.

14:01:54  2            So it is going to be very confusing and

14:01:57  3    prejudicial to us if they come in and say well, we changed

14:02:00  4    the temperature and so look at this video and you can tell

14:02:03  5    with your eyes that these are the same numbers even though

14:02:06  6    these are complex properties of these resins, they're going

14:02:10  7    to tell the jury look how it comes out of the machine, it

14:02:13  8    looks the same to us even though one of those is not done in

14:02:17  9    accordance with the standard and that's in direct violation

14:02:20 10    of Your Honor's construction which we contend should not be

14:02:22 11    allowed to be presented to the jury.

14:02:24 12            THE COURT:  Okay.

14:02:27 13            MR. BOOKER:  So our MFR data is based on

14:02:37 14    Daiken's own specification and over a thousand batches of

14:02:40 15    Daiken's products tested by Daiken per the ASTM standard.

14:02:45 16            THE COURT:  Right, but their real problem is

14:02:48 17    this, the exhibits that show the drips.

14:02:54 18            MR. BOOKER:  An issue in the case is how similar

14:02:58 19    a flow rate of 36 --

14:03:00 20            THE COURT:  Right.  But look, your whole patents

14:03:02 21    are about melt flow rate.  Right?  The title is melt flow

14:03:02 22    rate.  And so it is a little bit weird that you come in here

14:03:11 23    and you say oh, melt flow rate, I mean, it was important

14:03:15 24    that we got this melt flow rate, now it's like as long as a

14:03:20 25    little bit of drip hits around the same time the other

14:03:23 1    little bit of drip hits, it's close enough.  I mean --

14:03:28 2                MR. BOOKER:  Well, our --

14:03:30 3                THE COURT:  Is that really the position?

14:03:31 4                MR. BOOKER:  No, that's much, much more than

14:03:34 5    that.  We go through the limitation, other testing, other

14:03:38 6    opinions.  This is one part of our analysis.  I think it's

14:03:40 7    important to give the jury context of what it means to have

14:03:43 8    a melt flow rate.  What does that really mean?  And it's

14:03:47 9    something you can readily see visually what a rate of 33

14:03:51 10   looks like relative side-by-side to a 36, and anyone can see

14:03:55 11   that.  It's very easy to see.  And it goes to show that the

14:04:00 12   rate itself is not substantially different.  It's one aspect

14:04:05 13   of our overall --

14:04:06 14               THE COURT:  But if you read your patents and it

14:04:08 15   says oh, the melt flow rate, this particular melt flow rate

14:04:11 16   is important and we wanted to get rid of variation in melt

14:04:15 17   flow rate, that's part of your patents, too, that there was

14:04:18 18   all this variation before and now oh, look, it hits and it

14:04:22 19   kind of looks the same, this one hits a little faster.

14:04:27 20               MR. BOOKER:  It goes right to -- I mean the jury

14:04:31 21   won't understand --

14:04:31 22               THE COURT:  I mean, is this evidence or is this

14:04:34 23   a demonstrative?  You seem to be wanting to put it in as

14:04:37 24   evidence.

14:04:38 25               MR. BOOKER:  It is evidence.  It's evidence that

14:04:40 1    our expert looked at and he relies on it in part in forming

14:04:44 2    his overall opinion.  The rate, how fast a 33 flows relative

14:04:51 3    to a 36 is relevant in this case.  And this is something you

14:04:55 4    don't just have to talk about, you can see it.

14:04:58 5            THE COURT:  Does it matter that that wasn't

14:05:00 6    measured using the standard, because it seems like it

14:05:03 7    wasn't; right?

14:05:04 8            MR. BOOKER:  Well, it wasn't measured -- the 33

14:05:08 9    was generated using a different temperature to generate a

14:05:12 10   33.  In our briefing, we had the model polymer that had a 33

14:05:18 11   flury, we would use that, but I think any issues with the

14:05:20 12   testing or how it appears, that's fodder for

14:05:23 13   cross-examination.  If the testing is flawed, if the video

14:05:26 14   is flawed, if it doesn't show what we say, that's

14:05:29 15   cross-examination.

14:05:32 16           THE COURT:  I don't know about that.  It's

14:05:35 17   borderline unreliable, isn't it?

14:05:37 18           MR. BOOKER:  I don't think so.  I mean, it's

14:05:39 19   something that when you see it, when you see flow rate, you

14:05:42 20   can see how fast it's coming out, compare two things, a 33

14:05:47 21   and 36.  It's prone to eye witness or percipient --

14:05:52 22           THE COURT:  That's not the way, though, anybody

14:05:54 23   says that this should be measured.  It's not like the guy

14:05:57 24   sitting there and says I just look at the stuff as it comes

14:06:01 25   down the conveyer belt and see what it looks like, it looks

14:06:05 1    pretty good to me.

14:06:06 2              MR. BOOKER:  No, how it's measured, again, to

14:06:09 3    show what their products' MFR are, we use their own data,

14:06:14 4    we're not using the video to measure what it is.  We're

14:06:17 5    saying now we have on one side a 36, the other a 33, let's

14:06:21 6    look at them, see how close they are.  And that's relevant

14:06:24 7    to whether or not 36 is equivalent to a 33.

14:06:31 8              MS. HUFNAL:  Your Honor, may I say something?

14:06:34 9              THE COURT:  Sure.  I mean, look, I get it, I

14:06:38 10   watched the videos, I just --

14:06:44 11             MS. HUFNAL:  I just wanted to address your

14:06:46 12   question earlier about like the patent seems to want a

14:06:51 13   specific MFR and that we are --

14:06:53 14             THE COURT:  There is a reason that 30 plus or

14:06:55 15   minus 3 was included in this patent.  And I get it that now

14:06:59 16   you want to, you know, broaden it some, but this, oh, it's

14:07:05 17   all the same, look, it drips, I mean, that's not saying that

14:07:09 18   it acts the same way, that there is not some other

14:07:12 19   differences, it just seemed -- I need to think about this

14:07:16 20   and I'm not going to decide this issue today, but I have

14:07:20 21   some concerns.

14:07:22 22             MS. HUFNAL:  May I make a point, Your Honor?  So

14:07:25 23   on your -- we're not saying all the melt flow rates are the

14:07:28 24   same, we're not saying that.  In the patent, example A in

14:07:31 25   the patent is talking about a melt flow rate of 22.  That's

14:07:34 1    what the evidence is going to come out, the melt flow rates

14:07:37 2    were down in the 20s, so getting it up, the melt flow rate

14:07:42 3    in addition to the fluorination and the unstable end groups,

14:07:45 4    all three of those pieces are what the patents are about and

14:07:47 5    the melt flow rate is part of that.  And this polymer with

14:07:49 6    all of those pieces, they were able to make a very stable

14:07:52 7    and reliable polymer.  So it is -- the testimony will come

14:07:56 8    out that, you know, a flow rate of 36 when we're talking

14:08:00 9    about these polymers at these share rates and these

14:08:04 10   temperature and the extruder, a melt flow rate of 36 is not

14:08:07 11   that different from 33.

14:08:09 12          THE COURT:  But you don't need those pictures of

14:08:11 13   drips to show that; right?

14:08:13 14          MS. HUFNAL:  Well, we do.  So the jury might

14:08:16 15   understand --

14:08:16 16          THE COURT:  So you need those or else I should

14:08:18 17   be granting summary judgment?

14:08:20 18          MS. HUFNAL:  No.  So the jury knows 85 degrees

14:08:23 19   outside, they know what that means.  They know what

14:08:27 20   75 degrees means.  They're not going to be familiar with

14:08:29 21   what a melt flow rate in grams per ten minutes, what that

14:08:33 22   means, and so it is going to be helpful for the jury to

14:08:35 23   understand what we are talking about in this context.

14:08:39 24          MR. MAIORANA:  Your Honor, may I address the

14:08:40 25   last discussion?

14:08:42  1           THE COURT:  Sure.

14:08:42  2           MR. MAIORANA:  Thank you.  So one thing that I

14:08:44  3  want to clarify.  The things on the left in the video,

14:08:49  4  that's not an MFR.  An MFR is only at the temperature of the

14:08:54  5  ASTM in accordance with your claim construction.  So now

14:08:57  6  they want the jury to see a video of an MFR at 36 and some

14:09:01  7  other test done by something else that's not compliant with

14:09:04  8  the standard.  That's violating your claim construction and

14:09:07  9  we don't think it's appropriate.

14:09:08 10           Putting aside whether or not a human being can

14:09:11 11  see two things falling and say those are equivalent, because

14:09:14 12  I can put a video in front of Dr. Bortner, their expert, and

14:09:19 13  say tell me the MFR of that resin, he would have no idea.

14:09:22 14  That's what you have to do the patent.  That's our problem.

14:09:22 15  They just want to show some video of things falling into a

14:09:25 16  pan and say that looks good to me, that's equivalent.

14:09:28 17  That's totally inappropriate.

14:09:30 18           Thank you, Your Honor.

14:09:31 19           THE COURT:  All right.  I'm going to reserve on

14:09:34 20  this one.

14:09:35 21           Okay.  Some of the other issues in the pretrial

14:09:38 22  order, witnesses, there are a lot of witnesses, though I was

14:09:42 23  told from the voir dire that we may be limiting it.  How

14:09:47 24  many witnesses are we actually going to have?

14:09:50 25           MR. MAIORANA:  So we have been narrowing the

14:09:52  1    case, Your Honor, and worked with the other side to reach

14:09:55  2    agreement.  We have some deposition designations because a

14:09:58  3    lot of the people we deposed they're not bringing to trial

14:10:01  4    and they're outside the subpoena power of the Court, so we

14:10:05  5    have a lot of names, but a lot are short depo clips that we

14:10:09  6    would like to play for the jury.  People who will be here

14:10:12  7    live, we have five, I believe, live witnesses, Your Honor.

14:10:20  8    And we have three or four depo designations that will be

14:10:23  9    short and we will certainly stay well within our time that

14:10:27 10    you have allotted to us.

14:10:28 11          I just want to address that, we did list our

14:10:31 12    depo witnesses on our list of witnesses --

14:10:34 13          THE COURT:  But you envision five live

14:10:38 14    witnesses, that's just not your case-in-chief, that's for

14:10:41 15    everything?

14:10:42 16          MR. MAIORANA:  Yes, our case-in-chief is our

14:10:45 17    case, Your Honor, unless you're going to let us have sur

14:10:49 18    rebuttal after their rebuttal case.

14:10:50 19          THE COURT:  I was thinking you were going to

14:10:52 20    respond to their case on infringement which is not your

14:10:52 21    case-in-chief.

14:10:57 22          MR. MAIORANA:  Right.  We are going to rebut

14:10:58 23    their case on infringement and we're going to present our

14:11:01 24    invalidity case and we are going to rebut their case on

14:11:02 25    damages.

14:11:03 1                    THE COURT:  That's five live witnesses and three

14:11:06 2     to four depo designations?

14:11:08 3                    MR. MAIORANA:  Yes, Your Honor.

14:11:09 4                    THE COURT:  Plaintiff?

14:11:11 5                    MS. HUFNAL:  Your Honor, we have six live

14:11:13 6     witnesses, three of whom are our experts and three of whom

14:11:18 7     are fact witnesses.   Three fact witnesses and three experts.

14:11:28 8                    THE COURT:  Any depositions?

14:11:29 9                    MS. HUFNAL:  There will be.  One of the

14:11:32 10    inventors is not able to come, so he'll be by deposition.  I

14:11:38 11    think we're kind of in the same boat, there might be some

14:11:41 12    small clips for purposes of infringement proof before our

14:11:45 13    infringement expert goes up, but in terms of substantive

14:11:48 14    depositions, I think there is going to be three kind of

14:11:52 15    meaty deposition clips.

14:11:53 16                   THE COURT:  Okay.

14:11:56 17                   MS. HUFNAL:  Your Honor, I just wanted to let

14:11:57 18    you know that the parties resolved the issue about the

14:11:59 19    opening demonstratives.

14:12:02 20                   THE COURT:  Great.

14:12:02 21                   All right.  Now, the statement of intended

14:12:02 22    proofs says defendants are going to pursue anticipation,

14:12:12 23    obviousness, indefiniteness, and improper dependency.  So

14:12:14 24    let's go through each of those.  Anticipation based on how

14:12:20 25    many references?

14:12:23  1          MR. MAIORANA:  They are the prior art products

14:12:25  2   we discussed earlier, Your Honor, at least one.

14:12:27  3          THE COURT:  Can you name them for me?

14:12:29  4          MR. MAIORANA:  NP-101, NP-2000, NP-3000.

14:12:40  5          THE COURT:  Okay.  And that's your anticipation

14:12:43  6   case?

14:12:46  7          MR. MAIORANA:  Yes.

14:12:46  8          THE COURT:  Obviousness?

14:12:48  9          MR. MAIORANA:  Will be based on one or more of

14:12:50 10   those same products.

14:12:51 11          THE COURT:  In combination with anything or if

14:12:54 12   it's not anticipated it would have been obvious.

14:12:57 13          MR. MAIORANA:  It would be in combination with a

14:12:59 14   prior art patent called Pikarski.

14:13:04 15          THE COURT:  Anything else other than those?

14:13:05 16          MR. MAIORANA:  No, Your Honor.

14:13:06 17          THE COURT:  Okay.  And then indefiniteness, is

14:13:09 18   that still live after I ruled on the claim construction

14:13:13 19   issue?

14:13:14 20          MR. MAIORANA:  Well, we're debating that amongst

14:13:17 21   our team, Your Honor, in view of this issue about doctrine

14:13:21 22   of equivalents doesn't have to have a standard, so if that's

14:13:24 23   going to be in the case --

14:13:26 24          THE COURT:  They're not saying doctrine of

14:13:29 25   equivalents doesn't have a standard, they're saying in order

14:13:32 1    to demonstrate what a melt flow rate looks like, we didn't

14:13:35 2    use the standard, we just used something that gives us a

14:13:38 3    melt flow rate.  So your argument isn't exactly what they

14:13:42 4    are saying.  Right?  They're not saying doctrine of

14:13:46 5    equivalents, you can use any standard you want and it's

14:13:48 6    equivalent, all they're doing is saying, at least as I

14:13:52 7    thought it was demonstrative, but apparently they think it's

14:13:55 8    evidence that you can show what a melt flow rate looks like.

14:13:58 9              But anyway, assuming that they are not arguing

14:14:02 10   what you think they're arguing, is indefiniteness dead?

14:14:07 11             MR. MAIORANA:  Yeah, I believe so, checking with

14:14:09 12   my team, my team is nodding, so yes, Your Honor.

14:14:12 13             THE COURT:  What is this improper dependency?

14:14:15 14             MR. MAIORANA:  So claim 7 is not further

14:14:17 15   limiting on claim 1 under 112 paragraph 4 because claim 1

14:14:22 16   says that you do not use alkali metal during polymerization

14:14:29 17   in isolation and then it says wherein claim 7 says wherein

14:14:33 18   the alkali metal is potassium, so we believe that claim is

14:14:40 19   invalid under paragraph 4 because it's not further limiting,

14:14:42 20   it's actually broadening what you can use as an alkali

14:14:50 21   metal.

14:14:51 22             THE COURT:  And that's claim 7 of the '609

14:14:54 23   patent?

14:14:54 24             MR. MAIORANA:  Yes, Your Honor.

14:14:55 25             THE COURT:  Is that an issue for the jury?

14:14:57  1          MR. MAIORANA:  Yes, Your Honor.

14:14:58  2          THE COURT:  Do you have some law on that?  It

14:15:00  3   seems like it's a little bit of claim construction so I was

14:15:05  4   curious.

14:15:05  5          MR. MAIORANA:  It's a fact question whether or

14:15:07  6   not in your view it's a fact question whether or not the

14:15:10  7   claim is further limiting.  We will get you case law on

14:15:13  8   that, Your Honor, if you want to clarify.

14:15:15  9          THE COURT:  Okay.  Ms. Hufnal, why are you

14:15:20 10   asserting claim 7 so we have this, do you need it?

14:15:27 11          MS. HUFNAL:  Yes, we would like to continue

14:15:33 12   asserting it.  I'm sorry, I just want to grab the patent so

14:15:37 13   I can answer your question.  So Your Honor, I'm happy to get

14:15:47 14   back to Your Honor on the explanation.

14:15:49 15          THE COURT:  No, I want you to tell me now.

14:15:52 16          MS. HUFNAL:  All right.  Oh, well, it's

14:16:02 17   really -- it's an invalidity issue, so the potassium salt in

14:16:07 18   claim 7 that's specific in claim 7 is the salt that they use

14:16:12 19   in their prior art product, so there is no real dispute that

14:16:12 20   they don't use salt in their accused product.  And so this

14:16:17 21   is like, it's identifying what the salt can't be, and that's

14:16:24 22   the salt that they're using in their prior art product so

14:16:27 23   it's anticipating, it's really an invalidity claim.

14:16:35 24          THE COURT:  I don't understand.  I'm sorry.

14:16:36 25          MS. HUFNAL:  Sure.  So the claim --

14:16:39  1          THE COURT:  I mean, is it supporting an argument
14:16:43  2     you want to make in response to their invalidity arguments?
14:16:46  3     When you say it's an invalidity claim, I don't know what you
14:16:48  4     mean.
14:16:49  5          MS. HUFNAL:  Yeah, I'm short handing because I'm
14:16:51  6     thinking in my head.  We're keeping it in for purposes of
14:16:54  7     the invalidity case.  For them to say that their prior art
14:16:58  8     products are anticipating, they have to lack an alkali metal
14:17:03  9     salt.  And one of their prior practices they're saying is
14:17:06 10     anticipating has an alkali metal salt.  Claim 7 specifies
14:17:12 11     that the salt that you can't have is potassium and that's
14:17:15 12     the exact salt that they do have in their prior art
14:17:19 13     products.
14:17:24 14          THE COURT:  Okay.
14:17:25 15          MR. MAIORANA:  That is a good explanation of why
14:17:28 16     it's invalid under paragraph 4.  Claim 1 forbids all alkali
14:17:33 17     metal salts.  Claim 7 only forbids potassium thereby
14:17:38 18     allowing all the other alkali metals so it's broader than
14:17:42 19     that claim 7.  I never heard of someone asserting a patent
14:17:46 20     of infringement because of invalidity.  Either we infringe
14:17:50 21     it or we don't.  And if they do assert it then we're going
14:17:54 22     to try to prove that it's invalid.
14:17:54 23          THE COURT:  I'm not going to decide that issue.
14:17:56 24     I take your point that it seems a little whacky, but I just
14:18:01 25     want to make sure, do you agree it's a jury issue?

14:18:04  1              MS. HUFNAL:  Your Honor, I guess I haven't seen

14:18:09  2       -- we haven't disputed that it was.  I'm happy to see the

14:18:12  3       cases that they cite.

14:18:12  4              THE COURT:  I would just like to ensure that it

14:18:14  5       is, but it seems like everybody sort of assumed it was,

14:18:18  6       which given the experience level in the room tells me it

14:18:22  7       probably is.

14:18:23  8              Okay.  Paragraph 15 of the pretrial order that

14:18:29  9       list a bunch of things that are reportedly pending, but I

14:18:33 10       just want to clarify that I already denied plaintiff's

14:18:37 11       motion for summary judgment based on the IPR estoppel and

14:18:41 12       based on Daiken's prior art products on June 1st.  I denied

14:18:45 13       defendants' Daubert motion at that time.  I denied

14:18:48 14       defendants' motion for summary judgment on indefiniteness

14:18:50 15       and for non-infringement on July 1st, 2022.  So I think

14:18:55 16       everything mentioned in this section has been addressed.  Is

14:18:57 17       there anything I missed?

14:18:59 18              MR. MAIORANA:  Not from us, Your Honor.

14:19:01 19              MS. HUFNAL:  No, Your Honor.

14:19:02 20              THE COURT:  All right.  Thank you.  One

14:19:04 21       clarification on paragraphs 30 to 31 of the pretrial order,

14:19:09 22       any witnesses not listed will be precluded from testifying

14:19:12 23       unless you get leave of Court.  And I'm not going to allow

14:19:16 24       that absent exceptional circumstances.  And that's the same

14:19:22 25       for paragraph 34, you need leave of Court if you're looking

14:19:26  1   to have someone testify when that witness was not listed on

14:19:29  2   the witness list or deposition designations in the pretrial

14:19:33  3   order.

14:19:33  4         Next, paragraph 40 and 41, it says preliminary,

14:19:48  5   what's that mean?

14:19:50  6         MS. HUFNAL:  I haven't discussed it with

14:19:53  7   counsel, but you know, as we get closer, we have the

14:19:57  8   exchange process before, three days before the trial,

14:20:01  9   depositions can be played, it is not preliminary in the fact

14:20:05 10   that it can change the whole scope of the designations, it's

14:20:08 11   just the big scope.

14:20:09 12         THE COURT:  So you're saying preliminary meaning

14:20:12 13   you can't broaden it, but your understanding is of course

14:20:14 14   you're going to narrow it because the jury would be asleep.

14:20:18 15         MS. HUFNAL:  Correct.

14:20:19 16         MS. FURBY:  Yes, Your Honor, that's Daiken's

14:20:20 17   position as well.  By preliminary we meant it would be the

14:20:23 18   full range of designations, we would be narrowing much more

14:20:27 19   as we get up to trial.

14:20:28 20         THE COURT:  Excellent.

14:20:31 21         Paragraph 43 I am going to adopt with a

14:20:34 22   modification.  You may meet and confer prior to trial to

14:20:38 23   determine what testimony will be offered by deposition, but

14:20:40 24   if there are objections that remain to be resolved the party

14:20:42 25   calling the witness by deposition shall no later than

14:20:46 1    forty-eight hours before the witness is to be called at

14:20:48 2    trial submit the items enumerated in that paragraph

14:20:51 3    consistent with my procedures.  So instead of two days it's

14:20:56 4    forty-eight hours because I've gotten them where I get it at

14:21:00 5    10:00 p.m. at night for a witness at 8:00 a.m. or 9:00 a.m.

14:21:05 6         Paragraph 51, I am adopting with a modification.

14:21:10 7    Documents can only come into evidence if they are on exhibit

14:21:14 8    lists and shown to a witness.  So the proposal in

14:21:19 9    paragraph 57 is also adopted with that clarification.

14:21:23 10   Exhibits used solely for impeachment that are not on the

14:21:28 11   exhibit list will not come into evidence.

14:21:32 12        MR. MAIORANA:  Your Honor, one issue on that.

14:21:34 13   We wanted to ask the Court's view.  For the exhibits that

14:21:38 14   come up during the depo designations, how would you like us

14:21:42 15   to handle those, because you want us to have them published

14:21:45 16   to the jury during the depo designation and then we offer

14:21:49 17   them at the end?  What's your preference?

14:21:51 18        THE COURT:  You should know ahead of time if

14:21:54 19   there is going to be an objection.  If there is no

14:21:57 20   objection, you should published them to the jury and at the

14:21:59 21   end of the deposition read in or offer the exhibits into

14:22:02 22   evidence.

14:22:02 23        MR. MAIORANA:  Thank you, Your Honor.

14:22:04 24        THE COURT:  But if there is an objection, you

14:22:04 25   need to bring it up pursuant to the regular objection

14:22:08 1    period.

14:22:09 2                    MR. MAIORANA:  Understood, Your Honor.  Thank

14:22:10 3    you.

14:22:10 4                    THE COURT:  Just note for the record there is no

14:22:14 5    paragraph 52 in your pretrial order.

14:22:17 6                    Paragraph 53 -- I just wanted you to know we

14:22:21 7    read it.

14:22:22 8                    Paragraph 53, I know that my preferences and

14:22:27 9    procedures give you all the option to object to expert

14:22:30 10   testimony and get my ruling during trial or agree to defer

14:22:33 11   that ruling until after trial subject to my proviso that if

14:22:41 12   I have to order a new trial it's going to be paid for.  You

14:22:46 13   guys chose the second option, but you added requirements,

14:22:50 14   specifically tying the objection to the reason for a new

14:22:53 15   trial.  You don't get to modify the option, and I sure don't

14:22:56 16   care to argue with the parties about whether an objection is

14:22:59 17   the reason for a new trial and to have another appealable

14:23:04 18   issue as to whether I made you pay because it was the reason

14:23:07 19   for a new trial.  So no to that modification.  What we're

14:23:11 20   going to do is say you all have to object at trial and we

14:23:14 21   will deal with it at trial using trial time charged as I see

14:23:18 22   appropriate, so you need to make and argue any objections

14:23:22 23   regarding expert testimony scope at trial.

14:23:27 24                    Paragraph 54, just to clarify that leave of

14:23:30 25   Court is required to add anything to the list of trial

14:23:32  1    exhibits.

14:23:33  2              Paragraph 56, I need some clarity here.  With

14:23:41  3    this translation thing, I mean, have you all exchanged

14:23:46  4    translations with each other?

14:23:47  5              MR. MAIORANA:  You mean the produced documents?

14:23:51  6    Yes, Your Honor, we have.

14:23:52  7              THE COURT:  I'm not sure what we're talking

14:23:54  8    about here with translations, like are there going to be

14:23:59  9    translated things that nobody has ever seen, that one side

14:24:02 10    or the other hasn't seen before?

14:24:04 11              MR. MAIORANA:  No, Your Honor, any translations

14:24:06 12    that we may intend to use are on our exhibit list as such so

14:24:10 13    the original and then the translation.

14:24:13 14              MS. HUFNAL:  Your Honor, I think this is

14:24:14 15    remnants of the parties were debating, discussing when there

14:24:20 16    would be an exchange of certified translations as opposed to

14:24:24 17    the machine translations and we just had it resolved at the

14:24:28 18    time of the pretrial order, everything has been exchanged

14:24:30 19    now, as far as I know there is no issue.

14:24:34 20              MS. FURBY:  I don't think there is going to be

14:24:36 21    an issue -- so that's right, we did provide our certified

14:24:41 22    translations, I believe we have received Chemours' certified

14:24:44 23    translations at this point.  We just included a note that we

14:24:47 24    did not have them at the time that we did our objections to

14:24:51 25    the exhibit list so we have to reserve our right to what the

certified translations might be because we didn't have them
at the time we did our objections.

THE COURT:  But as far as you're concerned all
certified translations have been exchanged and there are no
objections based on those certified translations.

MS. FURBY:  I believe that's right, Your Honor.

THE COURT:  Okay.  Paragraph 67.  The parties'
competing proposals for dealing with opening demonstratives
in paragraph 67, I think -- did you guys work it out?

MS. HUFNAL:  We did.

THE COURT:  All right.

MS. HUFNAL:  We're exchanging at 5:00 p.m. with
a meet and confer at 7:00 p.m.

THE COURT:  Okay.  Excellent.  I will adopt
that.

Paragraph 69 is fine, if you all agree that
you're not going to be exchanging demonstratives.  So I
think this one is okay because I think my proviso was on the
opening demonstrative, so I think that one is okay.

Paragraph 90, let's talk about inequitable
conduct.  So I was planning to hear that during the trial
time in the hours after the jury leaves.  So tell me, I
couldn't even tell from the pretrial order what the basis
was.  I have to go back and look at the answers.  So what is
the basis for it and how are you going to prove it so I can

14:26:46 1   decide how much time to allot for it?

14:26:48 2            MR. MAIORANA:  So the prior art products we

14:26:50 3   discussed earlier, Your Honor, the plaintiffs had purchased

14:26:53 4   those products back before they filed for the

14:26:56 5   patents-in-suit.  They tested them to look at the properties

14:27:00 6   that are relevant to these patents to determine, we will

14:27:04 7   argue that they were within the scope of the claims and then

14:27:07 8   did not present anything about those products to the Patent

14:27:10 9   Office during prosecution.

14:27:12 10           Also, there is a prior art reference called

14:27:14 11  callback that we have documents showing that inventor Tooley

14:27:19 12  at least had knowledge --

14:27:21 13           THE COURT:  Just so I understand, the prior art

14:27:24 14  products when you say Chemours bought them whatever, someone

14:27:26 15  with a duty of candor?

14:27:29 16           MR. MAIORANA:  Yes, Your Honor.  Inventor Tooley

14:27:32 17  from both patents, she had purchased the products --

14:27:33 18           THE COURT:  The NP whatever?

14:27:35 19           MR. MAIORANA:  Yes NP-101 and 3000, I believe,

14:27:38 20  Your Honor.  And so Inventor Tooley, someone had acquired

14:27:42 21  the products at DuPont.  She tested them, wrote a report

14:27:46 22  saying here are the properties and she certainly had a duty

14:27:51 23  to disclose under Rule 56 and did not.  That is the basis as

14:27:54 24  well as the callback patent that she had found and sent it

14:27:58 25  to what I would call a patent liaison, someone that

interfaces between the engineers and the legal team and said look, 3M got a patent on FEPs.  That patent was not submitted during prosecution, either.

So our presentation of proofs will be either Dr. Tooley live, or through her deposition as well as some deposition testimony from Ms. Scott who is a patent attorney at DuPont and Chemours regarding the duty of disclosure and how the company handled that, and as well as our expert, Dr. Giacomin talked about that those products do in fact meet the claims of the patents.  So we estimated about two hours for all of that, Your Honor, from our side.

THE COURT:  Okay.  A new face.

MR. WARDEN:  Joseph Warden, Your Honor, on the inequitable conduct issue.

As counsel for Daiken said, their contention is that Ms. Tooley didn't disclose this testing that she had done on their prior art products as well as this prior art patent, the callback patent.  What we'll show is as they alluded to, Ms. Tooley did disclose the callback patent to the patent liaison, this guy named James Keating, he was the one that interfaced between the inventors on the one hand and the patent prosecutors on the other hand.  Ms. Tooley wasn't disclosing anything to the Patent Office herself. She would pass things along to Mr. Keating, the patent liaison --

14:29:35  1              THE COURT:  Did the patent liaison have a duty

14:29:38  2    of candor?

14:29:39  3              MR. WARDEN:  He did, Your Honor.  And they could

14:29:42  4    have and chose not to depose Mr. Keating.  He was never

14:29:46  5    deposed in this case and never answered why he did or did

14:29:50  6    not disclose any particular things.  For the callback,

14:29:52  7    specifically we have evidence and she did pass it to the

14:29:55  8    Mr. Keating.  For the testing data, Ms. Tooley said it has

14:29:59  9    been twenty years, she can't remember specifically whether

14:29:59 10    she passed that document on to Mr. Keating.  We do have,

14:30:02 11    however, Mr. Keating was on the distribution lists for

14:30:05 12    quarterly reports showing the work that was being done which

14:30:07 13    would have indicated the testing would have gone on.

14:30:10 14              We also have that Ms. Tooley forwarded on to

14:30:14 15    others in the group and forwarded on to Mr. Keating one of

14:30:17 16    the other prior art patents, the Kono patent and the data in

14:30:20 17    that Kono patent shows the MFR limitations within the same

14:30:25 18    range of the products they had tested.  And while that

14:30:28 19    specific Kono patent wasn't disclosed to the Patent Office,

14:30:31 20    a different Kono patent application with the same table

14:30:34 21    containing the same data was disclosed to the Patent Office.

14:30:37 22    So our position as well is that even though some

14:30:41 23    information, some specific references might not have been

14:30:42 24    disclosed, all of the material relevant information was

14:30:46 25    disclosed and anything not disclosed was cumulative.

14:30:50 1            As far as time and witnesses, we don't

14:30:52 2   anticipate that we would call any additional witnesses

14:30:55 3   beyond the three that they would.  It's possible that some

14:30:57 4   of the expert testimony that came in on validity issues in

14:31:01 5   front of the jury we might rely on, but we would not call

14:31:04 6   our experts again.  There is nothing that we would have to

14:31:07 7   call them again on at this point.  And two hours seems

14:31:10 8   sufficient from our perspective.

14:31:12 9            THE COURT:  Two hours total?

14:31:14 10            MR. WARDEN:  Well, they were saying two hours

14:31:15 11   for their side.  We certainly would not need a full two

14:31:18 12   hours for our side.  I'm not sure two hours combined would

14:31:21 13   be enough or not, but certainly we would be -- if the Court

14:31:25 14   would give us an hour apiece, we would be fine with that.

14:31:29 15            THE COURT:  All right.  I'll give you two hours

14:31:32 16   each, but you need to include in that time where you can

14:31:37 17   make your arguments to me.

14:31:40 18            MR. WARDEN:  Can I just ask, Your Honor, are you

14:31:42 19   going to want any kind of opening statement on inequitable

14:31:45 20   conduct issue or just a closing argument after we're done?

14:31:48 21            THE COURT:  I like you to do whatever you think

14:31:52 22   you should do in order for me to understand the position.

14:31:55 23   If you think it's helpful, which it probably would be, to

14:31:57 24   give an opening statement given I had to go scrounging into

14:32:00 25   the pleadings to find out what this is even about, it

14:32:03 1    probably would be helpful, but up to you.

14:32:05 2              MR. WARDEN:  Okay.

14:32:06 3              MR. MAIORANA:  One logistical issue related to

14:32:08 4    that, Your Honor.  Plaintiffs had told us that Dr. Tooley is

14:32:11 5    coming, but she's only available on Monday, the first day of

14:32:14 6    trial.  We weren't sure when Your Honor -- which nights you

14:32:17 7    were planning on doing the inequitable conduct.

14:32:19 8              THE COURT:  We'll do it when she's here.  It's

14:32:22 9    probably useful to hear from her live.

14:32:25 10             MR. MAIORANA:  Thank you, Your Honor.

14:32:26 11             THE COURT:  Let me ask you this question,

14:32:27 12   though.  So if at least with respect if not the callback

14:32:32 13   patent but with respect to the products, if the jury were to

14:32:35 14   find that those product don't invalidate, what does that do

14:32:38 15   to your inequitable conduct?  It kind of makes it hard for

14:32:42 16   the but for, doesn't it?

14:32:43 17             MR. MAIORANA:  It may make it hard for the but

14:32:45 18   for, Your Honor.  We think that the fact that one of the

14:32:48 19   inventors of the patent had these and then filed a patent

14:32:50 20   application saying that that was their invention, even if

14:32:54 21   the jury finds that we didn't prove that by clear and

14:32:57 22   convincing evidence, we think we can still prove materiality

14:33:01 23   but it would make it difficult for the but for test, yes,

14:33:04 24   Your Honor.

14:33:05 25             THE COURT:  Okay.  Paragraph 96, jury selection

14:33:08 1    I'm going to talk about in a few minutes.

14:33:11 2            Okay.  Now we get to these stealth motions *in*

14:33:15 3    *limine*.  You guys have dumped a bunch of extra stuff at the

14:33:19 4    end of the pretrial order that seems like they should have

14:33:22 5    been raised in motions *in limine* but weren't because I guess

14:33:26 6    you have limits or I imposed limits on how many you can

14:33:31 7    include.  So I'm not obligated to hear and decide motions in

14:33:38 8    limine in advance of trial and of course I could require the

14:33:42 9    parties to simply raise objections during trial.  What I

14:33:46 10   want to do is go through these and see which of these are

14:33:49 11   out there and if we need to have substantive argument on

14:33:52 12   them, I'm going to put you on the clock and you're going to

14:33:56 13   be using your trial time.

14:33:58 14           So plaintiff's request to have its expert

14:34:01 15   testify remotely.  Seems like if indefiniteness is out, that

14:34:05 16   may be moot.

14:34:06 17           MR. McCANN:  It may be moot for another reason,

14:34:07 18   Your Honor, because we're trying to get him to reschedule

14:34:09 19   his flight to leave Thursday at 10:00 p.m.  It's always

14:34:12 20   difficult to judge when rebuttal will happen at trial.

14:34:17 21   Hopefully he'll testify that day, Thursday.  You're right,

14:34:20 22   with indefiniteness out that removes one issue, but I

14:34:23 23   suppose he might rebut on infringement.  Your Honor knows

14:34:26 24   often that's like five, ten minutes at the end of the case.

14:34:29 25           So I think, Your Honor, what might make sense is

14:34:32  1   we'll see how the trial is going.  If we think there remains

14:34:36  2   an issue, we'll ask the Court for guidance.  If the Court

14:34:40  3   says he's either here live or not at all, we understand

14:34:43  4   that.  If the Court says we can make some arrangements to do

14:34:46  5   it remotely given the scope of what we then say he'll

14:34:49  6   testify to, obviously we'll do that.

14:34:50  7           THE COURT:  I did want to talk about the issue

14:34:52  8   that folks came to Mr. Buckson with on the remote access to

14:34:58  9   this trial.  I think it's about time that we stopped court

14:35:02 10   TV and if folks want to come, they come and if they don't

14:35:06 11   want to come, they don't come.  But I did want to give you

14:35:09 12   an opportunity to be heard on that, but clearly if I end

14:35:15 13   that, it will probably -- I guess he could probably still

14:35:20 14   testify remotely, but I would prefer that everyone who is

14:35:24 15   testifying live as in answering questions, not deposition,

14:35:30 16   be here.

14:35:30 17           MR. McCANN:  Understood, Your Honor.  We didn't

14:35:32 18   know if the Court still -- at the time of the Excela trial a

14:35:36 19   few months ago you were limiting who could come.

14:35:39 20           THE COURT:  I don't want to have full benches in

14:35:41 21   the back.  I think that makes the jury uncomfortable.  I

14:35:42 22   don't think this case requires you to have full benches in

14:35:46 23   the back.  I guess what I will do is I will say use your

14:35:49 24   best judgment that you're not going to creep the jury out

14:35:52 25   with full benches.

14:35:53 1                MR. McCANN:  We will not do that, Your Honor.

14:35:55 2                THE COURT:  I trust you.  Okay.  I'm giving you

14:36:00 3 guys some leeway here, so you're going to ruin it for

14:36:04 4 everyone if you screw it up.

14:36:07 5                Plaintiff's ability to respond to Dr. --

14:36:13 6                MR. MAIORANA:  Giacomin.

14:36:14 7                THE COURT:  -- Giacomin's supplemental report

14:36:17 8 which plaintiff chose not to respond to in writing.  That

14:36:20 9 one seems like plaintiff's expert is limited to the opinions

14:36:23 10 fairly disclosed in the opening report and I think that's

14:36:26 11 what you guys are prepared to live with.

14:36:28 12                MR. McCANN:  Correct, Your Honor.

14:36:29 13                THE COURT:  Whether he says it, gets up and says

14:36:32 14 like I already said when I testified in opening, as long as

14:36:36 15 it's fairly disclosed, that's fine.

14:36:38 16                MR. McCANN:  Yes, Your Honor.

14:36:38 17                THE COURT:  Okay.  Look at us going through

14:36:41 18 these issues so fast.

14:36:42 19                Okay.  Mr. Sincere and Mr. Crenshaw.

14:36:49 20                MR. McCANN:  So, Your Honor, it's just Crenshaw

14:36:52 21 now we dropped Sincere and very briefly.

14:36:55 22                THE COURT:  How is this -- my question on this

14:36:57 23 one, how is this not an end run around Judge Burke's ruling?

14:37:02 24                MR. McCANN:  We didn't want to take the

14:37:07 25 deposition for discovery, Your Honor.  We know what he says

14:37:09  1   because he provided a declaration at the IPR supporting us,

14:37:12  2   saying the DuPont product was wonderful and changed the

14:37:16  3   industry sort of thing so we wanted to take a trial

14:37:18  4   deposition so we wouldn't have to bring him here and Judge

14:37:23  5   Burke said you have done all that too late.  Okay?

14:37:25  6            THE COURT:  So isn't this even later?

14:37:28  7            MR. McCANN:  It is if it was a deposition.  I

14:37:31  8   guess we now are in the position, Your Honor, where we can't

14:37:34  9   just play a short deposition, we would have to bring the

14:37:37 10   witness live if the Court permits it, so we call the witness

14:37:40 11   and prevailed upon him would you be willing to come live if

14:37:44 12   the Judge allowed it and he said yes.  I think, Your Honor,

14:37:47 13   Judge Burke's order said you can't take a deposition.  We

14:37:50 14   would like to bring him live if the Court permits.

14:37:54 15            MR. MAIORANA:  You hit our argument on the head,

14:37:56 16   Your Honor.  This didn't come in during fact discovery.

14:37:59 17            THE COURT:  Were these folks disclosed as people

14:38:01 18   they were going to rely on during fact discovery?

14:38:04 19            MR. MAIORANA:  Not until the end of fact

14:38:07 20   discovery.

14:38:07 21            THE COURT:  Like five days before the end of

14:38:09 22   fact discovery.

14:38:10 23            MR. MAIORANA:  We had no chance to subpoena him

14:38:12 24   and use him.  It wasn't in their initial disclosures and

14:38:15 25   they don't do this until it was too late so we do think it's

14:38:16 1  and end run, Your Honor, and he shouldn't be allowed to

14:38:22 2  testify about it.

14:38:22 3          MR. McCANN:  That's all correct, Your Honor,

14:38:23 4  with the caveat he gave a declaration in the IPR.  That is

14:38:30 5  his direct examination here at trial if the Court permits

14:38:30 6  it, it was is the same testimony he had at the IPR around

14:38:33 7  2018 or so.

14:38:33 8          MR. MAIORANA:  If they wanted to use him in this

14:38:35 9  case, they should have disclosed him in their initial

14:38:38 10 disclosures and they didn't.  The fact that he was in the

14:38:40 11 IPR, we should be on notice that anything in the IPRs --

14:38:43 12         THE COURT:  The initial disclosures came after

14:38:45 13 the IPR.

14:38:46 14         MR. MAIORANA:  The initial disclosures came --

14:38:48 15         THE COURT:  Because I know that there was a stay

14:38:50 16 in this case so I'm just trying --

14:38:52 17         MR. MAIORANA:  I believe they were, Your Honor,

14:38:54 18 and then they updated them at the very end of fact discovery

14:38:57 19 to add St. Cyr and Crenshaw so we weren't on notice until it

14:39:01 20 was too late for us to do anything about it, so we think

14:39:04 21 it's unfair that he come and testify now.

14:39:11 22         THE COURT:  All right.  Defendants believe

14:39:13 23 plaintiffs should be precluded from eliciting testimony from

14:39:16 24 Mr. Randall Crenshaw, a third-party witness who is

14:39:22 25 apparently a paid consultant that plaintiff was pretty

14:39:30 1    delinquent in identifying.  Apparently plaintiff received

14:39:32 2    subpoenas to take trial depositions of Mr. Crenshaw and

14:39:35 3    another person on October 29th, 2021, and Judge Burke said

14:39:39 4    no, that the plaintiff wasn't allowed to take depositions

14:39:44 5    outside of fact discovery period.  So then on November 5th,

14:39:51 6    2021, plaintiff amended its disclosures to add these two

14:39:54 7    individuals as witnesses likely to have discoverable

14:39:57 8    information, but plaintiff is not going -- I am not going to

14:40:01 9    allow the plaintiff to bring these witnesses at trial

14:40:04 10   because that would circumvent Judge Burke's ruling and given

14:40:08 11   that we just had to have a little bit of argument on that,

14:40:11 12   one, I'm going to deduct some trial time from you folks on

14:40:15 13   that one.

14:40:16 14          Now we have defendants want to preclude

14:40:18 15   plaintiffs from using a document relevant to damages.  See

14:40:20 16   this one, plaintiff, seriously, they mentioned it, you're

14:40:25 17   going to stand up and tell me that you resolved this.  I

14:40:29 18   want to ask plaintiffs a question first unless you're going

14:40:33 19   to say resolved.  They mention it, they said we want to talk

14:40:37 20   about it for a motion *in limine* and then you didn't bother

14:40:40 21   to put it on the exhibit list.  Why am I not supposed to

14:40:44 22   think that plaintiff was playing a little fast and loose

14:40:47 23   here?

14:40:48 24          MR. WARDEN:  Two things, Your Honor, not

14:40:50 25   including it on the exhibit list was inadvertent.

14:40:53  1                  THE COURT:  How did that happen?

14:40:54  2                  MR. WARDEN:  I can't tell you how it happened.

14:40:56  3                  THE COURT:  Someone needs to tell me how it

14:40:58  4      happened because it seems like a pretty incredible thing.

14:41:02  5                  MS. HUFNAL:  I can, Your Honor.

14:41:03  6                  THE COURT:  This document is so important that

14:41:05  7      nobody bothered to put it on the exhibit list?

14:41:08  8                  MS. HUFNAL:  It was an oversight.  It was cited

14:41:10  9      in one of Mr. Hansen's, our damages expert, appendices and

14:41:15 10      when the team went and did the run through to attach on

14:41:18 11      the -- include on the exhibit list all documents cited by

14:41:22 12      the experts, which is routine because this was a document

14:41:25 13      cited on the appendix, it didn't get up to that initial.  We

14:41:28 14      did amend, you know, well within the time of the pretrial

14:41:32 15      order, but it was a pure procedural --

14:41:36 16                  THE COURT:  No one gave me the document.  Can I

14:41:38 17      have the document?

14:41:39 18                  MR. WARDEN:  I have one copy of it, Your Honor.

14:41:41 19      And one thing I think is critical to point out is the Court

14:41:42 20      actually already decided this issue.  This with one of the

14:41:42 21      pieces of the Daubert motion.

14:41:52 22                  THE COURT:  I can't believe I actually decided

14:41:52 23      this issue on a particular document.

14:41:52 24                  MR. WARDEN:  You didn't, you asked them to argue

14:41:52 25      their best and strongest argument, they argued that, you

14:42:00 1  denied it, you said since you denied their strongest

14:42:03 2  argument, you were going to deny their other arguments as

14:42:06 3  well.

14:42:06 4            But my point is this issue that they wanted to

14:42:09 5  put in the MIL, it was briefed by both parties.  They had an

14:42:13 6  opportunity to brief it --

14:42:13 7            THE COURT:  Stop with that.  I'm addressing it

14:42:15 8  now.  And you're on the clock for the trial, so tell me --

14:42:19 9  actually let's hear from them since they're trying to

14:42:22 10  exclude it and you can tell my why it shouldn't be excluded

14:42:26 11  under the *Pennypack*.

14:42:27 12            When was this document first, whatever,

14:42:29 13  produced?

14:42:30 14            MS. HOGAN:  I'm going to take ten seconds, Your

14:42:32 15  Honor, as quickly as I can.  We got the document the first

14:42:35 16  time after discovery closed.  We did request it, but Your

14:42:38 17  Honor, we asked for it because it had been requested a year

14:42:41 18  earlier in our RFP's.  The document had no foundation and

14:42:44 19  just so you know, it was marked as an exhibit at

14:42:47 20  Mr. Hansen's deposition, so when they say it was part of the

14:42:51 21  appendices, it was marked as an exhibit at his deposition.

14:42:54 22  And every deposition exhibit to Mr. Hansen's deposition made

14:42:57 23  it on the exhibit list except this one.  And we had a

14:43:02 24  detailed conversation with them about why we're going to

14:43:02 25  move to keep it out and we assumed that they agreed with us,

14:43:09 1   sometimes it happens, Your Honor, and that's why they didn't

14:43:12 2   put it on the exhibit list.  It is a critical document that

14:43:15 3   has --

14:43:15 4              THE COURT:  Tell me why it's critical.

14:43:17 5              MS. HOGAN:  Because it's the only evidence --

14:43:19 6              THE COURT:  And you know one of the issues that

14:43:21 7   I have to look at in terms of exclusion is how important it

14:43:24 8   is, so if you're telling me it's important to them, I guess

14:43:28 9   --

14:43:28 10              MS. HOGAN:  I want to be honest with you, it's a

14:43:31 11   document that relates to the capacity to make the products.

14:43:34 12   If Daiken's products weren't out in the market, this is

14:43:37 13   their primary evidence that their Washington Works facility

14:43:42 14   had the capacity to make up the difference in the products.

14:43:45 15   It's a very important document.

14:43:47 16              THE COURT:  So you did not -- you were not able

14:43:49 17   to take any discovery on this document?

14:43:51 18              MS. HOGAN:  Your Honor, we haven't seen it until

14:43:54 19   Mr. Hansen produced it as part of that expert report.  And

14:43:58 20   when we asked him about it, he said he had received it from

14:44:01 21   Denise Dignam who is one of their business people, that he

14:44:04 22   had one conversation with her.  He couldn't answer basic

14:44:07 23   questions about it.  He couldn't tell us what certain things

14:44:10 24   meant.  He said Denise gave this to me and told me this is

14:44:15 25   evidence that they had the capacity to makeup the products.

14:44:18 1 And their argument is I should have filed a motion to compel

14:44:21 2 Ms. Dignam to give more testimony, but at this point

14:44:26 3 discovery is closed and I don't think I have the obligation

14:44:28 4 at that point.

14:44:29 5          But be that as it may, we would have brought

14:44:32 6 this to your much more detailed process, Your Honor, if we

14:44:35 7 had the ability to file a MIL on it.  And it seems a little

14:44:39 8 bit unfair to take that ability away from us and then say

14:44:42 9 well, it's critical and we need it.

14:44:44 10          Thank you.

14:44:44 11          THE COURT:  So why wasn't this produced if this

14:44:47 12 was so important?  Why wasn't this produced and why wasn't

14:44:50 13 the expert able to testify what it was about?

14:44:53 14          MR. WARDEN:  So first why wasn't it produced.

14:44:56 15 It did not exist until it was produced.  So they did not --

14:45:00 16 they had a request for production for documents related to

14:45:03 17 capacity.  This was not a preexisting document that existed

14:45:07 18 in the course of business.  What happened is they deposed

14:45:09 19 Ms. --

14:45:10 20          THE COURT:  I'm sorry.  How are we getting it

14:45:12 21 into evidence?

14:45:14 22          MR. WARDEN:  We produced it at their request.

14:45:15 23 Ms. Dignam was deposed on the 3rd.  She was asked about

14:45:19 24 capacity.  Ms. Dignam testified that Chemours would have the

14:45:22 25 capacity to fill the orders that were being done by Daiken.

14:45:26 1    She also testified that we could if we wanted to produce a

14:45:30 2    report that showed the capacity at the Washington Works.   It

14:45:32 3    did not exist, but we had the ability to create one.   The

14:45:35 4    next day we were e-mailed on November 4th and asked to

14:45:39 5    create that document for all three of our facilities.   We

14:45:41 6    did, but it took some time.   November 30th, about three

14:45:44 7    weeks later we produced it.   Mr. Hansen then relied on it in

14:45:48 8    his report, we disagreed he couldn't answer basic questions

14:45:52 9    --

14:45:52 10              THE COURT:   Let me see his testimony.

14:45:53 11              MR. WARDEN:   I would direct the Court actually

14:45:56 12   to the briefing -- I don't have it with me, but it is in the

14:45:59 13   briefing on the --

14:46:00 14              THE COURT:   Anyone?

14:46:01 15              MR. WARDEN:   In the motion *in limine*.

14:46:03 16              THE COURT:   You're telling me he couldn't answer

14:46:05 17   basic questions?   You really should have this stuff if you

14:46:08 18   want to show it.   Show don't tell.

14:46:13 19              MS. HOGAN:   Your Honor, we don't have the

14:46:15 20   transcript with us.

14:46:16 21              THE COURT:   No, I want the transcript.   I don't

14:46:18 22   want a summary of it, that's not helpful.   You really need

14:46:23 23   some evidence, folks.   So what we're going to do is I am not

14:46:27 24   going to decide this issue.   I want you to show me what he

14:46:30 25   said so I can evaluate which of you is telling me the truth

14:46:34 1    about what the expert knew or didn't know about this

14:46:38 2    document.  So I'll withheld on that one.

14:46:41 3            All right.  Trial logistics.  I think I already

14:46:48 4    told you that you'll have twelve hours trial time for jury

14:46:52 5    trial.  That includes opening statements, closing arguments,

14:46:56 6    witness examinations and arguments about objections.

14:46:58 7    Generally if we are in the courtroom, someone is being

14:47:01 8    charged for time unless we are picking the jury or I am

14:47:04 9    reading jury instructions.

14:47:05 10           The parties are required to set aside one hour

14:47:08 11   of the twelve hours of trial time for closing arguments.

14:47:12 12   And just so we're clear because people have been accused in

14:47:15 13   the past, if you have more than one hour left at the end,

14:47:18 14   you can use that more than one hour for closing.  In the

14:47:21 15   past I have had people with an hour-and-a-half, but they

14:47:25 16   thought they were cut off at an hour.  You can use whatever

14:47:28 17   you have left, but it cannot be less than an hour.

14:47:31 18           Inequitable conduct proceedings, you'll each

14:47:33 19   have two hours.  We'll start on Monday when the jury leaves

14:47:38 20   and we'll go until we use up the time or the evidence is

14:47:42 21   complete.

14:47:42 22           Jury selection will take place on Monday morning

14:47:52 23   and the presentation of evidence will begin after the jury

14:47:55 24   is seated.  We'll start at 9:00 a.m. each morning and plan

14:47:55 25   to present evidence until 4:30 or 4:45.  We'll do the normal

14:48:03  1    fifteen-minute break in the morning and another in the

14:48:06  2    afternoon, and have a lunch break.  To move things along

14:48:09  3    quicker during jury trials I often ask the parties if

14:48:14  4    they're willing to buy lunch that is brought in for the

14:48:17  5    jurors.  Let my chambers know by the close of business

14:48:20  6    tomorrow if you agreed to do that.

14:48:23  7          COVID jury questionnaires.  So we sent out

14:48:25  8    questionnaires to prospective jurors asking about COVID

14:48:29  9    hardships such as underlying conditions, vaccination status,

14:48:32 10    child care.  You will not get a copy of those, but the

14:48:34 11    current plan is to bring in those who have been fully

14:48:38 12    vaccinated and who have no stated concerns as well as anyone

14:48:41 13    who did not return the questionnaire regardless of their

14:48:44 14    status.  And then we excuse the other folks.

14:48:48 15          We typically have been bringing in twenty-some

14:48:52 16    people for jury duty and it's been fine.  Given that the

14:48:56 17    voir dire ask questions about DuPont and that we usually

14:49:01 18    have people who answer yes to some of those questions, I

14:49:04 19    think we're going to bring in a few more people, probably

14:49:08 20    thirty some just to make sure we have enough to pick the

14:49:11 21    jury.

14:49:12 22          Is there any objection to the bringing in the

14:49:15 23    jurors as I just stated?

14:49:15 24          MS. HUFNAL:  No objection.

14:49:20 25          MR. MAIORANA:  No objection, Your Honor.

THE COURT:  All right.  Voir dire, I think
you're all probably familiar with how I do jury selection.
The prospective jurors will be randomized and assigned a
number 1 through whatever number we have coming in, 1
through 14 sit over here, 15 to 28 sit over here, and 29
through whatever sit over here.  And if there is more, we
set them up in the seats in front of the jury box.  Each
juror is going to wear a number and they're sitting --
they'll be like 1, 2, 3, 4, 5, 6, they kind of go in order
but they will be wearing a juror tag so you can see who they
are.

So typically what I have been doing is I ask the
question of voir dire and then I ask the folks over here how
many of you have answered yes to any question?  You can
count them up.  And then we bring anyone who answered yes
back into the jury room for further discussion.

Each juror will also be provided a sheet that
includes the voir dire questions and a pencil so that they
can keep track of yes answers on their own when I read the
questions aloud.  After that is done, the attorneys will
move to the jury room in the back where we will bring up
people who have answered yes to any of the questions.

So typically what I have been doing is I ask the
question of voir dire and then I ask the folks over here how
many of you have answered yes to any question?  You can
count them up.  And then we bring anyone who answered yes
back into the jury room for further discussion.

If the perspective juror answered no to every
question or didn't answer yes to any questions, you will not
talk to them, they will just be sitting there and will be

part of the panel that will be challenged for cause.

If we don't get our eight, what we do is we keep going until we get 14 folks who haven't been excused for cause.  If we have to excuse someone for cause of the original 14 we go to number 15 and say did you answer yes to any questions.  If juror number 15 answered yes to a question, that person will come back and talk to us.  If juror 15 answered no to all the questions, juror number 15 will take a seat over there and be subject to preemptory strikes.

I think that's it.  So once we have our fourteen who are sitting over there, we proceed to preemptory strikes.  I typically don't put you on the clock for preemptory strikes, or I haven't been, but if it starts like getting really long and dragging out unnecessarily, I may give you a warning and do so.

Plaintiff is responsible for bringing enough pens or pencils and enough copies of the voir dire for the prospective jurors, about forty.  We need those delivered to the clerks office by noon on Friday, July 8th.

I already talked about the number of people in the courtroom.  I'm not going to set a limit at this point, but if it's abused, I may do so in the future.  Right now I'm not planning to require masks, but I may change my mind if we have jurors that complain.  I will say that if you

14:52:37 1    start to cough, the jurors notice that, okay, and you know,

14:52:42 2    they're not thinking allergies, they're thinking eww, right,

14:52:46 3    so if you start to cough, put on a mask or leave the

14:52:50 4    courtroom, because it's just not feasible to have people

14:52:54 5    kind of freaked out.  They're not paying attention to the

14:52:58 6    evidence when they're watching you cough.

14:53:00 7          We do limit moving around the courtroom.

14:53:05 8    Attorneys need to stay at the podium, so during openings and

14:53:09 9    closings, we used to let you kind of wander around.  Now the

14:53:13 10    podium is kind as close as you can get to the jurors.  You

14:53:18 11    can turn the podium around for openings and closing, if you

14:53:22 12    want to talk to them, but I ask that you don't go in front

14:53:25 13    of them.

14:53:25 14          When witnesses are on the stand, I ask that you

14:53:30 15    give the witness when they go to the stand a binder for

14:53:34 16    direct and a binder for cross so we don't have four people

14:53:37 17    coming up with binders, just give it to the witness so we

14:53:40 18    only have one person walking past the jury if possible.  I

14:53:45 19    know some experts, people load them up with like eight

14:53:48 20    binders.  If we need an extra person to help them so they

14:53:52 21    don't hurt themselves, that's find, but what people get kind

14:53:55 22    of sloppy about it and oh, wait, I have another binder and

14:53:59 23    oh, can I run up with my cross binder.  Those are all things

14:54:02 24    that the jurors complained about and the jurors noticed.

14:54:05 25    So, I suppose if I let you do it, if you want to give them

14:54:09 1    the binders know that the jurors are looking at you askant.

14:54:14 2    Don't give us a binder.  We don't -- don't give one to me or

14:54:21 3    my clerk or the court reporter, just the witness.  But you

14:54:27 4    will be providing us with electronic versions of all the

14:54:31 5    trial exhibits.  And you have to do that by noon on Friday.

14:54:37 6    And so what I ask is that we get all of the plaintiff's

14:54:41 7    exhibits and they should be labeled plaintiff's, you know,

14:54:44 8    PTX 1, PTX 2, so that they're in order if I sort them, and

14:54:49 9    then DTX's, same thing, and JTX's the same thing, so they

14:54:55 10   essentially come up in order on my screen.  You can do that

14:54:58 11   via a shared link or a flash drive, I don't care, but have

14:55:03 12   folks coordinate with Mr. Buckson so we have them

14:55:06 13   electronically on the first day of trial.

14:55:09 14          Additionally, every morning the parties need to

14:55:13 15   provide us with witness folders for directs and crosses that

14:55:19 16   will occur.  So it would be as if you were giving me a

14:55:23 17   binder, but you're giving it to me in electronic format.  I

14:55:28 18   know I probably have the exhibits and I can get them on the

14:55:31 19   general list, but I like having those folders.  In that

14:55:36 20   folder include demonstratives if you're putting in the

14:55:41 21   expert's cross binder his deposition and his expert report,

14:55:46 22   put those in the electronic folder, too, so that I can read

14:55:50 23   them in case there is an objection.

14:55:54 24          So I haven't been having sidebars during trials

14:56:02 25   because it's just kind of close over here, so typically what

14:56:06  1    we have been doing is we used to when we were using a

14:56:09  2    different conference room, we would go to the jury room.

14:56:12  3    Now we go out and kind of stand in the hall here.  So if we

14:56:17  4    have to do that, we'll do that for our sidebars.  And you're

14:56:24  5    on the clock during those things.  If I have to let the jury

14:56:27  6    recess to decide an objection because we can't do it out

14:56:30  7    there, you need to show me things, then I am going to

14:56:35  8    allocate that time.  And I may do it to the loser, I may do

14:56:39  9    it evenly, whatever I determine is fair at the time.

14:56:44  10            All right.  We already talked about broadcasting

14:56:46  11   the proceedings.  Are we okay with not broadcasting the

14:56:51  12   proceedings given that I haven't imposed a limit?

14:56:56  13            MR. McCANN:  We are, Your Honor.

14:56:57  14            MR. MAIORANA:  Yes, Your Honor.

14:56:58  15            THE COURT:  We won't do that.

14:56:59  16            As to closing the courtroom, I'm sure you are

14:57:02  17   all already aware that I'm generally disinclined to do so.

14:57:06  18   If you anticipate needing to have the courtroom sealed at

14:57:09  19   any point, you have to keep it to an absolute bare minimum.

14:57:12  20   You have to kind of put all of the stuff that's going to be

14:57:15  21   under seal together in the examination so we don't have

14:57:20  22   going in and out, in and out, and you have to provide

14:57:23  23   sufficient notice to the other side and to the Court.  And I

14:57:26  24   don't guarantee that you will be -- that we will seal the

14:57:28  25   courtroom, but if you don't follow those procedures we will

14:57:33 1   not.

14:57:36 2          If the parties agree on a set of documents that

14:57:38 3   the jury should have in the jury binders, you may give the

14:57:42 4   jury a binder.  If you want to do that, you have to bring

14:57:44 5   eight copies of the jury notebooks to court on the first day

14:57:48 6   of trial.  If you don't agree on contents there will be no

14:57:51 7   binders.

14:57:52 8          Consistent with my procedures, the parties shall

14:57:55 9   provide a completed AO Form 187 list to the courtroom deputy

14:58:01 10  the first day of trial.  After trial I need you all to

14:58:03 11  review the trial transcript and submit any necessary

14:58:06 12  corrections to the court reporter no later than two weeks

14:58:09 13  after trial, otherwise we tend to get a bunch of corrected

14:58:14 14  briefs and we can't even kind of look through the briefs

14:58:16 15  because we don't know what is corrected or what's going to

14:58:22 16  be changed.

14:58:22 17         If you all need access to the courtroom to set

14:58:26 18  up for trial, you may do so on Friday, July 8th.  I think

14:58:29 19  you may have coordinated with Mr. Buckson on that, but know

14:58:33 20  that you need to finish by 1 or 1:15 because we have a claim

14:58:36 21  construction hearing at 2 o'clock.

14:58:38 22         All right.  So those are the issues that we saw.

14:58:41 23  Now, anything else you all want to talk about?

14:58:44 24         MR. MAIORANA:  In paragraph 29 of the pretrial

14:58:47 25  order, Your Honor, we had mentioned the need for

14:58:49 1   interpreters for two of our witnesses.  We have agreed on an

14:58:54 2   interpreter and a check interpreter.  The question for Your

14:58:57 3   Honor is where would you like them to sit when they're

14:59:01 4   actually assisting with the testimony?

14:59:04 5             THE COURT:  So we're going to have an

14:59:07 6   interpreter and a check interpreter?  You guys can't agree

14:59:11 7   that one person can interpret?

14:59:13 8             MR. MAIORANA:  We certainly can agree that one

14:59:16 9   person can interpreter, we don't need a check interpreter.

14:59:20 10             THE COURT:  How is this going to work?  We have

14:59:22 11   three people sitting over here in front of the juror?

14:59:25 12             MS. HUFNAL:  No, Your Honor.  We have had check

14:59:26 13   interpreters for the depositions.  We thought for the check

14:59:30 14   interpreter having them sitting in the back of the courtroom

14:59:35 15   just in case.

14:59:36 16             THE COURT:  Is the check interpreter going to be

14:59:38 17   sworn in?

14:59:41 18             MR. McCANN:  If the Court would entertain what

14:59:47 19   the interpreter would have to say, they would have to be.

14:59:50 20             THE COURT:  All right.  So we're not having two

14:59:55 21   interpreters sit up here.  During the deposition, how often

14:59:55 22   did the check interpreter have to --

14:59:55 23             MS. HUFNAL:  It was actually a fair amount.

15:00:00 24             THE COURT:  Was it substantive?

15:00:02 25             MS. HUFNAL:  I don't really anticipate this

15:00:04 1   being an issue, but I am concerned about not knowing if

15:00:09 2   there is an issue in the interpretation.

15:00:12 3            THE COURT:  The check interpreter will sit in

15:00:15 4   the back.  Only bring issues that you feel are necessary to

15:00:17 5   bring to me.  But the check interpreter is going to have to

15:00:21 6   be sworn in.

15:00:22 7            MS. HUFNAL:  Okay.

15:00:23 8            THE COURT:  And then I guess the other

15:00:24 9   interpreter is going to have to -- Mark, do we sill still

15:00:28 10  have that screen?  Can we put a screen up?

15:00:32 11           COURT CLERK:  Yes.

15:00:33 12           THE COURT:  So they'll have to stand there back

15:00:36 13  behind the screen next to the witness.

15:00:38 14           How many witnesses do we have that are going to

15:00:40 15  need an interpreter.

15:00:42 16           MR. MAIORANA:  Two witnesses, Your Honor.  We

15:00:44 17  expect their testimony will be thirty minutes for one and

15:00:47 18  less than an hour for the other.  And that will be it for

15:00:52 19  interpretation.

15:00:54 20           THE COURT:  Okay.  Anything else?

15:00:57 21           MS. HUFNAL:  Your Honor, we do have an

15:00:59 22  additional issue, this is estoppel, the issue of estoppel.

15:01:06 23  And Your Honor I'm sure saw we filed a motion for summary

15:01:11 24  judgment of no estoppel.  The ruling from Your Honor was

15:01:15 25  that there were material issues of fact as to whether or not

15:01:19 1    estoppel applies.  I think both sides are in agreement that

15:01:22 2    estoppel is not something that the jury should be deciding,

15:01:25 3    but it is still technically in the case right now.  What we

15:01:30 4    are requesting and we are working, the communications are

15:01:32 5    ongoing right now --

15:01:33 6                    THE COURT:  I'm sorry, I thought estoppel did

15:01:41 7    apply to the written prior art.  Is that what we're taking

15:01:45 8    about or are we talking about different estoppel?

15:01:48 9                    MS. HUFNAL:  The IPR estoppel.

15:01:50 10                   THE COURT:  The IPR estoppel applies to the

15:01:54 11   paper art.

15:01:55 12                   MS. HUFNAL:  Correct.

15:01:55 13                   THE COURT:  And we already had a discussion that

15:01:57 14   if they start saying stuff about what the new systems, my

15:02:03 15   issue was that the new systems, there is an issue as to

15:02:07 16   whether those -- they say there is additional things that

15:02:14 17   weren't in the art, so what do you want me to do?  You want

15:02:21 18   me to decide whether there are additional things?

15:02:24 19                   MS. HUFNAL:  No.  I guess in an ideal world it

15:02:27 20   would have been that they moved for summary judgment that

15:02:30 21   they can do estoppel, it's just that we're in this position

15:02:33 22   that we have an appeal of a denial of a summary judgment,

15:02:37 23   that's how this issue has percolated in the case, so we

15:02:41 24   would request -- we're trying to see if there is a

15:02:42 25   stipulation so that the parties can stipulate that it

15:02:46 1  becomes a final judgment.  I'm just not sure that -- or not

15:02:49 2  final judgment, but a decided issue that we could appeal,

15:02:52 3  but I'm not sure procedurally that will work, so we were

15:02:56 4  then going to request that we present evidence that there is

15:02:59 5  no difference between the estoppel issue.

15:03:02 6           THE COURT:  If you want to use your trial time,

15:03:04 7  you can do that.

15:03:04 8           MS. HUFNAL:  But it would be outside the

15:03:06 9  presence of the jury.

15:03:07 10           THE COURT:  Sure.  We have from 4:30 to 6:30

15:03:10 11  most nights, maybe 7:00 if you guys don't want to prepare

15:03:14 12  for trial, sure.  You can use your two hours that I gave you

15:03:18 13  for inequitable conduct.

15:03:19 14           MS. HUFNAL:  Thank you, Your Honor.

15:03:21 15           THE COURT:  All right.  Anything else?

15:03:26 16           MR. MAIORANA:  Nothing from defendants, Your

15:03:31 17  Honor.

15:03:31 18           MS. HUFNAL:  No, Your Honor.

15:03:36 19           THE COURT:  All right.

15:03:40 20           MS. HUFNAL:  Now, I was just going to let Your

15:03:42 21  Honor know that there is going to be a supplementation to

15:03:42 22  Exhibit 1 to the PTO, uncontested facts that will probably

15:03:49 23  be filed shortly.  I want to let Your Honor know that that

15:03:52 24  is something that the parties are working on to streamline

15:03:52 25  issues and that will be coming through shortly.

15:03:58 1           THE COURT:  How am I supposed to adopt a

15:04:01 2    pretrial order here.  I never understand what I'm supposed

15:04:04 3    to do when people make edits.  So what do you want me to do?

15:04:09 4           MS. HUFNAL:  If Your Honor prefer that we do it

15:04:12 5    as a separate stipulation, we were just trying to streamline

15:04:15 6    the issues further for the presentation for trial.

15:04:17 7           THE COURT:  Why don't you do a stipulation of

15:04:19 8    uncontested facts, that way I don't have to worry about

15:04:23 9    looking in seven different places for the pretrial order.

15:04:26 10          MS. HUFNAL:  Okay.

15:04:26 11          THE COURT:  Anything else?  All right.

15:04:28 12          COURT CLERK:  All rise.

13           (Court adjourned at 3:04 p.m.)

14

15           I hereby certify the foregoing is a true and
     accurate transcript from my stenographic notes in the proceeding.

16

17                        /s/ Dale C. Hawkins
                          Official Court Reporter
18                        U.S. District Court

19

20

21

22

23

24

25